**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FRANCISCO JAVIER RIVERA AGREDANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-608C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR LEAVE TO FILE DEFENDANT'S OBJECTIONS**
**TO PLAINTIFF'S REVISED WITNESS AND EXHIBIT LISTS**

Pursuant to paragraph 13(c) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests leave to file its objections to the plaintiff's revised exhibit and witness lists of plaintiff, Francisco Javier Rivera Agredano, which were filed on January 8, 2008. The proposed objections are attached hereto as Exhibit A to this motion.

In this case, the plaintiff's original final witness and exhibit lists did not comply with the Rules, and the Court ordered that the plaintiff recompose and refile his lists no later than January 8, 2008. See January 4, 2008 order regarding plaintiff's witness and exhibit lists, dkt. no. 80. The January 4 order did not provide a time by which the defendant could file any objections it may have to these new lists. Id. The plaintiff filed his revised lists after the close of business on January 8, 2008.

Counsel for the defendant immediately began his review of these lists, as well as the copies of the exhibits that the plaintiff had recently provided to the defendant. Upon the completion of this review, counsel for the defendant identified a small number of objections to the plaintiff's proposed witnesses and exhibits, and immediately began drafting the present motion and attached statement of objections.

Paragraph 13(c) of Appendix A of the RCFC provides that, "if anything new or unexpected is discovered, it may be addressed in a brief response which must be filed under cover of a motion for leave immediately upon learning of it." We respectfully suggest that this provision is applicable in this instance, and counsel's diligence in reviewing the plaintiff's revised lists and preparing these materials satisfy the Rule's immediacy requirement.

Accordingly, we respectfully request that the Court grant leave to file the defendant's statement of objections to the plaintiff's revised witness and exhibit lists, attached hereto as Exhibit A. Should the Court grant such leave, we further request that the Court direct the Clerk to file Exhibit A to this motion as a separate docket entry in this case.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Patricia M. McCarthy (by Steven J. Gillingham)
PATRICIA M. McCARTHY
Assistant Director

s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, DC 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

January 9, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on January 9, 2008, a copy of the foregoing "MOTION FOR LEAVE TO FILE DEFENDANT'S OBJECTIONS TO PLAINTIFF'S REVISED WITNESS AND EXHIBIT LISTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/ Devin A. Wolak
DEVIN A. WOLAK

# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FRANCISCO JAVIER RIVERA AGREDANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-608C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS**
**<u>TO PLAINTIFF'S REVISED WITNESS AND EXHIBIT LISTS</u>**

Pursuant to paragraph 13(c) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following objections to the revised exhibit and witness lists of plaintiff, Francisco Javier Rivera Agredano, which were filed on January 8, 2008.

I. <u>Objections To Plaintiff's Witness List</u>

***Plaintiff's Witness 15: Michael Levine.*** The defendant objects to plaintiff's witness 15, Mr. Michael Levine, upon the basis that his anticipated testimony (as stated in the plaintiff's final witness list at p. 9) has not been previously disclosed in this litigation. Accordingly, Mr. Levine's expert testimony does not comply with RCFC 26(a)(2) or 26(b)(4), and should be excluded.

Specifically, the plaintiff's witness list states that Mr. Levine will provide his expert opinion about: (1) "the reasonableness of the policies and directives regarding restricting damage to seized vehicle[s]"; and (2) "[the reasonableness of] the policies, directives, and procedures involved in the instant case for re-inspection searches and the initial search and seizure." Pls. Witness List at 9.

Mr. Levine's expert report, on the other hand, contains eight expert opinions, none of

which addresses Customs' policies and directives regarding restricting damage to seized vehicles or Customs' initial and re-inspection search policies and procedures. See Exhibit 1 to these objections (Pls. Exhibit 22) at 16-19. Rather, Mr. Levine's opinions focus upon whether the search performed upon the 1987 Nissan Pathfinder satisfied national Drug Enforcement Agency search, seizure, and narcotics investigation standards as he understands them; whether Customs' handling of the 1987 Nissan Pathfinder after the initial search complied with those same, non-Customs policies and procedures;[1] and whether the allegedly substandard initial search in this case is evidence that 1992 Congressional findings concerning Customs' search and seizure performance continued through 2001. Id. Indeed, Customs' written policies and procedures concerning searches and seizures (pls. exhibit 39) are not listed among the materials Mr. Levine considered in forming his expert opinions. Id. at 9-15.

Thus, the plaintiff proposes to offer Mr. Levine to present expert opinions that have not been previously disclosed in this litigation and are not included in his expert report. Therefore, Mr. Levine's testimony should be excluded.

***Any of plaintiff's witnesses who will testify concerning plaintiff's emotional distress.*** Consistent with our pretrial memorandum of facts and law, the defendant objects to any witness to the extent he or she will testify about the plaintiff's alleged emotional distress. It is our position that emotional distress damages are not available in this contract action as a matter of law, and the presentation of evidence relating to this issue would be irrelevant. Accordingly, any such testimony should be excluded under Rules 401 and 403 of the Federal Rules of Evidence,

[1] And, illogically, how that same handling subsequent to the initial search caused the initial search to be substandard. See Ex. A at 17, specifically opinions "D," "F," and "G."

which bar irrelevant, prejudicial, and confusing evidence from being presented at trial.

II. Objections To Plaintiff's Exhibit List

***Plaintiff's Exhibit 11.*** The defendant objects to plaintiff's exhibit 11 upon the basis that these documents relate to a separate legal proceeding that is irrelevant to this case. Accordingly, the documents should be excluded under Rules 401 and 403 of the Federal Rules of Evidence, which bar irrelevant, prejudicial, and confusing evidence from being presented at trial. Additionally, these documents have not been previously produced or disclosed in this litigation.

***Plaintiff's Exhibits 14, 15, and 36.*** The defendant objects to plaintiff's exhibits 14, 15, and 36 upon the basis that they are irrelevant to this case. The documents are correspondence transmitted between the agency and the plaintiff's attorneys in relation to his Freedom of Information Act ("FOIA") requests concerning files and documents relating to the search and seizure of the 1987 Nissan Pathfinder at issue in this case. The object of the plaintiff's FOIA request -- the agency's files and documents -- are relevant to these proceedings, and appear elsewhere in the plaintiff's exhibit list. The plaintiff's attorneys' correspondence to obtain those files and documents are not relevant to this case. Accordingly, the documents should be excluded under Rules 401 and 403 of the Federal Rules of Evidence, which bar irrelevant, prejudicial, and confusing evidence from being presented at trial.

***Plaintiff's Exhibits 19, 20, 21, 23, 24, 25, 26, 27, 34, and 35.*** The defendant objects to plaintiff's exhibits 19, 20, 21, 23, 24, 25, 26, 27, 34, and 35 upon the basis that they are Spanish-language documents and are not accompanied by an English translation. Additionally, plaintiff's exhibits 34 and 35 have not been have not been previously produced or disclosed in this litigation.

***Plaintiff's Exhibit 28.*** The defendant objects to plaintiff's exhibit 28 upon the basis that it is irrelevant and prejudicial. The document is a computer printout of a Kelly Blue Book resale estimate for a 1987 Nissan Pathfinder in "excellent" condition, stating a resale value of $5,425. The plaintiff has previously admitted, and the documentary evidence overwhelmingly demonstrates that the plaintiff paid $2,600 for the 1987 Nissan Pathfinder at issue in this case. Accordingly, the documents should be excluded under Rules 401 and 403 of the Federal Rules of Evidence, which bar irrelevant, prejudicial, and confusing evidence from being presented at trial.

***Plaintiff's Exhibits 36 and 37.*** The defendant objects to plaintiff's exhibits 36 and 37 upon the basis that they have not been previously produced or disclosed in this litigation, and this non-production and non-disclosure continues despite repeated assurances from the plaintiff's attorney that these exhibits will be disclosed.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Patricia M. McCarthy (by Steven J. Gillingham)
PATRICIA M. McCARTHY
Assistant Director

s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor

Washington, DC 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

January 9, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on January 9, 2008, a copy of the foregoing "DEFENDANT'S OBJECTIONS TO PLAINTIFF'S REVISED WITNESS AND EXHIBIT LISTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/ Devin A. Wolak
DEVIN A. WOLAK

# EXHIBIT 1

TO: Teresa Trucchi, Esquire.

RE: Expert Witness Work-notes And Opinions

MATTER: FRANCISCO JAVIER RIVERA AGREDANO and ALFONSO CALDERON LEON v US

**I STATEMENT OF FACTS:**

b. On 12/12/00, a 1987 NISSAN Vehicle was purchased by JOSE ARMANDO JIMENEZ CORONEL on 12/12/00, in the US and then imported legally into Mexico.

c. 1/25/01 COLONEL was arrested and vehicle seized from him by US Customs. 27.5 kilos of marijuana seized as the result of a canine alert, followed by a secondary border search. [see Details Section VI for full details]

d. The 27.5 kilos was seized from the gas tank area of the vehicle. The photos of the original seizure and reports of investigation indicate that no other area within the structure of the vehicle itself [i.e. the wheel wells, the interior, the rocker panels, the areas between the dashboard and the engine, etc., nor any other area within the chassis, was searched or probed in any way. [see Details Section VI for full details]

e. The prisoner, Mr. COLONEL, made a voluntary statement indicating his willingness to cooperate and that he was aware

of the marijuana hidden in the vehicle. [see Details Section VI for full details].

f. The 27.5 kilos of marijuana and the prisoner were turned over to State of California authorities for processing on the same day of the seizure; the files indicate no investigative follow-up toward sources, kingpins, etc., whatsoever. [see Details Section VI for full details].

g. 2/20/01, Mr. COLONEL was subsequently sentenced to 39 days in prison and ordered to pay $400 in fines and restitution.

h. 2/20/01, the NISSAN vehicle was made available, THROUGH FEDERAL FORFEITURE SALE, through EG&G Inc, who effected an auction through McCORMACK.

i. 9/5/01 MR.RIVERA and MR.ALFONSO CALDERON LEON [PLAINTIFFS] individual with neither record nor reputation for drug trafficking, were stopped at a Highway check point at a location known as El Sauzal, Ensenada, Baja California by Mexican authorities. The vehicle was searched and 22 brick shaped packages weighing 17 kilograms, of marijuana were discovered between the upholstery walls and the body of the vehicle [close to the wheel well]. [see Details Section VI for full details].

j. RIVERA and CALDERON were then incarcerated in a Mexican jail, were they remained for a period of 1 year or more.

k. 1/25/02, JOSE BLANCO LOYA and expert witness from the office of the Attorney General in Mexico tested the marijuana. On

2/13/02, he testified in the 11th Federal District Court of Ensenada that the marijuana found by Mexican authorities on 1/24/02 was highly dehydrated, consistency and texture had been lost and color lost," as well as other changes that were due to the marijuana being "old or stored."

l. 3/11/02, expert chemists RAFAEL GARCIA GUTIERREZ and MIGUEL CARRILLO MENDIVIL, also testified that this marijuana was both old and highly dehydrated and that the marijuana had been exposed to "adverse atmospherical and physical conditions for a long time."

m. That, subsequently, all charges related to said seizure of 17 kilos by Mexican authorities were dismissed against PLAINTIFFS.

## II. PURPOSE OF REPORT:

I Michel Levine state, that I reside in Stone Ridge, New York, and that I have been a court-qualified expert and legal consultant in civil and criminal matters involving all facets of Narcotic law enforcement (local, federal & international), enforcement since 1971, including the conducting of and/or supervision of and/or review of hundreds of investigations involving the smuggling of illegal narcotics into the US.[1] My detailed resume is attached hereto as Exhibit A.

That I have been retained by attorney Teresa Trucchi, to render comments and opinions as to the adherence to national

[1] I have actually been qualified as an expert witness in Federal and state courts, as early as 1965, in matters not directly related to narcotic enforcement, i.e. Income Tax Investigations;

standards and training by US Customs officers, US Customs Supervisory officers and US Treasury/Customs Administrative personnel, in relation to the U.S. Customs and/or Treasury Department actions and/or lack thereof, described in the Statement of Facts [I above], Specifically:

a. Whether or not, the search of the 1987 NISSAN vehicle made incident to the arrest of Mr. COLONEL, on 1/25/01, was in accordance with standards and training for that type of search.

b. Whether or not US Customs enforcement officers and/or supervisory officers and/or administrative officers involved in the search and seizure of the 1987 NISSAN and/or its subsequent disposition via public auction, overlooked and/or disregarded significant intelligence and/or information, available to them in numerous databanks and/or official records indicative that the search of the 1987 NISSAN vehicle was substandard and/or insufficient and Whether or not the subsequent handling of said NISSAN vehicle and/or any investigative actions related thereto, by US Customs administrative personnel, was sufficiently substandard to have been a causal factor in the events resulting in the arrests and incarceration of the plaintiffs.

c. Whether or not the investigative actions and/or lack thereof, in relation to the above described search and seizure were inconsistent with standards and training and/or with U.S. national drug policy.

---

Undercover Tactics; Weapons and Firearms investigations; Informant Handling; Illegal Gaming,

d. Whether or not the investigative actions and/or lack thereof, of Customs officials, in relation to the search, seizure and subsequent disposal by auction of said Nissan, were in reckless disregard of a significant possibility that said vehicle might still contain illicit drugs and that said auction might result in innocent and law abiding citizens being exposed to arrests for possession of said illicit drugs.

**III THAT THE FOLLOWING PRIOR PROFESSIONAL EXPERIENCE AND ASSIGNMENTS WERE HEAVILY RELIED UPON IN MY COMMENTARY AND PRELIMINARY EXPERT WITNESS REPORT, WHICH IS ATTACHED HERETO:**

a. Nineteen years of training and experience as a Drug Enforcement Administration and US Customs supervisory officer with experience in conducting, supervising and reviewing thousands of narcotic trafficking and smuggling investigations.

b. Among many highlights of this career that directly relate to the massive smuggling of drugs into the U.S. hidden in automobiles,[on ships and across the U.S. Mexican border] are the more than 800 hours I spent debriefing defendant/witnesses involved in the original French Connection investigations and continuing through U.S. v August Ricord, et. al. Including, but not limited to RICHARD BERDIN and CLAUDE PASTOU

---

etc.

c. Nineteen years of training and experience as a Drug Enforcement Administration and US Customs supervisory officer during which time, on at least 100 occasions I supervised and/or reviewed and/or was a key investigator in international smuggling investigations in which automobiles, trucks, ships and other transportation vehicles were utilized in the concealment of narcotics for smuggling purposes.

d. Twenty-five years of experience as an undercover operative and case agent with intensive personal experience working undercover in drug cases at every level of criminal activity throughout the world, the majority of these cases involving smuggling activity.

e. Seventeen years of experience during which I was frequently assigned as a DEA Instructor of narcotic investigative procedures, primarily in the area of undercover work. Significant to the findings and opinions herewith is my extensive experience dealing face-to-face with international drug smugglers during which smuggling ventures similar to those involved in the instant case, were planned.

f. Approximately 19 of my 25 years as a federal agent, during which time I was called on by the prosecution, on in excess of 50 occasions, to testify as an expert in areas, specifically related to drug smuggling.

g. Three years of co-duty as a DEA Inspector of Operations, during which time I was sent to DEA Divisional offices throughout the world on unannounced operational inspections, which always included a full review of investigative

procedures related to top level, international narcotic smuggling investigations. Among the many purposes of these inspections was the full review of all aspects of smuggling investigations to ascertain and opine as to the adherence to national standards and U.S. Drug Policy.

h. An additional duty, specifically applicable to the opinions rendered herein, was the assessments made necessary throughout my career as a DEA supervisory officer and/or Inspector of Operations, as to the functioning of narcotic enforcement agreements, directives and regulations extant between The Drug Enforcement Administration and U.S. Customs, whereby DEA remained the lead agency in the war on drugs and that all Customs border seizures of smuggled drugs mandated a notification of DEA in order that the initial smuggling seizure be fully investigated with the full resources of the Drug Enforcement Administration.

i. Approximately 5 years experience during which as a DEA Country Attaché and supervisory officer assigned to the Vice President's South Florida Task Force, during which time I supervised, reviewed and managed numerous drug smuggling investigations wherein the drugs were concealed in cars, boats and/or other transport vehicles.

j. Since my retirement from DEA, thirteen years of professional consulting during which time I have continued to lecture for police agencies in the US and Canada on enforcement tactics and procedures related to narcotic enforcement. Many of these lectures also entailed my attendance at other lectures presented by top experts covering the full gamut of narcotics

and other law enforcement activities, in order to maintain my expertise as current as possible.

IV. That my findings and opinions, as listed in Paragraph 5 of this affidavit, are based on my review of the below listed materials and current research, as viewed through the lens of my now 35 years of training and experience:

a. Published **HEARINGS Before the COMMERCE, CONSUMER, AND MONETARY AFFAIRS SUBCOMMITTEE of the COMMITTEE ON**

I, INTRODUCTION.

II. SUMMARY STATEMENT OF FACTS.

III. SPECIFICS OF REVIEW REQUESTED.

IV. SPECIFIC EXPERT QUALIFICATIONS HEAVILY RELIED UPON IN REACHING OPINIONS, EXCERPTED FROM CV AND EXPANDED UPON;

V. MATERIALS REVIEWED IN REACHING OPINION;

VI. PRELIMINARY EXPERT OPINIONS AND FINDINGS;

VII. DETAILS [REASONS FOR MY BELIEF];

February 1, 2003

TO: Teresa Trucchi, Esquire.

RE: Expert Witness Work-notes And Opinions

MATTER: FRANCISCO JAVIER RIVERA AGREDANO and ALFONSO CALDERON LEON v US

## I. INTRODUCTION

I, MICHAEL LEVINE, of the City of High Falls and State of New York, do say as follows:

That I have been a court-qualified expert and legal consultant in civil and criminal matters involving all facets of Narcotic law enforcement; Controlled Delivery Operations, Informant Handling, Corroboration and Management; Undercover Tactics, Investigative Procedures; Investigative File Review; Police Corruption and Misconduct Investigations; Law Enforcement Hiring Procedures including paneling, background investigations and selection; Selection of Law Enforcement Officers for Undercover Work; financial, income tax and money laundering investigations and other matters related to law enforcement activities since 1966. My detailed resume is attached hereto as Exhibit A. Specifics as to expert qualifications and other materials heavily relied upon in all opinions rendered herein, are included in Section IV of this report, below.

That, I have been retained Teresa Trucchi, Attorney at Law, to review the materials listed in Section V of this report through the lens of my 38 years of training and experience and conduct whatever other research and consultations I deem necessary, and to then render comments and opinions as to the existence of indications in said materials [probable cause] of violations of, and/or inconsistencies with U.S. national law enforcement standards and procedures, and/or U.S. Federal and/or state criminal statutes, as relates to the facts and circumstances resulting in the arrests and incarceration of plaintiffs.

That, this report is presented as a report of my preliminary review of Discovery materials as of the date of this report, in the matter of *FRANCISCO JAVIER RIVERA AGREDANO and ALFONSO CALDERON LEON v US*

Attached as Exhibit A to this report is my (updated) Curriculum Vitae outlining my experience as a Federal law enforcement officer, during which period I personally supervised and/or handled in excess of 5,000 narcotic investigations, served as an instructor for the DEA Narcotic Investigations and other subjects directly related to this review; and served as an Inspector of Operations for the Office of Professional Responsibility, during which time I was charged with the review of investigative procedures (directly related to this review) as well as the management thereof [see specifics of requested review in Section III, below].

That I have incorporated said opinions and comments in a preliminary Expert Witness Report Format, which is herewith set forth in the following format:

I, INTRODUCTION.

II. SUMMARY STATEMENT OF FACTS.

III. SPECIFICS OF REVIEW REQUESTED.

IV. SPECIFIC EXPERT QUALIFICATIONS HEAVILY RELIED UPON IN REACHING OPINIONS, EXCERPTED FROM CV AND EXPANDED UPON;

V. MATERIALS REVIEWED IN REACHING OPINION;

VI. PRELIMINARY EXPERT OPINIONS AND FINDINGS;

VII. DETAILS [REASONS FOR MY BELIEF];

**II STATEMENT OF FACTS:**

b. On 12/12/00, a 1987 NISSAN Vehicle was purchased by JOSE ARMANDO JIMENEZ CORONEL on 12/12/00, in the US and then imported legally into Mexico.

c. 1/25/01 COLONEL was arrested and vehicle seized from him by US Customs. 27.5 kilos of marijuana seized as the result of a canine alert, followed by a secondary border search. [see Details Section VI for full details]

d. The 27.5 kilos was seized from the gas tank area of the vehicle. The photos of the original seizure and reports of investigation indicate that no other area within the structure of the vehicle itself [i.e. the wheel wells, the interior, the rocker panels, the areas between the dashboard and the engine, etc., nor any other area within the chassis, was searched or probed in any way. [see Details Section VI for full details]

e. The prisoner, Mr. COLONEL, made a voluntary statement indicating his willingness to cooperate and that he was aware of the marijuana hidden in the vehicle. [see Details Section VI for full details].

f. The 27.5 kilos of marijuana and the prisoner were turned over to State of California authorities for processing on the same day of the seizure; the files indicate no investigative follow-up toward sources, kingpins, etc., whatsoever. [see Details Section VI for full details].

g. 2/20/01, Mr. COLONEL was subsequently sentenced to 39 days in prison and ordered to pay $400 in fines and restitution.

h. 2/20/01, the NISSAN vehicle was made available, THROUGH FEDERAL FORFEITURE SALE, through EG&G Inc, who effected an auction through McCORMACK.

i. 9/5/01 MR.RIVERA and MR.ALFONSO CALDERON LEON [PLAINTIFFS] individual with neither record nor reputation for drug trafficking, were stopped at a Highway check point at a location known as El Sauzal, Ensenada, Baja California by Mexican authorities. The vehicle was searched and 22 brick shaped packages weighing 17 kilograms, of marijuana were discovered between the upholstery walls and the body of the vehicle [close to the wheel well]. [see Details Section VI for full details].

j. RIVERA and CALDERON were then incarcerated in a Mexican jail, were they remained for a period of 1 year or more.

k. 1/25/02, JOSE BLANCO LOYA and expert witness from the office of the Attorney General in Mexico tested the marijuana. On 2/13/02, he testified in the 11th Federal District Court of Ensenada that the marijuana found by Mexican authorities on 1/24/02 was highly dehydrated, consistency and texture had been lost and color lost," as well as other changes that were due to the marijuana being "old or stored."

l. 3/11/02, expert chemists RAFAEL GARCIA GUTIERREZ and MIGUEL CARRILLO MENDIVIL, also testified that this marijuana was both old and highly dehydrated and that the marijuana had

been exposed to "adverse atmospherical and physical conditions for a long time."

m. That, subsequently, all charges related to said seizure of 17 kilos by Mexican authorities were dismissed against PLAINTIFFS.

## III. PURPOSE OF REPORT:

I Michel Levine state, that I reside in Stone Ridge, New York, and that I have been a court-qualified expert and legal consultant in civil and criminal matters involving all facets of Narcotic law enforcement (local, federal & international), enforcement since 1971, including the conducting of and/or supervision of and/or review of hundreds of investigations involving the smuggling of illegal narcotics into the US.[1] My detailed resume is attached hereto as Exhibit A.

That I have been retained by attorney Teresa Trucchi, to render comments and opinions as to the adherence to national standards and training by US Customs officers, US Customs Supervisory officers and US Treasury/Customs Administrative personnel, in relation to the U.S. Customs and/or Treasury Department actions and/or lack thereof, described in the Statement of Facts [I above], Specifically:

a. Whether or not, the search of the 1987 NISSAN vehicle made incident to the arrest of Mr. COLONEL, on 1/25/01, was in

[1] I have actually been qualified as an expert witness in Federal and state courts, as early as 1965, in matters not directly related to narcotic enforcement, i.e. Income Tax Investigations; Undercover Tactics; Weapons and Firearms investigations; Informant Handling; Illegal Gaming, etc.

accordance with standards and training for that type of search.

b. Whether or not US Customs enforcement officers and/or supervisory officers and/or administrative officers involved in the search and seizure of the 1987 NISSAN and/or its subsequent disposition via public auction, overlooked and/or disregarded significant intelligence and/or information, available to them in numerous databanks and/or official records indicative that the search of the 1987 NISSAN vehicle was substandard and/or insufficient and Whether or not the subsequent handling of said NISSAN vehicle and/or any investigative actions related thereto, by US Customs administrative personnel, was sufficiently substandard to have been a causal factor in the events resulting in the arrests and incarceration of the plaintiffs.

c. Whether or not the investigative actions and/or lack thereof, in relation to the above described search and seizure were inconsistent with standards and training and/or with U.S. national drug policy.

d. Whether or not the investigative actions and/or lack thereof, of Customs officials, in relation to the search, seizure and subsequent disposal by auction of said Nissan, were in reckless disregard of a significant possibility that said vehicle might still contain illicit drugs and that said auction might result in innocent and law abiding citizens being exposed to arrests for possession of said illicit drugs.

**IV THAT THE FOLLOWING PRIOR PROFESSIONAL EXPERIENCE AND ASSIGNMENTS WERE HEAVILY RELIED UPON IN MY COMMENTARY AND PRELIMINARY EXPERT WITNESS REPORT, WHICH IS ATTACHED HERETO:**

a. Nineteen years of training and experience as a Drug Enforcement Administration and US Customs supervisory officer with experience in conducting, supervising and reviewing thousands of narcotic trafficking and smuggling investigations.

b. Among many highlights of this career that directly relate to the massive smuggling of drugs into the U.S. hidden in automobiles,[on ships and across the U.S. Mexican border] are the more than 800 hours I spent debriefing defendant/witnesses involved in the original French Connection investigations and continuing through U.S. v August Ricord, et. al. Including, but not limited to RICHARD BERDIN and CLAUDE PASTOU

c. Nineteen years of training and experience as a Drug Enforcement Administration and US Customs supervisory officer during which time, on at least 100 occasions I supervised and/or reviewed and/or was a key investigator in international smuggling investigations in which automobiles, trucks, ships and other transportation vehicles were utilized in the concealment of narcotics for smuggling purposes.

d. Twenty-five years of experience as an undercover operative and case agent with intensive personal experience working undercover in drug cases at every level of criminal activity

throughout the world, the majority of these cases involving smuggling activity.

e. Seventeen years of experience during which I was frequently assigned as a DEA Instructor of narcotic investigative procedures, primarily in the area of undercover work. Significant to the findings and opinions herewith is my extensive experience dealing face-to-face with international drug smugglers during which smuggling ventures similar to those involved in the instant case, were planned.

f. Approximately 19 of my 25 years as a federal agent, during which time I was called on by the prosecution, on in excess of 50 occasions, to testify as an expert in areas, specifically related to drug smuggling.

g. Three years of co-duty as a DEA Inspector of Operations, during which time I was sent to DEA Divisional offices throughout the world on unannounced operational inspections, which always included a full review of investigative procedures related to top level, international narcotic smuggling investigations. Among the many purposes of these inspections was the full review of all aspects of smuggling investigations to ascertain and opine as to the adherence to national standards and U.S. Drug Policy.

h. An additional duty, specifically applicable to the opinions rendered herein, was the assessments made necessary throughout my career as a DEA supervisory officer and/or Inspector of Operations, as to the functioning of narcotic enforcement agreements, directives and regulations extant

between The Drug Enforcement Administration and U.S. Customs, whereby DEA remained the lead agency in the war on drugs and that all Customs border seizures of smuggled drugs mandated a notification of DEA in order that the initial smuggling seizure be fully investigated with the full resources of the Drug Enforcement Administration.

i. Approximately 5 years experience during which as a DEA Country Attaché and supervisory officer assigned to the Vice President's South Florida Task Force, during which time I supervised, reviewed and managed numerous drug smuggling investigations wherein the drugs were concealed in cars, boats and/or other transport vehicles.

j. Since my retirement from DEA, thirteen years of professional consulting during which time I have continued to lecture for police agencies in the US and Canada on enforcement tactics and procedures related to narcotic enforcement. Many of these lectures also entailed my attendance at other lectures presented by top experts covering the full gamut of narcotics and other law enforcement activities, in order to maintain my expertise as current as possible.

**V. THAT MY FINDINGS AND OPINIONS, AS LISTED IN PARAGRAPH 5 OF THIS AFFIDAVIT, ARE BASED ON MY REVIEW OF THE BELOW LISTED MATERIALS AND CURRENT RESEARCH, AS VIEWED THROUGH THE LENS OF MY NOW 35 YEARS OF TRAINING AND EXPERIENCE:**

a. Published **HEARINGS Before the COMMERCE, CONSUMER, AND MONETARY AFFAIRS SUBCOMMITTEE of the COMMITTEE ON GOVERNMENT OPERATIONS HOUSE OF REPRESENTATIVES, One**

**hundred second congress, Second Session March 26, 27, and April 1, 1992, titled: "Serious Mismanagement and Misconduct in the Treasury Department, Customs Service, and Other Federal Agencies and the Adequacy of Efforts to Hold Agency Officials Accountable.**

----------------

**The report concludes that, within the US Customs law enforcement divisions, there is much ineptitude, lack of training and that "Customs Internal Affairs consciously elected not to investigate serious mismanagement issues which had directly contributed to** the perception of corruption."

b. **U.S.Customs Detector Dog Training Manual**

c. **Onandaga County Detector Dog Training Manual.**

d. ***Police Dog Tactics*, by Sandy Bryson, Detselig Enterprises, Calgary, Canada.**

e. Interviews and contacts with former Customs Inspectors and Customs agents, with reference to the prevalence of insufficient vehicle searches, particularly, at the southwest border crossings between the U.S. and Mexico.

f. Complaint for Damages, Francisco Javier Rivera Agredano and Alfonso Calderon Leon v US Department of Treasury/US Customs, EG& G Inc., A corp., status unknown; McCormack Auction co, status unknown. 16 pages…f8iled 11/14/02.

g. Third amended complaint Rivera et al v US of America; EG&G Inc; McCormack Auction company 16 pages.

h. Standard Forms 95, 28 CFR 14.2 personal injury damage in the amount of $9,320,000, date of claim 7/4/02…. With Basis of claim chronology attached.

i. Custody and Receipt For Retained or Seized Property, dated March 19, 2002, under name Jose Jimenez Coronel, Tijuana Mexico.

j. Form, indicating Spanish translation of property seized receipt.

k. Spanish to English Translation of Extension to Judicial Inspection regarding motor vehicle in case 23/2002-11[2 pages, dated 2/14/02.

l. Original Spanish language document in g [two pages

m. Spanish to English Translation of a hearing before the 11th district court in Ensenada, Baja California, Mexico. [3 pages], on 2/13/02.

n. Original Spanish language document in i [above]..

o. US Customs SEACATS, printout, heavily redacted, referencing the seizure of a 1987 Nissan Pathfinder in which 27.5 kilos of marijuana was seized and a single person arrested on 1/25/01.

p. DEA From 7, Report of Drug Property Seized and laboratory submission report, indicating that on 1/25/01, Customs inspectors at the San Ysidro CA port of entry seized Exhibit one from the gas tank of a 1987 Nissan Pathfinder..”One of 40 packages was probed, yielding a green leafy substance which field-tested positive for Marijuana…

q. US customs notice of destruction of drug evidence..indicating that the 27.5 kilos of marijuana seized above were destroyed, with the exception of a “representative sample.”

r. Undated, heavily redacted San Diego County Sheriff’s Department Detention Facility Inmate Intake form, indicating a bail of 60,000 for a defendant described as Mexican Male, age 31, 5’2”, 160lbs. Blk hair, Brn eyes.

s. San Diego County Sheriff’s Department property receipt, undated, heavily redacted.

t. State of California Statement of Facts for an arrested party, dated of arrest 1/25/01 indicating that the arrest was as a result of a canine alert at the San Ysidro border crossing.

u. 9 Xerox copies of photos [poor copies] of vehicle seized.

v. US Treasury response to FOIA request of attorney Trucchi, dated 5/24/02, signed by Joyce Henderson, Port director, Otay Mesa

w. Spanish to English translation and original Spanish language document of a Power of Attorney granted by Francisco Javier Rivera Agredano [AKA Francisco River Agredano] and Alfonso Calderon Leon on behalf of Carlos Mejia Lopez and Maria del Carmen Calderon Leon, Roberto Calderon Leon and Jose Antonio Calderon [12 pages].

x. FOIA response to attorney Trucchi dated May 28, 2002. [3 pages].

y. US customs ROI [report of investigation] dated 1/30/01, re: conviction and Sentencing of [name redacted]. Indicating that the individual arrested smuggling the marijuana in subject vehicle on 1/25/01 had plead guilty in a State of California court, to "possession of marijuana for sale," on 1/25/01 and sentenced to 39 days in jail on 2/20/01.

z. Standard Forms 95, 28 CFR 14.2 personal injury damage [including property damage] in the amount of $9,325,425, date of claim 7/4/02....

aa. 3 letters from US customs Service to attorney Trucchi, dated 9/20/02, pursuant to various FOIA requests.

bb. TECS printout describing the seizure of 40 packages of marijuana at the San Ysidro Border crossing on 1/25/01

cc. ROI describing the arrest and seizure in x above. [4 pages]

dd. State of California Statement of Facts, describing the same arrest detailed in 23.

ee. US customs Service memo dated 9/20/02, in response to FOIA request by attorney Trucchi of 4/30/02 [4 pages].

ff. US customs Service memo dated 9/20/02, in response to FOIA request by attorney Trucchi of 7/10/02 [4 pages].

gg. 4 US Department of Treasury Destruction Orders for various quantities of marijuana, all of which were seized during above cited arrest on 1/25/01.

hh. US Treasury Custody Receipt for a Seized Property for a 1987 Nissan, in Spanish and English.

ii. 6 documents related to export of the seized Nissan to Mexico, dated around the end of 2001-beginning 2002.

jj. US GOVERNMENT CERTIFICATE to obtain title to a vehicle for the 1987 Nissan, in name of FRANCISCO AGREDANO, dated 9/5/01.

kk. Temporary registration for the 1987 Nissan in Mexico, dated 10-19-01.

ll. State of California title for the 1987 Nissan, dated July 26, 1997 in the name RAMON CORONA, San Diego.

mm. US government certificate of sale of the 1987 Nissan to FRANCISCO AGREDANO on 9/1/01.

nn. FOIA Requests [2] memos dated 4/5/02, by Teresa Trucchi to US Customs, indicating that FRANCISCO AGREDANO, purchased said Nissan in September of 2001 and that in January, 2002 he was arrested by Mexican authorities and several packages of marijuana were discovered in a wheel well. The file requests all records and photographs relating to Jose Jimenez Coronel, the individual from whom the Nissan was seized prior to the vehicle being auctioned to Mr. AGREDANO. This request made one week prior to AGREDANO's trial in Mexico for smuggling.

oo. FOIA request memo dated 4/8/02 by Teresa Trucchi to US Customs, providing additional information requesting that petition be expedited due to trial date.

pp. Federal forfeiture Sale Certificate for Nissan Pathfinder, dated 7/5/01, purchased by Francisco Agredano on 9/5/04.

qq. Standard Forms 95, 28 CFR 14.2 personal injury damage in the amount of $1 million, dated 10-9-03 [8 pages]

rr. Standard Forms 95, 28 CFR 14.2 property damage in the amount of $3,145, dated 10-9-03 [8 pages].

**VI . SUMMARY OF OPINIONS:**

That, the following are my opinions and comments as per my review of the above materials:

A. That, the original search of the NISSAN vehicle, begun by a canine alert and resulting in the seizure of 27.5 kilograms found in the gas tank of the subject 1987 Nissan automobile from JOSE ARMANDO JIMENEZ CORONEL on 1/25/01, was substandard and incomplete in that there was significant reason in the form of decades of drug trafficker intelligence, case specific experience and training to indicate that the search of said vehicle was significantly substandard. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

B. That, the searching officers and/or their supervisory officers and managers [in A above] ceased all search actions and forwarded the vehicle to state authorities at while there was significant probable cause to believe that said vehicle may still have contained hidden quantities of illegal narcotics. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

C. That, the original search and seizure, as described in A above, was highly indicative of [presented significant probable cause to believe] that the 27.5 kilograms seized in the 1987 Nissan, was part of a "wave" of vehicles sent across the border under the control of a large and sophisticated smuggling organization, and that this probability, in violation of all national standards and training and U.S.

drug policy was totally ignored by those Customs Officers. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

D. That, the substandard and incomplete search of the 1987 Nissan, was then exacerbated by the failure of U.S. Customs to notify the "lead agency in the war on drugs," the Drug Enforcement Administration—in direct violation of mandates and agreements dating back to the creation of the Drug Enforcement Administration [July, 1973] and continuing to this date, as well as U.S. drug policy—in order that the full resources of the Drug Enforcement Administration might have been utilized to fully investigate said seizure; and that said substandard failure heightened significantly the likelihood that significant amounts of marijuana would be missed during the initial search of the Nissan vehicle on 1/25/01. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

E. *NOTE: It is recommended that an supplementary Discovery Motions be made to include all agreements between DEA, the United States Attorneys Office and U.S. Customs as to the investigative handling of all border seizures, extant on or about 1/25/01.*

F. That, the failure to take any investigative action whatsoever by <u>any</u> trained narcotic investigators, as to sources, extent, methods and conspiratorial patterns of smuggling as relate to the original seizure of 27.5 kilograms of marijuana on 1/25/01, again, in violation of standards, training and

policy, was significantly contributory to the substandard search in A above. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

G. That, at the time of the original seizure, 1/25/01, the admitted smuggler, ARMANDO JIMENEZ CORONE, willingly made self-incriminating statements without benefit of an attorney, thus offering himself for possible use as an informant, and that, in violation of national standards, training, interagency agreements and U.S. drug policy, his use as a federal informant in pursuit of the possibility that he was part of a large and sophisticated operation, was ignored; and that said deviation from standards was significantly instrumental in the U.S. Customs failure to appropriately, thoroughly and professionally search said NISSAN as well as its subsequent sale, while still containing marijuana, to PLAINTIFFS. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

H. That, at the moment of ARMANDO JIMENEZ CORONEL's arrest and the original search and seizure of the 1987 NISSAN [that would later be sold to PLAINTIFFS], the urgent and timely need to put both the defendant COLONEL and the physical seizure [the marijuana and the NISSAN automobile] into the hands of professional investigators, cognizant of all the above, [i.e. the Drug Enforcement Administration] is both key to adherence to standards and training as well as the U.S. national drug policy of exploiting all investigations toward sources and kingpins; training and policy that are the very foundation and purpose of all interagency agreements; and that, the failure to do so that is evidenced by the materials was, again, a direct cause of the faulty and substandard search that led

to the incarceration of PLAINTIFFS. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

I. That the above listed failures to adhere to standards, training and police, further corroborate that the 1992 Congressional findings, referred to above, as to U.S.Customs substandard operations, training and accountability, particularly as relates to U.S. Customs operations on the Southwest border, played a significant role in the substandard search of the Nissan Vehicle which, predictably, led to the arrests and incarceration of PLAINTIFFS; substandard operations, training and supervision, that, significant evidence indicates is continuing to this date. *[My reasons for this belief are listed in the Details Section, Section VI, of this report].*

**VII DETAILS:**

The materials reviewed, as listed above, indicate the following:

A. That, on 1/25/2001 at approximately 1500 Hours, the 1987 Nissan. Bearing Baja, California license plates, was first noticed at the SAN YSIDRO border crossing pursuant to a non-specific canine alert.[Customs TEC II, Information printout]

B. That, the vehicle was then brought to a secondary search area where Customs

Inspectors with the tools and implements to conduct an in depth search of the vehicle, located 27.5 kilograms of marijuana.[Customs Report of Investigation and DEA-7, and other materials].

C. That a comparison of the photos of the U.S.Customs search on 1/25/01 with the search of the same vehicle by Mexican authorities concurrent with the arrests of PLAINTIFFS, is indicative of the insufficiency of the U.S.Customs search. [see photos].

D. That, the driver of the vehicle JOSE ARMANDO JIMENEZ CORONEL was interviewed and was apparently "cooperative," in that he was willing to make a statement without a lawyer present.

*NOTE: It is recommended that supplementary discovery motions be filed requesting copies of all notes, reports of investigation, recordings, etc. detailing this interview, in particular the identities, training and experience of those conducting this interview, and the decision making process that led to this investigation being dropped within hours and transferred to California State authorities.*

E. That, the materials show no indication that there a notification of DEA or the Customs Agents for continued investigation, and that COLONEL was then "arrested and booked" and turned over to state authorities, at approximately 6:30 p.m.

F. That, CORONEL made the following statements and admissions to a San Diego Police officer [not a trained federal agent-Customs Printout- "Report of Investigation"]:

- That, he was aware that he was transporting marijuana hidden inside the Nissan.
- That, "was to be paid $500 to deliver the vehicle and the marijuana to Church's Chicken parking lot on San Ysidro Blvd. In San Ysidro, CA." [TECS II, printout].
- That he had "been recruited to drive the load [of marijuana] by a Mexican male known only as [redacted] whom he met on Avenida Evolucion in Tijuana, Mexico."

G. That, all U.S. Customs investigative activity, in violation of national standards and training and U.S. drug policy, ceased at this point. [Customs ROI, State of California Fact Sheet and other materials].

H. That, in violation of national standards and training and U.S. drug policy and in reckless disregard of decades of drug intelligence gathering, there was no further search of the vehicle conducted nor any additional federal investigative action of any kind with regard to the information furnished by COLONEL, and that processing of the Nissan Vehicle for its ultimate sale at auction began almost immediately {totality of documentary materials, plus review of photos listed in Materials Reviewed Section].

I. That, as a "penalty" for his drug smuggling, Mr. COLONEL was, predictably, sentenced to only 39 days in jail.

Comments/Opinions A-I:

The materials—as viewed through the lens of my 38 years of training and experience and in consideration of the totality of my finding listed herein—depict a significant and wonton

disregard for all standards, training, regulations, operational agreements and known intelligence as regards cross-border drug smuggling, that both led to the wrongful incarceration of PLAINTIFFS and ultimately worked very much to the benefit of all major drug traffickers whose M.O. is the same or similar to those who first sent Mr. COLONEL across the U.S. border in the Nissan automobile on 1/25/01, for the following specific reasons:

(1) Three decades of intelligence gathering by both U.S Customs and DEA professional narcotic investigators [the reader is reminded that I have served in both agencies] indicate clearly that narcotics traffickers capable of the purchase and concealment of drugs in automobiles, are often large, powerful and sophisticated organizations that utilize "wave" shipment methods; that is, the sending of numerous drug laden automobiles across the border, with smaller amounts of drugs on each. The "wave" method historically and continuing to this date, is also used with human "conveyances."

For example, when working smuggling cases at JFL Airport in New York, or Miami Airport in Florida, when one "swallower" [individuals who swallow cocaine wrapped in condoms, in order to pass through Customs undetected], is detected, invariably there are several others either on the same flight, or arriving within hours or days of the one that was apprehended.

During face-to-face negotiations with the *Mafia Cruzeña,* [the Bolivian cocaine Mafia], as was documented in U.S. v Mendez-Dueñas, et al., the heads

of this immense cocaine trafficking empire espoused quite clearly to undercover officers, their "wave" philosophy of sending numerous smaller shipments of cocaine concealed in a wide variety of conveyances into the United States, rather one or two larger ones. Losses were factored into the cost of business. What was and continues to be counted upon by international drug smugglers, for the business to continue and prosper, is the inefficient and substandard functioning of U.S. Customs and their substandard working relationships with other enforcement agencies; the very kind of substandard operation that resulted in the wrongful arrests of PLAINTIFFS.

(2) That, once a vehicle is selected for smuggling use by international smugglers, <u>every</u> part of that vehicle's chassis, wherein it is possible to secrete drugs in a manner difficult to locate, will be utilized; and that this fact is well known and recorded in numerous vehicle smuggling cases, including but not limited to cases dating all the way back to the infamous French Connection, U.S. v Papa et al and U.S. v Auguste Ricord, et. al.

(3) That, among the well known and classic sections of automobiles used for drug smuggling are the wheel wells and those areas of space that are difficult to reach, between the dashboard and engine; the very same areas, according to both the reporting and photos reviewed in the instant case, that were never touched during the search on 1/25/01.

(4) That, the "wave" method of smaller shipments, both exposes the main criminal organization to a much lower loss risk of exposure and the courier to a very minor penalty, when, as happened in 1/25/01 seizure of the 1987 NISSAN, there is no follow-up investigation by trained professionals with the ability and resources to conduct and international investigation.

(5) That, to utilize the "wave" method most cost effectively in the marijuana smuggling business, the drug traffickers would tend to smuggle amounts larger than the 27.5 kilograms seized, but still an amount smaller than that which they felt would attract an intensive follow-up investigation and/or a higher jail sentence for the courier; and that a significant factor often found in the traffickers selection of precisely how much marijuana would be secreted in each vehicle, was their own knowledge and awareness of U.S. Attorney policies as to minimum amounts of marijuana that will be accepted for federal prosecution; amounts that directly influence whether or not a border seizure will result in a federal investigation, or simply be transferred for "processing" to local and/or state authorities.

(6) That, as a result of my many thousands of hours of face-to-face negotiations with drug traffickers in South and Central America, arranging smuggling ventures as a DEA and U.S. Customs undercover

operative, as well as many thousands of hours debriefing arrested drug smugglers and heads of organizations, I have learned that, often, drug traffickers are acutely aware of Federal Prosecutor minimum standards for prosecution, which directly affects whether or not a case will "go federal" or not. For some reason, the magic number, when it comes to marijuana cases has historically been 50 to 100 kilo seizures, meaning that any seizures of marijuana less than the federal prosecutor's minimum standard, will automatically be shunted, by Customs, to state authorities for prosecution, without any follow-up investigation. These rather shortsighted policies play right into the hands of large and sophisticated marijuana smuggling organizations, who can then "guarantee" all prospective drug smugglers, [i.e. ARMANDO JIMENEZ CORONEL], that, if caught, the most time they will serve will be less than a year in a state jail" COLONEL spent only 39 days, which START HERE

*(7)* These, FOA, [Forward to Other Agency] procedures—as happened in the 1/25/01 seizure of the 1987 NISSAN—also result in quick, substandard searched of vehicles, which remain in good shape for subsequent auction, but, expose future law-abiding purchasers,[ i.e. PLAINTIFFS of said vehicles], to wrongful arrest and incarceration.

(8) *Note: It is for this reason, [e. above] that, I again recommend that all policies, written and/or oral, communicated between the U.S. Attorneys office of San Diego, U.S. Customs, DEA and/or any other agency, and/or in-house memos of any of said agencies, that would set forth policy as to limits and amounts of drugs seized as a prerequisite of any type, should be requested via supplementary discovery. It is certainly clear that the "penalty" paid by Mr. COLONEL for the seizure of 27.5 kilograms, in my opinion, which is buttressed by thousands of hours of undercover work in Mexico and South America, acted as a "recruiting poster" for drug smugglers.*

(9) That, at the moment of COLONEL's arrest, the urgent and timely need to put both the defendant COLONEL and the physical seizure [the marijuana and the NISSAN automobile] into the hands of professional investigators, cognizant of all the above, [i.e. the Drug Enforcement Administration] is both key to adherence to standards and training as well as the U.S. national drug policy of exploiting all investigations toward sources and kingpins; training and policy that are the very foundation and purpose of all interagency agreements; and that, the failure to do so that is evidenced by the materials was, again, enabling of the faulty and substandard search that led to the incarceration of PLAINTIFFS.

(10) That, this failure was further exacerbated by the fact that COLONEL, by making a self-incriminating

statements, had exposed himself to use as an informant and his organization to the possibility of truly being damaged or even destroyed, but that these possibilities were rejected, again, in wanton disregard of decades of intelligence gathering and in violation of standards, training and U.S. drug policy; and that said failures were significantly instrumental to the disposal at auction of the Nissan, while there remained a significant possibility that the vehicle still contained illegal drugs in one or more of the classic parts of the chassis mentioned.

(11) Time constraints make a full explanation of how the radical violations of standards and training in the "time critical" exploitation of COLONEL as an informant, were both significantly detrimental to U.S. drug policy, as well as instrumental to the events leading to the wrongful incarceration of PLAINTIFFS. I reserve the right, in either future reporting and/or at trial, to explore this area fully.

(12) That, it is highly likely-as viewed through the lens of my 38 years of training and experience and in particular consideration of my experience and/or supervision and/or review of in excess of 5,000 narcotic investigations –that a timely, full and proper debriefing and aggressive use of COLONEL by professionals on 1/25/04, by trained professionals, cognizant of the practices and mores of international drug traffickers, would have resulted in the seizure

of the marijuana still contained in the NISSAN and subsequently sold to PLAINTIFFS at auction.

(13) NOTE:, Page 3 of the Customs Report of Investigation indicates, under the section "Investigative Leads, "Undeveloped investigative leads are to be determined by the office of the District Attorney, San Diego, California and the office of Resident Agent in Charge, San Ysidro, California." The totality of materials reviewed herein, particularly the State of California Statement of Facts, indicate that no such investigation ever occurred and that this statement—were I reviewing this file in my former capacity as an Operations Inspector—would be considered in my official findings as a "sham statement" with neither investigative intent nor impact; that, its inclusion in the report is, instead, recognition and acknowledgement of the substandard nature of the search and seizure of the NISSAN automobile, in that the procedure and mandate to follow-up this type of seizure with an in depth investigation, was included in the report writing requirements, yet not followed in a meaningful and professional manner.

(14) That, the hurried and substandard nature of the search of the NISSAN and lack of investigative effort—from search to referral to San Diego Police, less than 3 hours—were so radically antithetical to standards, training and U.S. drug policy, that—as viewed through

the lens of my 38 years of training and in consideration of the totality of this report, particularly the congressional findings as to U.S. Customs overall lack of professionalism, training and supervision—it is my opinion that strongly indicate that there was never a thought of a proper and standard investigation among those Customs officers charged with the responsibility of said seizure, and that the overall performance further corroborates all opinions herein as well as the congressional findings.

(15) That, the apparent failure of U.S. Customs to notify the Drug Enforcement Administration, as per guidelines, that, in my opinion, was a significant factor leading directly to the substandard search of the 1987 NISSAN and its rapid submission to the auction process, may be associated with the on-going turf war between the two federal agencies, that first necessitated the creation of the Drug Enforcement Administration in 1973, and continues to this writing.[2]

J. A comparison of the photographs taken the search of the NISSAN by U.S. Customs authorities on 1/25/01 with the photos taken of that same vehicle searched incident to the arrest of PLAINTIFFS highlights significantly the insufficiency of the U.S. Customs search.

[2] There are many well-documented events, including court testimony, illustrating that this interagency rivalry continues, very much to the benefit of drug traffickers, and the detriment of law-abiding citizens

**Comment/Opinion J:**

An examination of the photos taken on 1/25/01, pursuant to the arrest of COLONEL and the original seizure of 27.5 kilograms of marijuana from the 1987 NISSAN, indicate that the interior of the vehicle was left in a relatively pristine condition; that is, the only area that shows evidence of being professionally probed for concealed drugs, was the gas tank, and that the vehicle's condition, as such, was left in a more saleable condition, via the auction process that U.S. Customs was keenly aware would follow, wherein PLAINTIFFS purchased said vehicle.

An examination of the photos taken of the search by Mexican Customs authorities, pursuant to the arrest of PLAINTIFFS and the seizure of an additional 17.5 kilograms of cocaine from that same 1987 NISSAN vehicle, provides solid evidence of said search being cognizant of the true practices of cross-border use of vehicles to conceal marijuana, as stated above.

In essence, the Mexican authorities carried out the standard and professional search on the 1987 NISSAN vehicle that U.S. Customs failed to do. The comparison between the two sets of photos corroborate and highlight my findings and opinions as follows:

- The U.S. Customs photos of the 1987 NISSAN taken on 1/25/01 indicate that the upholstery and dashboard areas of said vehicle, were left pristine and not probed in any way.
- The Mexican Customs photos, taken on or about 9/5/01, indicate that the dashboard and upholstery areas of said vehicle, as well as all other areas that could

---

such as PLAINTIFFS. I reserve the right to testify to same during trial and/or fully document this

possibly contain marijuana or any other drug, were probed thoroughly and professionally; that said search was, in essence, more consistent with U.S. Standards and training than the search conducted by U.S. Customs.

- The Mexican Customs photos and reports indicate that the additional 17 kilos of marijuana were, in fact, found in those areas of the 1987 NISSAN that were left untouched by U.S. Customs during their search of the same vehicle on 1/25/01.
- The Mexican Customs search evidences a keen awareness of all known practices, customs and mores of drug traffickers and acts as further corroboration of all opinions as to same, as set forth in Sections V and VI of this report.

K. A detailed review of the Published **HEARINGS Before the COMMERCE, CONSUMER, AND MONETARY AFFAIRS SUBCOMMITTEE of the COMMITTEE ON GOVERNMENT OPERATIONS HOUSE OF REPRESENTATIVES, One hundred second congress, Second Session March 26, 27, and April 1, 1992, titled: "Serious Mismanagement and Misconduct in the Treasury Department, Customs Service, and Other Federal Agencies and the Adequacy of Efforts to Hold Agency Officials Accountable.**

---

observation in future reporting.

**Comments/Opinions K:**

A full and detailed review of the 1540 page congressional report, as to the overall failures of U.S. Customs in the performance of its mission, particularly at the Southwest border, cannot be accomplished in the instant report.[3] However, the following specific Findings are some—but far from all—of the congressional findings and comments found in this 1540 page document, that identify both direct and indirect causal factors leading to the substandard search and investigation of the 1987 NISSAN on 1/25/01 and the subsequent wrongful arrest and incarceration of PLAINTIFFS on 9/5/01:

CONGRESSIONAL FINDINGS AS TO MANAGEMENT:

Finding (1): "There is no reliable, service-wide system to identify, report, address, investigator or resolve questions of mismanagement. Customs lacks a coherent system to assess organizational management."

Finding (2): "There is a notable lack of accountability among managers at all levels for actions which are taken or which fail to be taken with respect to management issues. The systems to deal with ineffective supervisors and managers do not work.

"The unacceptable situations encountered in the Southwest Regional SAC/RAC officers had existed for a period of years and were widely recognized by supervisory and non-supervisory employees alike. The fact that they went unresolved is indisputable, yet no senior regional manager, no IA manager, no Headquarters manager accepted responsibility for this failure. They all blamed the other guy.

[3] I reserve the right to refer to this report, in detail, in future reporting and/or at trial.

"Numerous managers and supervisors attributed employee problems to ineffective or inadequate supervision, yet no clear articulated action was taken to address the management and supervision with the SAC/RAC offices."

Finding (3): "Current organizational structures and lines of authority between the office of Enforcement at Headquarters, regional levels and field offices are confusing and have impacted adversely on both accountability and efficiency."

Finding (4): "There was a general inability to take action due to the perception that personal relationships were more important than organizational considerations..."

Finding (6) "There is a lack of honest, thorough communication on serious management and performance problems. Employees ranging from senior managers to lower level employees indicate that the were never told 'what they did wrong.'"

<u>CONGRESSIONAL FINDINGS AS TO THE OFFICE OF ENFORCEMENT:</u>

Finding (8) "First line supervisors are often inexperienced and lack proper training."

***Finding (11): "Other law enforcement agencies have expressed difficulty in working with Customs because of the overlapping organizational alignments. Customs has provided contradictory guidance to other law enforcement agencies regarding appropriate points of contact."** [emphasis mine].

CONGRESSIONAL <u>FINDINGS AS TO TRAINING:</u>

Finding (1): "Customs agents operating on the Southwest border need special attention **<u>to unique training and requirements</u>**, **<u>technical law enforcement skills</u>**, Spanish language proficiency, emphasis on increased vulnerability to

integrity concerns, and rigid adherence to constitutional and ethical standards."

Finding (3): "Middle-level supervisors lacked the ability to effectively manage subordinate agents because they themselves lacked necessary leadership skills and investigative experience."

Finding (4): "New agents lack proper supervision in investigations and case management."

Finding (5): Service-wide ethical and **professional standards** are inadequately addressed by existing training programs..."

L. Consultation with other former U.S. Customs employees, including inspectors with significant experience at Southwest border crossings, including the San Ysidro crossing.

**Comment/Opinion L:**

I have made recent contact and interviewed several Customs employees, including at least two inspectors, with service at the Southwest U.S./Mexico border crossings, who affirm the following:

- that, in their experience, few if any of the Congressional findings listed, were ever addressed by U.S. Customs;
- that, poor and substandard vehicle searches at the Southwest border crossing is not uncommon;
- that, examples of poor and substandard cooperation between U.S.Customs, DEA and other enforcement authorities involved in the war on drugs, continues to be uncommon.

At this writing, at least one of these officers had expressed a willingness to testify at trial and will be identified at that time.