Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
SEP 11 2003
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**MICHAEL RAY SHIPP,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

**CASE NO. SACV 01-0167 DOC (ANx)**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

ENTER ON ICMS
SEP 12 2003

This civil case was called for trial before the Court, without a jury, on May 13, 2003, the Honorable David O. Carter, United States District Judge, presiding. The Court having heard all the testimony and considered all admissible evidence, as well as the arguments of counsel and their respective proposed Findings of Fact and Conclusions of Law, hereby enters its Findings of Fact and Conclusions of Law in this case in conformity with Federal Rule of Civil Procedure 52. Any Finding of Fact that constitutes a Conclusion of Law shall be deemed a Conclusion of Law and any Conclusion of Law that constitutes a Finding of Fact shall be deemed a Finding of Fact.

///

55

## I. FINDINGS OF FACT

### A. Introduction

The basic factual findings are uncontested. Plaintiff Michael Ray Shipp was arrested on September 2, 1999 in the State of Oregon, based on a narcotics surveillance conducted under the direction of the United States Drug Enforcement Administration ("DEA"). After spending approximately six weeks in jail, in Oregon and California, Shipp was released after it was determined he was not the person the DEA had been surveilling.

### B. Michael Ray Shipp

Shipp was born on February 27, 1974. He attended high school in Clovis, California. After high school, Shipp took classes at a junior college and enrolled in the Police Academy reserves. As part of the Academy's training, Shipp was required to acquire a firearm. He purchased a Glock 23, which he also registered.

Shipp also worked at Costco Wholesale in Fresno, California, beginning in early 1993. By 1997, Shipp was a supervisor. He was informed, however, that his chances of advancement in the Fresno Costco were not very good because there were many employees who had worked there since the store's opening. Shipp was advised to transfer to another, newer, warehouse in order to boost his chances of advancement within the company, specifically, his chances of becoming a warehouse manager. Shipp looked at over 20 Costco stores before choosing one in Oregon, where he was assured he would have a chance for advancement. In November 1997, Shipp received a transfer to the Oregon Costco. Initially, Shipp had to take a demotion to prove himself as an employee before he could get the promotion he desired.

Shipp's pay cut caused some financial problems. As a result, Shipp sold his gun to a pawn shop to raise money. Also, he could not make the payments on his 1997 Dodge Ram pickup truck and began looking for a buyer. He made phone calls to all his friends asking if anyone was willing to take over the payments on the truck. At the end of October 1998, an acquaintance of Shipp's from high school named Eric Miller called Shipp. Miller offered to buy the truck from Shipp by taking over the payments on the truck. Shipp agreed. A couple weeks later, on November 1, 1998, Miller arrived at Shipp's house in Oregon with a different

proposition. Miller proposed he trade a Harley-Davidson custom-built motorcycle for Shipp's truck. Specifically, Miller would give Shipp $1,000 to bring the overdue payments on the truck current. Miller would take possession of the truck and Shipp would transfer title to Miller. In exchange, Miller would transfer the Harley to Shipp. Shipp would take the pink slip to the Harley and use it for security on a new loan, then pay off the balance of the loan on the truck. Shipp agreed to the proposition. That day, Miller took possession of the truck. In exchange, Shipp wrote a note entitled "Release of Liability For 1997 Dodge Ram." Miller and Shipp each signed the note, wherein Miller agreed, as of November 1, 1998, to "take over all responsibilities" of the vehicle. (Ex. 93.) Miller promised to return in about two weeks with the Harley for Shipp.

In mid-November 1998, Miller called Shipp and said he would be another week or so. By the end of November, Miller had still not returned. Shipp placed numerous calls to Miller, who kept promising to return to Oregon soon. By the middle of December, Miller was not returning Shipp's calls. A few weeks later, Shipp received a call from a friend in Fresno, informing him that Miller had been arrested. Shipp's truck had been towed to the friend's house and Shipp could pick it up. Within a week, Shipp traveled to Fresno and retrieved his truck. He testified that he cannot remember the exact date, but it was sometime in February or March of 1999.

In November 1998, Shipp switched cell phone carriers. The cell phone company salesperson offered Shipp three or five free phones on Shipp's plan for friends or family. Shipp asked many of his friends whether any of them wanted a cell phone. The next day, his friend Amy Garabedian took Shipp up on the offer. She had just moved to Oregon for a new job. She could not obtain her own cell phone, however, because she had not been employed at the same company for at least three months. Shipp agreed to obtain an extra cell phone for Garabedian. The bills were first sent to Shipp, who then gave Garabedian the bill for her phone which she would promptly pay.

Garabedian's on-again, off-again boyfriend was Eric Miller. While living in Oregon, Garabedian sometimes flew to Fresno to visit Miller. During one of her visits, she accidentally left her cell phone, in Shipp's name, in Miller's car. The phone was in Miller's possession for

about a week before it was returned to Garabedian.

**C. The Benito Soria Investigation**

In 1998, the DEA was conducting a narcotics investigation of a drug conspiracy, focusing on a Mexican national and drug trafficker named Bonito Soria. Helen Graziadei is an employee of the DEA. In 1998, Graziadei worked as the case agent on the Benito Soria investigation. This meant she was "responsible for a variety of aspects of conducting the investigation." (Trial Transcript[1], 5/13/03 a.m., at 6.) To assist in the investigation, Graziadei sought the involvement of local police departments, namely Costa Mesa Police Department (CMPD) and Anaheim Police Department (APD). Detective Michael Ginther was the case agent for CMPD and Detective Michael Chlebowski was the case agent for APD.[2]

On December 14 and 15, 1998, the investigators conducted a surveillance that initiated in San Diego and concluded in Bakersfield. In San Diego on December 14, investigators witnessed a suspect described as "WM, 20's, 5-9, 200, light brn, heavy goatee." (Suspect 1) (Ex. 1.) Suspect 1 was driving a white Dodge Ram pickup truck with Oregon plates, registered to Michael Ray Shipp. On December 15, investigators witnessed the same suspect driving the same vehicle.[3] At some point on December 15, Suspect 1 remained in San Diego while police followed another suspect, driving a Ryder truck, to Bakersfield. Police apprehended the driver in Bakersfield and found 52 bricks of marijuana in the Ryder truck.

In September 1999, the DEA ran a report on phone calls made to and from Soria's phone. The records reflect that Soria placed calls to Shipp's phone number. (Ex. 9.)

**D. The Identification of Suspect 1**

Graziadei prepared agent reports called "DEA-6's" which documented all investigative activities throughout the investigation. (*See, e.g.*, Ex. 15.) Pursuant to DEA policy, Graziadei

---

[1] Hereinafter, "Tr.".

[2] Detective Chlebowski actually worked for the Fullerton Police Department, but worked with Anaheim for this investigation.

[3] Suspect 1 was listed as "Suspect #3" on December 15. (Ex. 2.)

initiated DEA-6s regarding the December 14 and 15 surveillance within five working days of the surveillance. She then filled in information as it became available to her.

The DEA-6 documenting the December 14 surveillance was completed on January 11, 1999. (Ex. 15.) That DEA-6 states, "Sergeant Don Kline[4] observed an unknown white male, subsequently identified as Michael Ray Shipp. . . ." (*Id.*) The DEA-6 documenting the December 15 surveillance date was completed on January 8, 1999. (Ex. 16.) That DEA-6 states, "surveillance observed a white male, subsequently identified as Michael Ray Shipp . . . meet up with Soria." (*Id.*) Graziadei had therefore positively identified Suspect 1 as Shipp by January 8, 1999.

Graziadei testified that she received an identification of Shipp verbally from Detective Ginther some time prior to January 8. However, Graziadei did not make any written notation that Ginther, or any other officer, had positively identified Suspect 1 as Shipp. Rather, she merely wrote in the DEA-6 that Suspect 1 had been "subsequently identified as Michael Ray Shipp." Ginther testified that although he was on surveillance, he never actually viewed Suspect 1. He testified that he never identified Suspect 1, nor does he recall Graziadei ever asking him to identify any of the suspects. (Tr, 5/13/03 a.m., at 109.)

On December 21, 1998, at Graziadei's direction, Ginther requested an Oregon DMV photo of Shipp. (*See* Ex. 99.) Local law enforcement in Oregon did a background check on Shipp and drove by his residence. (*Id.*) The Oregon officer forwarded the Oregon DMV photo and his report to Ginther on approximately December 23, 1998. (*Id.*; Ex. 5.) Graziadei also asked Ginther, on approximately December 22, 1998, to run a California DMV check on Shipp. Ginther obtained a color California DMV license photo of Shipp. (Ex. 4.) When Ginther received the DMV driver's license photos, he forwarded them to Graziadei. He did not compare the photos to any surveillance photos, and had never personally witnessed the driver of the truck.

Sergeant Michael Patterson, a police officer with APD in charge of the major narcotics unit, also assisted the DEA in the Soria investigation. Patterson never identified Shipp as

---

[4] By the time of trial, Kline had been promoted to Lieutenant.

Suspect 1, and testified that to his knowledge, no one at APD identified Shipp as Suspect 1. Lieutenant Donald Klein with APD also testified that, to his knowledge, no one in APD was asked to compare Shipp's DMV photo with any surveillance photos. He also testified that the DEA never asked the police, aside from Ginther, to follow-up on Suspect 1. Detective Chlebowski testified that he viewed the surveillance photos some time in February, March, or April and told Graziadei, "this could be the guy." However, he never made an identification. Aside from Chlebowski, Graziadei never asked an officer from CMPD or APD to compare the surveillance photos to Shipp's DMV photos. She could not positively identify Suspect 1 herself because she never witnessed Suspect 1 on the stakeout.

Another member of the Soria investigation was Department of Homeland Security agent Stephanie Jones. During the investigation, Jones was assigned to the commercial narcotics group in San Diego. Jones testified that DEA and Customs were in charge of the Soria trafficking investigation. Jones was on the surveillance and witnessed Suspect 1 10 - 15 times. After the surveillance, on December 14, 1998, she ran a DMV check of Shipp. However, Jones herself did not make an identification of Shipp as Suspect 1. In January 1999, Jones met with either Chlebowski or Ginther (she does not recall which one) in a parking lot in San Diego. During this meeting, and on a phone conversation prior to the meeting, Jones was told there had been an identification of Suspect 1. Jones was told that Suspect 1 had been positively identified as Michael Ray Shipp. There is no evidence as to how this identification was made.

Therefore, it appears that at some point between the surveillance and mid-January 1999, Graziadei and either Ginther or Chlebowski came to the understanding that Shipp had been positively identified as Suspect 1. However, none of these individuals actually *had* positively identified Suspect 1 as Shipp. Nevertheless, Graziadei subsequently prepared an arrest warrant affidavit, and provided information verbally and through the DEA-6s, to the assistant district attorney, who then prepared the felony complaint for the arrest warrant. (*See* Ex. 13.) Graziadei then signed the felony complaint, executed on July 29, 1999. Graziadei certified under penalty of perjury that the information contained in the complaint was correct. The complaint alleges that Shipp unlawfully conspired to transport/possess marijuana for sale. The accompanying

arraignment information and bail computation set Shipp's bail at $5,000,000. (*Id.*) Shortly after Graziadei signed the felony complaint, she was transferred to Puerto Rico.

The DEA ran phone records on calls made to and from Soria's phone. The records reflect that Soria placed a call to Shipp's number. However, the report was not run until September 28, 1999, well after the DEA signed the felony complaint authorizing the arrest of Shipp.

**E. Shipp's Arrest**

On September 2, 1999, Shipp went to a pawn shop to purchase the gun he had pawned. When the store owner conducted a routine background check on Shipp, the arrest warrant turned up. The store owner called the police. When the police arrived, the owner locked himself in the back and the police called Shipp out of the store. He was taken to Clackamas county jail. He was first left in a holding cell for about 10 hours. During those 10 hours, the police informed him he was being held on $5 million bail, but he did not know what the charges were against him. Shipp pled not guilty at his arraignment and continually maintained his innocence. He was transferred to a temporary housing facility for about 5 days, then a housing unit for about 3 ½ more weeks. During this time, his mother faxed his time card records showing he was working at Costco during December 14 and 15, 1998, to the DEA. After about a week, Shipp's public defender advised him to waive his extradition rights so they would transfer him to California and speed the process up, which he did. He was transferred on or about September 27, 1999.

While preparing for the transfer, he was ordered to put on someone else's dirty pants, since Shipp himself only had shorts. He was shackled and taken to the airport, where he was forced to board after everyone else had boarded, which was humiliating for Shipp. Each time he was transferred he was strip searched. Once he arrived in Los Angeles, he was first placed in a temporary facility overnight. He was made to remove his shoes, and had to walk in socks on the floor which was covered in urine and trash. One man in the cell started throwing blood from his nose around the cell. During the night, Shipp was pulled out of his bunk by the other inmates and kicked and beaten and yelled at. In another holding cell, another inmate began to antagonize Shipp, eventually hitting Shipp's head up against the brick wall. He was then transferred to Los Angeles County jail, where he was separated from everyone else because his bail was so high.

On October 13, 1999, Shipp had his first court date in Los Angeles. Approximately a week before the court date, the Deputy District Attorney, Maria Ramirez, called Detective Chlebowski regarding Shipp's claim of misidentification. Chlebowski told Ramirez he would attend the court hearing on October 13 to view Shipp. At the hearing, Chlebowski confirmed that Shipp was indeed not Suspect 1.[5] Shipp was not physically released until about 18 hours later, at two in the morning on October 14. He was released about one thousand miles from his home in Oregon, with no money. At the time of his release, Shipp had lost about thirty pounds.

**F. Post-Release**

Shipp has suffered emotional and mental problems since his release from jail. He has problems sleeping and being in crowded places. He has developed fear of police officers. Shipp has been prescribed antidepressants and sleeping medication. Further, Costco informed Shipp that he had been terminated, and would have to be rehired as a "new hire," losing approximately seven years of seniority with the company. Shipp felt humiliated at the Oregon Costco; co-workers continually asked him why he had been arrested. He was also informed by investigators that his safety might be at risk. He therefore moved back to California to be closer to his family. The Tustin, California Costco branch hired him as a new employee. However, Shipp was frustrated with having to "start from scratch" at the Costco company, and soon found a new job.

About six months after Shipp's release, on April 22, 2000, Shipp returned from a trip to Cabo San Lucas, Mexico. When Shipp's passport was scanned at Los Angeles International Airport ("LAX") after returning from Mexico, information about Shipp was displayed through the "Treasury Enforcement Communication System," or "TECS." TECS showed that Shipp was "wanted in Los Angeles for state prosecution," and ordered that Shipp be apprehended upon contact. (Ex. 116-7.) TECS further indicated that Shipp was wanted on drugs charges.

Shipp was detained by customs agents who searched his bags, handcuffed him, and strip searched him. After corroborating Shipp's explanation that the charges had all been dropped, the

[5] Suspect 1 turned out to be Eric Miller, who was using Shipp's truck and cell phone during the times the surveillance team was conducting their investigation.

agents released Shipp.

## II. CONCLUSIONS OF LAW

The Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1346 and the Federal Tort Claims Act ("FTCA").

### A. FTCA: Background and Choice of Law

The FTCA provides a cause of action against the United States for persons injured by the tortious activity of a federal employee when the employee was "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *Orsay v. United States DOJ*, 289 F.3d 1125, 1132 (9th Cir. 2002). Under the FTCA, the United States may be held liable for its employee's torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000).

The FTCA provides a waiver of sovereign immunity for intentional torts, including false arrest and false imprisonment, by investigative or law enforcement officers. 28 U.S.C. § 2680(h). "In an action under the FTCA, a court must apply the law the state courts would apply in the analogous tort action, including federal law." *Rhoden v. United States*, 55 F.3d 428, 431 (9th Cir. 1995). "In a Federal Tort Claims Act suit, the 'whole law' (including choice of law rules) of the jurisdiction where the alleged act or omission occurred governs the rights and liabilities of the parties." *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir. 1995) (citing *Richards v. United States*, 369 U.S. 1, 82 S. Ct. 585 (1961)). Both parties agree that California law should apply here.

### B. First Claim for Relief (False Arrest/False Imprisonment)

In California, false imprisonment is the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Rhoden*, 55 F.3d at 430 (quoting *Fermino v. Fedco, Inc.*, 30 Cal. Rptr. 2d 18, 26 (Cal. 1994)). False arrest is not a different tort, rather, it is simply "one way of committing a false imprisonment." *Collins v. City & County of San Francisco*, 123 Cal. Rptr. 525, 526 (Cal. Ct. App. 1975).

Under the FTCA, liability may lie where federal officers' wrongful acts cause the unjustified imprisonment. *See Arnsberg v. United States*, 757 F.2d 971, 977 (9th Cir. 1984); *Watts v. County*

*of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) ("A cause of action for false imprisonment based on unlawful arrest will lie where there was an arrest without process followed by imprisonment."). Defendant caused Shipp's unjustified imprisonment by negligently obtaining an arrest warrant for Shipp. The DEA had the surveillance photos and Shipp's DMV photos in its possession, but failed to have any surveilling officers positively identify Shipp as Suspect 1, as was the common practice. Graziadei alludes that officers of the APD and/or CMPD committed perjury by testifying that they had not made identifications, while Graziadei testified that she relied on a positive identification from Ginther. The Court does not believe that such nefarious conduct necessarily occurred. When Shipp's name came back from the DMV as the registered owner of the truck, the DEA assumed that Shipp had been positively identified as Suspect 1. However, no one actually compared the surveillance photos with the DMV photos until after Graziadei wrote, in the DEA-6s, that Suspect 1 had been positively identified as Shipp. It therefore appears that members of the joint investigation team operated under a chain of faulty assumptions, each one assuming the other had made a positive identification.

Subsequently, either Chlebowski and/or Ginther met with Jones in San Diego, after the DEA-6 reports had been prepared on January 8 and 11. It appears that, in all probability, Chlebowski and/or Ginther fed back the DEA's assumption that Shipp had been positively identified to Jones. In February, March, or April of 1999, when Chlebowski actually compared the surveillance and DMV photos, and said to Graziadei "this could be the guy," Graziadei was already operating under the assumption that Suspect 1 *was* Shipp. By July, when Graziadei prepared an arrest warrant affidavit, and provided information verbally and through the DEA-6s, to the assistant district attorney, who then prepared the felony complaint for the arrest warrant, these assumptions had been translated as fact even though no positive identification had been made. Graziadei believed that a positive identification had been made, although no surveilling officer had actually made a positive identification. Although some fault lies with each agency, the DEA ultimately controlled the Soria investigation. APD and CMPD had no independent jurisdiction in San Diego; they acted under the umbrella control of the DEA. APD and CMPD would never have jurisdiction for actions in San Diego -- they were only there in order to assist, and under the direction of, the DEA. Finally, it was

the DEA that obtained the arrest warrant through the district attorney's office. Compounding the entire problem was the fact that, before the Soria investigation concluded, the DEA transferred Graziadei to Puerto Rico. Therefore, it is ultimately the DEA's responsibility for the lack of a reasonable basis upon which to conclude Shipp was the suspect from the surveillance photographs. *See Bell v. State of California*, 74 Cal. Rptr. 2d 541, 547 (Cal. Ct. App. 1998) (ample evidence that arresting officers lacked a reasonable basis to conclude plaintiff was the person described in an arrest warrant); *see also Watts*, 256 F.3d at 891 (holding that a false imprisonment claim may lie where officers entered plaintiff's home pursuant to an improperly obtained arrest warrant and arrested him). As a result of Defendant's negligent acts, Shipp was unjustifiably held in jail for approximately six weeks.

There is a common saying amongst law enforcement: if you are going to do the crime, you will do the time. Another saying, equally appropriate, is that if you are going to fight crime, then you need to pay the dime. The drug war is this nation's effort to combat international narcotics trafficking. International narcotics traffickers are not limited by state boundaries or national borders; they rely on sovereignty as a buffer to successful prosecution. Each time a trafficker crosses a border, local, state, and federal law enforcement agencies must cooperate. Each border represents added burdens, but also an opportunity to increase our understanding with other states and nations. Inter-agency squabbles only hurt cooperative efforts between law enforcement agencies.

The war on narcotics traffickers requires the leadership and financial means of the federal government. This war can only be successful with federal agencies who can cross local, state, and national boundaries. The task forces that have been formed, such as the one that was assembled in the Soria investigation, are typical of the combined efforts of federal agencies reaching out for the assistance of local law enforcement. But the ultimate responsibility in combating multi-state narcotics traffickers such as Soria traditionally has been, and must continue to be, the responsibility of federal agencies such as the DEA. In this case, the task force was under the direction and control of DEA. Therefore, negligence on behalf of federal or local officers is ultimately the responsibility of the DEA.

Accordingly, Shipp prevails on his first claim for relief for false arrest/false imprisonment.

**C. Second Claim for Relief (Assault and Battery)**

The Court dismissed this claim on January 24, 2003.

**D. Third Claim for Relief (Intentional Infliction of Emotional Distress)**

Under California law, the elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Sabow v. United States*, No. 94-56634, 1996 U.S. App. LEXIS 27829, *22 (9th Cir., Aug. 28, 1996). "The conduct must not only be intentional and outrageous, but must also be 'directed at plaintiff, or occur in the presence of a plaintiff of whom defendant is aware.'" *Id.* (quoting *Christensen v. Superior Court*, 2 Cal. Rptr. 2d 79, 100 (Cal. 1991)).

Here, it is clear Shipp suffered actual emotional distress. However, the testimony shows that Defendant acted negligently, rather than intentionally, in misidentifying Shipp. Further, Defendant's acts were not directed at Shipp with the intention of causing him such emotional distress.

Accordingly, Shipp does not prevail on his third claim for relief.

**E. Fourth Claim for Relief (Negligent Infliction of Emotional Distress)**

The elements of a claim for negligent infliction of emotional distress are: (1) the defendant engaged in negligent conduct; (2) the plaintiff suffered serious emotional distress; and (3) the defendant's negligent conduct was the cause of the serious emotional distress. *Sabow v. United States*, SA CV 93-991 AHS, 2000 U.S. Dist. LEXIS 19611, *17 (C.D. Cal, Jan. 31, 2000) (citing *Thing v. La Chusa*, 257 Cal. Rptr. 865 (Cal. 1989)).

The United States was negligent in misidentifying Suspect 1 as Shipp. The DEA controlled the investigation and had a duty to abide by a reasonable standard of care when identifying suspects. Reasonable conduct would have included having at least one officer who was part of the surveillance team view the photographs of the suspect, compare those photographs to the DMV photo of Shipp, and make a positive identification prior to issuing an arrest warrant. Further, the DEA should have noted the date, time, and method of identification in some written form, especially

considering the importance of the identification. However, the DEA failed to do this.

Serious emotional distress is an essential element of the cause of action for negligent infliction of emotional distress. *Bogard v. Employers Casualty Co.*, 210 Cal. Rptr. 578, 589 (Cal. Ct. App. 1985). "'Serious emotional distress' is an emotional reaction which is not an abnormal response to the circumstances. It is found where a reasonable person would be unable to cope with the mental distress caused by the circumstances." *Sabow*, 2000 U.S. Dist. LEXIS 19611, *18 (citing *Thing*, 257 Cal. Rptr. at 881).

Since the ordeal, Shipp has had problems sleeping and being in crowded places. He suffers from a general lack of motivation. Police officers terrify him. He has been seeing a therapist and takes antidepressants and sleeping medication. He felt humiliated at his prior job in Oregon and therefore moved back to California. The Court finds that Shipp suffered serious emotional distress as defined by law.

Defendant's negligent acts were the cause in fact of Shipp's emotional distress. But for the DEA's negligent identification of Suspect 1, the arrest warrant would not have been issued for Shipp. Shipp's injuries were therefore caused by an act or omission of an employee of the United States acting within the course and scope of their employment. *Sabow*, 2000 U.S. Dist. LEXIS 19611, *18 (citing *United States v. Coffey*, 233 F.2d 41 (9th Cir. 1956)).

The arresting officers did not constitute an intervening act breaking the chain of causation. The arresting officers acted under orders which came from the DEA; the DEA's conduct created the resultant arrest. *See Alvarez-Machain v. United States*, 266 F.3d 1045, 1055 (9th Cir. 2001) (involvement of other parties in physically seizing plaintiff did not break the chain of causation; they merely completed the chain).

In hindsight, Shipp's actions were clearly not wise. He sold his car without changing title and allowed another person unlimited use of a cell phone in his name. These actions could have led to liability on Shipp's part if Garabedian failed to pay the phone bills or Miller got into a car accident. However, the injuries that Shipp actually did suffer were not *caused* by any *legal fault* of his own. Shipp did not create the circumstances for his own misidentification because it was not foreseeable that: (1) by not immediately switching registration from Shipp's name into Miller's name; and (2)

by allowing Garabedian to use a cell phone in Shipp's name, Shipp would be identified as a suspect in a drug ring and spend six weeks in jail.

Accordingly, Shipp prevails on his fourth claim for relief for negligent infliction of emotional distress.

**F. Fifth, Sixth, and Seventh Claims for Relief (False Arrest/False Imprisonment; Assault and Battery; and Intentional Infliction of Emotional Distress)**

Shipp's fifth, sixth, and seventh causes of action are based on the conduct of the customs agents at LAX on April 22, 2000. Generally, the Fourth Amendment commands that searches and seizures be "reasonable." Yet Congress also has broad power to regulate commerce with foreign countries. U.S. Const., Art. I, § 8, cl. 3. Due to Congress' power to protect the country by stopping and examining persons entering the United States, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya De Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304 (1985).

Careful patrol of international borders is essential to national security, health, and public welfare. *United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002). Therefore, at the borders, "routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ." *Montoya De Hernandez*, 473 U.S. at 537. However, the border search exception authorizes only *routine* searches. "In order to conduct a search that goes beyond the routine, an inspector must have a reasonable suspicion that the person to be searched may be carrying contraband." *United States v. Molina-Tarazon*, 279 F.3d 709, 712 (9th Cir. 2002); *see also Okafor*, 285 F.3d at 846 (holding that "even if a border search is not routine, our precedent makes clear that a non-routine border search will still be upheld if it was based on reasonable suspicion of criminal activity"). A border search goes beyond routine when it reaches the degree of intrusiveness present in a strip search or body cavity search. *Molina-Tarazon*, 279 F.3d at 713.

Therefore, the Court must consider whether the customs agents had reasonable suspicion to justify the non-routine search. *Id.* at 717. The Court concludes that the customs agents did have reasonable suspicion to justify the search. Certainly, emptying and searching Shipp's luggage was

routine, and no reasonable suspicion was needed. *See Okafor*, 285 F.3d at 845. Thereafter, Shipp was handcuffed, taken into a private room, patted down, strip searched, and detained while customs officials verified his innocence. Although this activity was non-routine, it was nevertheless reasonable because it was based on a reasonable suspicion of criminal activity. When Shipp's passport was scanned at LAX after returning from Mexico, information about Shipp was displayed through the "Treasury Enforcement Communication System," or "TECS." TECS showed that Shipp was "wanted in Los Angeles for state prosecution," and ordered that Shipp be apprehended upon contact. (Ex. 116-7.) TECS further indicated that Shipp was wanted on drugs charges. Therefore, it was reasonable for customs agents to conduct a non-routine search of Shipp upon his return from Mexico.

Accordingly, Shipp does not prevail on his fifth, sixth, and seventh claims for relief.

**G. Eighth Claim for Relief (Negligent Infliction of Emotional Distress)**

The Court dismissed this claim on January 24, 2003.

**H. United State's Affirmative Defenses**

Defendant argues that the discretionary function exception bars jurisdiction over Shipp's claims. The liability of the United States is subject to the discretionary function exception. 28 U.S.C. § 2680.[6] The exception covers acts that are discretionary in nature, *i.e.*, acts that "involve an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958 (1988). "Thus, the discretionary function exception will *not* apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (emphasis added). Defendant bears the burden of proving that the discretionary function exception applies. *Sabow*, 1996 U.S. App. LEXIS 27829, *10.

In order to determine whether the discretionary function exception applies, courts must apply

---

[6] That exception provides that the Government is not liable for "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U. S. C. § 2680(a).

a two-step analysis. First, the court must determine whether the conduct involves an element of judgment or choice. Second, if the conduct involves an element of choice, the court must determine whether the conduct implements social, economic, or political policy considerations. *Nurse*, 226 F.3d at 1001. The basis for the exception is "Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in public policy." *Id.* (citations omitted). However, the challenged decision "need not actually be grounded in policy considerations" so long as it is "by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). In order to determine whether given conduct falls within the discretionary function exception, courts should focus on the nature of the conduct rather than the status of the actor. *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 1273 (1991)).

The manner in which the DEA conducted its investigation and the decision to seek an arrest warrant for Suspect 1 are discretionary activities. *See Patel v. United States*, 806 F. Supp. 873, 876 (N.D. Cal 1992). The overall DEA investigation is indeed susceptible to a policy analysis. "Investigations by federal law enforcement officials . . .clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." *Sabow*, 1996 U.S. App. LEXIS 27829, *18.

However, Shipp's complaint focuses on the manner in which the DEA identified him as the suspect, not on the DEA's decision to seek a warrant. *See Patel*, 806 F. Supp. at 876. The identification of a suspect necessarily involves some element of judgment. However, that element of judgment must further implicate a social, economic, or political policy consideration. "Indeed, to expand the exception to encompass *any* government act or decision that simply involved the exercise of discretion would entirely eviscerate, and contradict, the Government's waiver of sovereign immunity under the FTCA." *Morales v. United States*, 961 F. Supp. 633, 636 (S.D.N.Y. 1997) (emphasis added). Courts have noted that the exception protects courts from entanglement in decision-making entrusted to other branches of the government, especially from questions involving "not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Caban v. United States*, 671 F.2d 1230, 1233 (2nd Cir. 1982) (quoting *Blessing v. United States*, 447 F. Supp. 1160, 1170 (E. D. Pa. 1978)). "The

exception thus protects the principles embodied in the separation of powers doctrine by keeping the judiciary from deciding questions consigned to the executive and legislative branches of the government." *Caban*, 671 F.2d at 1233.

The government's exercise of judgment in identifying Suspect 1 did not implicate any social, economic, or political policy to which the discretionary function exception is meant to apply. Police officers must act within established standards of care when identifying a person for the purposes of issuing an arrest warrant. (*See* Tr., 5/13/03 p.m. at 101-102; Officer Klein testifying that normal course and practice is to show a DMV picture to the surveillance team and ask if the picture was the same person the team witnessed; Tr. 5/24/03 a.m. part 2 at 6; Det. Chlebowski testifying to same). "If it is a choice to be exercised within established safety standards, and the plaintiffs claim negligence in failure to follow such standards, the discretionary function exception does not apply." *Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989); *see also ARA Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (failure to maintain national park roads in safe condition was not a decision grounded in social, economic, or political policies). This is precisely what happened in this case; the government strayed from established standards of due care and reasonableness.

Accordingly, Defendant has not met its burden of proving that the discretionary function exception applies. Defendant's remaining affirmative defenses have been addressed in the body of Section II and do not apply. Therefore, in sum, Shipp prevails on his first and fourth causes of action, for false arrest/false imprisonment and negligent infliction of emotional distress, respectively.

## III. DAMAGES

### A. Economic Damages

Shipp's claim for economic damages lies in three stages. First, he claims actual losses of approximately $15,000 from the first four months after his arrest, until January 2000. The figure stems from the six weeks of lost wages and benefits while in jail, and a subsequent recovery period of approximately 2 ½ months of lost wages until he resumed work. The figure represents lost wages of approximately $12,000, and lost benefits, including a bonus, sick pay, vacation pay, of

approximately $3,000.

Next, Shipp claims actual and future losses stemming from the loss of seven years of seniority at Costco, and the attendant benefits of that seniority. Prior to the arrest, he was accruing five weeks sick pay and five weeks vacation pay a year. He was also accruing a $1,200 bonus every six months and participating in a matching 401K contribution program. Finally, he lost his chances for promotion within the company. According to Shipp's testimony, it is reasonable to expect he would have been promoted to assistant warehouse manager within one year of the date of his arrest. It is reasonable to expect he would have been promoted to warehouse manager within two years after his assistant manager promotion. He moved to Oregon specifically because the Costco managers informed him he would be on track to become a full warehouse manager at that store. He was very career conscious and dedicated to progressing within the company.

The Court finds that Shipp would have been promoted to assistant manager by September 2000, one year from the date of his arrest. Shipp would have made approximately $50,000 a year as assistant warehouse manager, including benefits, sick pay, vacation pay, and bonuses. The Court finds that Shipp would have maintained the position of assistant manager until approximately September 2002, whereupon it is probable he would have been promoted to warehouse manager. Shipp would have made approximately $100,000 a year as warehouse manager, including benefits, sick pay, vacation pay, and bonuses.

Subsequent to the arrest, Shipp's income was approximately $40,000 a year. Therefore, due to the arrest, Shipp's losses are approximately $10,000 a year until September 2002 and $60,000 a year from September 2002 until September 2006. The Court therefore finds Shipp incurred economic damages totaling $275,000.00.

**B. Non-Economic Damages**

The Court finds that Shipp suffered physical injuries and serious emotional distress during his ordeal in jail, and continues to suffer serious emotional distress as a result of the arrest and imprisonment. Further, the Court finds that Shipp will continue to suffer damages throughout his life as a result of having to report on employment or other such applications that he was arrested for a felony.

Accordingly, the Court awards Shipp $550,000.00 as non-economic damages for emotional distress, pain, and suffering.

## IV. CONCLUSION

The capture of narcotics traffickers is important, but we must safeguard the liberty of our citizens. In the task force's zealous target of Soria, an innocent person was caught in the crossfire. A country founded upon a constitution of individual freedoms will need to make certain that in the eagerness to abolish drugs and punish dealers, we do not give up those rights that we fought for and which are the cornerstone of our democracy. The same professionalism exhibited by this task force in apprehending a narcotics kingpin like Soria must extend to even the lowest suspected member of a narcotics conspiracy. The reasons are obvious; when this doesn't occur, the results can be devastating to an individual such as Michael Ray Shipp.

For the foregoing reasons, the Court grants judgment in the amount of $825,000.00 for Plaintiff Michael Ray Shipp as to his claim against the United States for false arrest/imprisonment and negligent infliction of emotional distress. Michael Ray Shipp is awarded his costs.

IT IS SO ORDERED.

DATED: SEPTEMBER 11, 2003

DAVID O. CARTER
United States District Judge