# In the United States Court of Federal Claims

No. 05-608 C

(E-Filed under seal: June 24, 2008)

(E-Filed for publication: July 22, 2008)

| | |
|---|---|
| FRANCISCO JAVIER RIVERA AGREDANO,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Trial; Breach of Implied-in-Fact Covenant; Failure to Remove Contraband From Seized Vehicle Prior to Resale Constitutes Breach of Implied-in-Fact Covenant; Damages for Injuries Caused by Breach. |

Teresa Trucchi, San Diego, CA, for plaintiff.

Devin A. Wolak, Washington, DC, with whom were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. Erik J. Gantzel, U.S. Customs and Border Protection, U.S. Department of Homeland Security, San Diego, CA, of counsel.

OPINION[1]

[1]Footnote 1 to the Opinion E-filed under seal on June 24, 2008 stated:

This Opinion is filed under seal. If any party believes that this Opinion contains protected material that should be redacted before publication, that party shall, by motion to be filed on or before July 8, 2008, request that such protected material be redacted. The motion shall indicate the specific protected material as to which redaction is requested and, with respect to each such proposed redaction, the

(continued...)

HEWITT, Judge

I. Introduction

[1](...continued)
reason(s) for the request.

Opinion filed June 24, 2008 1 n.1.

On July 8, 2008, defendant filed its Motion to Redact Final Order (Redact Motion or Redact Mot.). Redact Mot. 1. In its Redact Motion, defendant requested the court to redact certain portions of the court's Opinion of June 24, 2008 "to avoid compromising the efforts of United States Customs and Border Protection . . . to protect the U.S.-Mexico border by publicly disclosing the specific means and methods by which they carry out their law enforcement duties." Id. In support of its Redact Motion, defendant submitted a copy of the protective order in this case, which had been issued by the United States District Court for the Southern District of California before the case was transferred to this court. See Redact Motion, Ex. B, 1. On July 10, 2008, plaintiff filed its Notice of Non-Opposition to Defendant USA's Motion to Redact Final Order (Pl.'s Notice), stating that plaintiff does "not oppose . . . [defendant's] requests as set forth in the [Redact Motion] filed July 8, 2008. Pl.'s Notice 1-2.

The court accepts the protective order issued in this case by the United States District Court for the Southern District of California as the law of the case. Thus, the issue before the court is whether the protective order should be modified in order to enable the court to publish this Opinion in its entirety without incorporating defendant's proposed redactions. The Federal Circuit has held "that a court may enter a protective order if 'good cause' exists to protect discovery information" but that "a presumption of public access to judicial records" exists. Baystate Techs., Inc. v. Bowers, 2008 U.S. App. LEXIS 14686, at *4 (Fed. Cir. July 10, 2008) (table) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998); Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993)). The Federal Circuit further stated that "in determining whether a protective order should be modified, the court must balance the privacy interests of the parties against the public interest in access to the discovery information." Id. at *4-5 (citing Siedle, 147 F.3d at 10).

The court finds that a balancing test is not necessary in this case to determine whether the protective order should be modified. Defendant has requested redactions of portions of the Opinion that describe the policies and procedures used by United States Customs and Border Protection, Redact Mot. passim, and plaintiff does not oppose those redactions, Pl.'s Notice 2. The court determines that the portions of the Opinion requested by defendant to be redacted contain information that is not available to the public. For these reasons, the court accepts defendant's requests contained in its Redact Motion.

This case is before the court following a trial[2] on a claim by plaintiff, Francisco Javier Rivera Agredano (Mr. Agredano or plaintiff), for breach of contract against the government (government or United States or defendant). The court heard testimony from

---

[2]A number of the witnesses presented at trial were Spanish speakers and required interpreters to translate their testimony into English for the court. Under Federal Rules of Evidence (FRE) 604, "An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." FRE 604 (2006). The court required each interpreter to undergo a voir dire by the counsels and the court and then to take the oath administered to every witness. The court qualified each interpreter as an expert in the Spanish language. Agredano Trial Transcript (Tr.) 10:7-9; 14:20-22; 753:6-8. For convenient reference, the names, in alphabetical order, and a description of the interpreters, upon whose live translation the court relies in this opinion, follow:

Ms. Eugenia Arguello trained as an English as a Second Language (ESL) teacher at the national university of Mexico; she served as an ESL teacher for fourteen years. Id. at 751:4-10. She then attended Southwestern College in the United States and trained to be an interpreter for two and a half years. Id. at 751:12-14. She has a California Certificate for Interpreters and a Federal Interpreter Certificate. Id. at 751:17-19. She has been qualified as an expert in the Spanish language in the federal district courts in San Diego and Albuquerque. Id. at 751:24-752:4. Ms. Arguello has worked as an interpreter for sixteen years, id. at 752:14, and she has held her California certification for fourteen years, id. at 752:19-24, and her federal certification for more than ten years, id. at 752:25-753:5. The court qualified Ms. Arguello as an interpreter of the Spanish language in the trial. Id. at 753:6-8.

Ms. Gloria Mayne has an undergraduate degree in economics, graduate courses in marketing, communication, and business administration, and a certificate degree from the University of California San Diego in translation and court interpreting. Id. at 7:13-17. She also has numerous certifications from the Judicial Council of California for various courses taken in interpreting and translation. Id. at 7:17-8:1. Ms. Mayne has been certified in the state of California as a court interpreter for almost seventeen years. Id. at 8:7-9. She has been certified as an interpreter by the United States District Courts for five years. Id. at 8:12-14. She has worked as an interpreter in criminal and civil proceedings in California for seventeen years. Id. at 8:9-12. The court qualified Ms. Mayne as an interpreter of the Spanish language in the trial. Id. 10:7-9.

Ms. Ruth Monroy has a law degree from the University of Mexico and is certified as a court interpreter of the Spanish language for the California state courts and the United States District Courts. Id. at 13:10-16. She has been certified as an interpreter for the federal courts for approximately nineteen years. Id. at 14:16-19. The court qualified Ms. Monroy as an interpreter of the Spanish language in the trial. Id. 14:20-22.

nineteen witnesses[3] and received some thirty-nine exhibits in trial. Agredano Trial

---

[3] For convenient reference, the names, in alphabetical order, and a description of the witnesses upon whose live testimony the court relies in this opinion follow:

Mr. Jayson Ahern is a fact witness for plaintiff. Plaintiff Francisco Javier Rivera Agredano's Witness List, filed Jan. 8, 2008 (Pl.'s Wit.) 6. He currently works as the Deputy Commissioner of the United States Customs and Border Protection (Customs). Tr. 565:18-20. From March 1, 2003 to August 2007, Mr. Ahern worked as the Assistant Commissioner for the Office of Field Operations within Customs. Id. at 566:1-7. From May 2002 to March 2003, he was the Assistant Commissioner for the Office of Field Operations with the United States Customs Service (USCS), which was then reorganized as Customs. Id. at 566:9-13. From January 2001 to May 2002, Mr. Ahern was the Director for the Southern California Customs Management Center in San Diego, id. at 566:15-19, and before that, he was the Port Director for Operations of Customs in Los Angeles, id. at 567:1-2.

Mr. Francisco Javier Rivera Agredano is the plaintiff in this case and a fact witness for plaintiff. Pl.'s Wit. 2. He is forty-five years old and resides in Tijuana, Mexico. Tr. 44:16-19. He works in the printing business as a printer, a job that he has held for twelve years. Id. at 44:20-21; 45:11-12. He has a technical degree in accounting. Id. at 45:15. Mr. Rivera Agredano is married to Maria del Carmen Calderon, with whom he has two daughters. Id. at 44:20-45:4.

Mr. Robert Bickers is a fact witness for plaintiff. Pl.'s Wit. 9. He currently works as a Customs and Border Patrol Supervisor for Customs. Tr. 261:13-18. He first began working for the USCS in 1991 as an Inspector at the port of entry. Id. at 261:23-262:5. In 2001, he served as a Supervisor for the Contraband Enforcement Team. Id. at 263:8-13. In his current position, Mr. Bickers trains new inspectors. Id. at 262:23-24.

Dr. Jesus Manuel Cesea Caro is a fact witness for plaintiff. Pl.'s Wit. 14-15. He has worked as a medical doctor for twenty-five years. Tr. 754:18-20. He currently practices in gerontology at the Issste Hospital in Tijuana, Mexico and his private practice. Id. at 754:22; 755:19-20. He studied medicine at the Autonomous University in Guadalajara, Mexico. Id. at 755:5-6. He specialized in family medicine at the Issste Hospital in Tijuana, Mexico and pursued a sub-speciality in gerontology at the Lopez Mateos Hospital in Mexico City, Mexico. Id. at 755:6-9.

Mr. Lawrence Fanning is a fact witness for plaintiff, Pl.'s Wit. 8-9, and a fact witness for defendant, Defendant's Witness List (Def.'s Wit.) 4. He currently works as an Assistant Port Director at Otay Mesa Cargo. Tr. 448:2-3. From October 2000 through 2007, Mr. Fanning served as a Fines and Penalties Officer. Id. at 448:6-19.

Mr. Robert Hood is a fact witness for plaintiff, Pl.'s Wit. 10, and defendant, Tr. 243:16-
(continued...)

[3](...continued)
244:18. He is a Deputy Assistant Port Director for Customs at Otay Mesa. Id. at 185:18-186:8. He first worked as a Customs Inspector for USCS in 1987. Id. at 186:1-2; 186:12-14. At that time, he worked in secondary inspections and, over the years, he has worked in cargo, commercial, and airport operations. Id. at 186:18-21. He became a Senior Inspector in 1991 and a Supervisory Customs Inspector in 2000. Id. at 187:8-10. In 2004, he became a Supervisory Customs and Border Protection Officer, and he was promoted to Chief Customs and Border Protection Officer. Id. at 187:10-14. In October 2007, Mr. Hood became Deputy Assistant Port Director. Id. at 187:14-16.

Mr. Alfonso Calderon Leon is a fact witness for plaintiff. Pl.'s Wit. 3. He was a plaintiff in this case when the complaint was first filed. Id.; see Complaint (Compl.) ¶ 5. He is thirty-nine years old, and he works with Messrs. Agredano and Gabriel Calderon in a print shop. Tr. 94:21-95:1. He has worked at the print shop for approximately fifteen years. Id. at 95:4-5. Mr. Rivera Agredano is married to Mr. Calderon's sister. Id. at 95:6-8.

Mr. Gabriel Calderon Leon is a fact witness for plaintiff. Pl.'s Wit. 15. He is thirty-five years old and works as a printer with his brother-in-law, Mr. Agredano. Tr. 520:8-15. He lives in Tijuana, Baja California, Mexico. Id. at 520:16-17.

Ms. Juliet Calip is a rebuttal witness for defendant. Tr. 676:18-22. She works as a paralegal specialist for U.S. Immigration and Customs Enforcement. Id. at 677:22-24. She has held that position since March 2003. Id. at 678:1. Prior to that, she was a paralegal specialist for USCS for two years. Id. at 678:2-8. In both positions, which are essentially the same jobs (the difference being the reorganization of the USCS within the Department of Homeland Security (DHS) in 2003), Ms. Calip processes Freedom of Information Act requests. Id. at 678:9-22.

Dr. Miguel Lizarraga is a fact and expert witness for plaintiff. Pl.'s Wit. 14. He works as a medical doctor. Tr. 798:1. He received a degree in a medicine from the University Juarez Autonoma de Tabasco in Mexico. Id. at 798:6-10. Dr. Lizarraga has a certificate in obesity, which was awarded to him by the Association of Obesity in Tijuana, Baja California after attending classes there. Id. at 799:6-17. For the past twenty-four years, he has practiced emergency medicine at the Issste Hospital in Tijuana, Mexico. Id. at 800:2-5. The court qualified Dr. Lizarraga as an expert in general medicine and in the control of obesity. Id. at 800:16-19.

Mr. Carlos Mejia Lopez is a fact witness for plaintiff. Pl.'s Wit. 3-4. He is a criminal law attorney in Tijuana, Mexico. Tr. 129:20; 130:2-4. He was president of the municipality of Tijuana from 2004 to 2007. Id. at 130:25-131:1. He represented Mr. Agredano in the criminal proceedings that followed Mr. Rivera Agredano's arrest by the Mexican border authorities. Id. 140:12-14. Mr. Rivera Agredano's wife is a sister to Mr. Lopez's wife. Id. 140:11.

(continued...)

[3](...continued)

Mr. Joseph Marilao is a fact witness for plaintiff. Pl.'s Wit. 6. He is a Supervisory Customs and Border Protection Officer, a position that he has held since 2006. Tr. 398:16-21. He began his employment with USCS in 1992 as an inspector at San Ysidro. Id. at 398:22-399:4. After six months, he worked as an inspector at Otay Mesa and then returned to San Ysidro two and a half years later. Id. at 399:5-16. In 1997, he became a Canine Enforcement Officer and, in 2000, he became a Senior Inspector. Id. at 399:20-400:2. In 2002, Mr. Marilao served as a Canine Enforcement Officer again, and he became a Supervisor in the Canine Border Protection unit in 2006. Id. at 400:3-12.

Mr. David John Murphy, Jr. is a fact witness for plaintiff. Pl.'s Wit. 7-8. He currently works as the Director of Field Operations for Customs in the Chicago field office. Tr. 304:24-305:1. From 1983 to 1986, he orked for USCS as a customs inspector in San Ysidro, California. Id. at 305:4-14. Heb then worked as a Canine Enforcement Officer in the San Diego field office until 1999 when he ecame Acting Chief of the canine section. Id. at 305:21-306:10. After approximately three montshs, Mr. Murphy was selected as the Enforcement Coordinator for the Southern California Custom[s] Management Center, a position that he held until November 2001. Id. at 306:15-25.

Ms. Aide Nunez is a fact witness for plaintiff. Pl.'s Wit. 12. She is an Inspector with Customs, Tr. 369:6-8, a position she has held since 1995, id. at 369:9-10. In 2001, she served as the Lead Officer in the Contraband Enforcement Team. Id. at 370:19-22.

Mr. Jose Perez is a rebuttal witness for defendant. Tr. 724:23-725:3. Mr. Perez is a Supervisor Chief with Customs, a position that he has held since 2000. Id. at 725:17; 726:2-3. He has been with USCS and Customs for over nineteen years. Id. at 725:24-25.

Mr. Robert Root is a fact witness for plaintiff, Pl.'s Wit. 11, and a fact witness for defendant, Def.'s Wit. 3. Although currently retired, Tr. 642:17, Mr. Root previously was employed by USCS, id. at 642:18-20. Beginning in October 1983, he served as an Inspector for USCS for three years. Id. at 642:21-643:6. In 1986, he became a Canine Enforcement Officer, a position that he held until 1995 when he became a Canine Enforcement Supervisor. Id. at 643:9-17. Mr. Root served as a Canine Enforcement Supervisor until his retirement in 2007. Id. at 643:19-20.

Dr. Hector Santillana is a fact and expert witness for plaintiff. Pl.'s Wit. 13. He has worked as a psychiatrist for forty years. Tr. 772:21-23. He currently practices in Tijuana, Mexico. Id. at 773:9-12. He earned a degree in psychiatry in 1969. Id. at 773:6-8. From 1965 through 1968, he trained at Hospital Cruz del Norte in Hermosillo Sonora, Mexico, Hospital Cruz del Sur in Oaxaca, Mexico, and Hospital Fray Bernardino Alvarez in Mexico City, Mexico. Id. at 774:13-19. Since that time, he has kept his own office for private practice, and, in 1970

(continued...)

Transcript (Tr.) passim. Following trial, the parties filed post-trial briefs and replies: Plaintiff Francisco Javier Rivera Agredano's Post Trial Brief (Pl.'s Br.); Defendant's Posttrial Brief (Def.'s Br.); Plaintiff Francisco Javier Rivera Agredano's Post Trial Reply Brief (Pl.'s Reply); and Defendant's Response to Plaintiff's Post-Trial Brief (Def.'s Reply). In a previous opinion in this case, the court dismissed a related claim brought by plaintiff's brother-in-law, Agredano v. United States (Agredano I), 70 Fed. Cl. 564, 579 (2006), and denied a motion by defendant to dismiss the case in its entirety, id. at 580. The procedural background is described in more detail in Part II.C below.

Plaintiff seeks to recover damages arising from an alleged breach of contract by the government, specifically, U.S. Customs and Border Protection (Customs), in connection with the government's sale of a 1987 Nissan Pathfinder (the Pathfinder) after Mexican authorities stopped plaintiff in the Pathfinder and arrested him for transporting seventeen kilograms of marijuana found in the Pathfinder. Complaint (Compl.) ¶¶ 7, 13-16. Specifically, plaintiff seeks to recover $2,600 for the fair market value of the Pathfinder; $350,000 for attorneys fees incurred by plaintiff during his criminal proceedings in Mexico; $1,254 for the costs and expenses incurred by plaintiff's family in bringing supplies to plaintiff while he was imprisoned; $48,000 for the income plaintiff lost during his imprisonment; $10,000 for the medical bills plaintiff incurred from the injuries and illnesses he sustained as a result of his imprisonment; $80,000 for the medical expenses it is reasonably foreseeable that plaintiff will incur in the future as a result of the injuries and illnesses he sustained as a result of his imprisonment; $12,500 for the psychiatric bills plaintiff has incurred as a result of the psychiatric ailments that his imprisonment caused; $33,000 to $60,000 for psychiatric expenses it is reasonably foreseeable that plaintiff will incur as a result of his imprisonment; and "[e]motional distress damages in an amount which the Court deems reasonable compensation for the arrest and imprisonment of . . . [plaintiff] for a period of 351 days . . . and the residual related problems suffered thereafter." Pl.'s Br. 1-2.

## II. Background

---

[3](...continued)
and 1976, he also had two psychiatric clinics in Tijuana, Mexico. Id. at 774:25-775:12. From 1981 to 1984, Dr. Santillana also served as the director of the Issste Hospital. Id. at 775:21-25. In 1996, he was the director of another hospital, Health Department Health Center No. 1. Id. at 775:21-776:1. From 1974 through 1978, Dr. Santillana also served as the president and vice president at the medical university in Tijuana. Id. at 776:19-777:4. The court recognized Dr. Santillana as an expert in psychiatry. Id. at 778:1-2.

A. Plaintiff's Purchase of the Pathfinder and Subsequent Arrest by Mexican Authorities

Plaintiff Agredano currently resides in Tijuana, Mexico with his wife, Maria del Carmen Calderon, and two daughters. Tr. 44:18; 44:22-45:8; 49:13-15. He is in the printing business. Id. at 44:20-21. Alfonso Calderon and Gabriel Calderon, both of whom are brothers to plaintiff's wife, have worked as partners in plaintiff's printing business for the last twelve years. Id. at 45:16-46:13. Plaintiff's business prints items such as brochures, cards, stationary, and envelopes. Id. at 47:22-48:1. Some of plaintiff's clients are ad agencies that conduct work for Burger King in Tijuana and Cali-Max, a supermarket chain. Id. at 48:4-7. Plaintiff has printing equipment in Tijuana that he uses for smaller jobs, but he sometimes rents equipment at other locations in order to perform larger-scale projects. Id. at 47:9-13. Depending on the particular job, plaintiff may rent equipment in either Tijuana or Enseneda, Baja California. Id. at 48:10-16; see Joint Exhibit (JX) 12 (photographs from the evidence offering session) 18.

On September 5, 2001, plaintiff bought the Pathfinder at an auction held by U.S. Customs near San Diego, California. Tr. 50:7-15; 51:6-7; see JX 4 (Conveyance Custody Acceptance Report) 13; JX 7 (plaintiff's title to the Pathfinder) 1. He attended the auction with his brother-in-law and business partner, Gabriel Calderon, because they each wanted to buy a vehicle. Tr. 54:22-55:5. At the auction, three to four hundred cars were being auctioned, id. at 55:5-6, but plaintiff and Gabriel Calderon decided to buy only one vehicle because "[s]ome of the ones that we were interested in were too expensive, so we weren't able to buy them," id. at 55:6-8. Plaintiff had learned about the auction from an acquaintenance, and he was interested in purchasing a vehicle at the auction because "this vehicle [Pathfinder], for example, in Tijuana would cost about $5,000, but at the auction, this vehicle cost - it cost me $2,600." Id. at 51:17-25. Plaintiff understood that the vehicles sold at these auctions were seized vehicles, but he had no knowledge as to where or why the cars had been seized. Id. at 52:2-12. Prior to this particular auction, plaintiff had bought vehicles at U.S. government auctions in the past "several times," and he had never had a problem with any of the vehicles that he had purchased previously. Id. at 51:12-16.

When plaintiff arrived at the auction lot, he completed a Bidder Registration Form that was administered by U.S. Customs Service Support. Id. at 52:22-53:3; JX 6 (Bidder Registration Form) 1. As a condition of participating in the auction, plaintiff signed the Bidder Registration Form, Tr. 53:1-3, which provided, "I agree to comply with the terms of sale contained in the sale catalog for this sale and all future sales I attend," JX 6 (Bidder Registration Form) 1. Plaintiff chose to bid on the Pathfinder because of the vehicle's condition: "[I]t wasn't destroyed on the outside and the interior was intact." Id.

at 53:12-13. Plaintiff was unable to open the doors and inspect the interior of the Pathfinder directly, but "[t]he back part was open and inside of that was a gas tank that had been removed and that's how you could look inside, and you could also look inside through the windows." Id. at 53:11-54:7. Gabriel Calderon confirmed at trial that the interior "looked in perfect condition," id. at 524:16, and that the only visible damage to the car was "that the gasoline tank had been removed and it was in the back of the car, in the trunk," id. at 524:10-12. Plaintiff further testified that "the upholstery was complete" in the Pathfinder, as opposed to "[o]ther vehicles [that] had the upholstery torn." Id. at 54:10-12. The fact that the upholstery was complete was important to plaintiff because "with some cars, it would be too expensive to have them be operational again[, a]nd that would raise the cost." Id. at 54:16-18.

At some point prior to purchasing the Pathfinder, plaintiff saw a flyer, id. at 56:7-10, that stated the following:

> WARRANTY/GUARANTEE: All merchandise is sold on an "AS IS, WHERE IS" basis, without warranty or guarantee as to condition, fitness to use, or merchantability stated, implied or otherwise. Please bid from your personal observations.

JX 5 (auction flyer) 1. Plaintiff testified that he understood that he was purchasing the vehicle "as is." Tr. 56:11-13. He stated that U.S. Customs "on one occasion said that the vehicles were auctioned as they were, 'as is.' And they made reference to the fact that they didn't assume any responsibility if the engine was shot or the transmission didn't work." Id. at 56:16-20. Plaintiff also testified that he was not concerned about the Pathfinder containing narcotics "[b]ecause I was buying it from a country that has - that I supposed had high technology, the latest technology, and that it was impossible for it to have any problem." Id. at 58:9-12. Plaintiff "felt 100 percent sure, safe" that the Pathfinder had been checked for contraband because he "was buying it from the [U.S.] [g]overnment itself." Id. at 58:20-59:1.

Plaintiff paid for the Pathfinder with cash, id. at 88:9-11, and signed the title to the vehicle, thereby obtaining ownership, JX 7 (Certificate to Obtain Title to a Vehicle) 1. The title stated the following:

> The undersigned Department or Agency of the United States Government certifies that the vehicle described herein, the property of the United States Government, has been transferred this 5th day of September 2001, to the Transferee designated herein; and that this is the first transfer of such

> vehicle in ordinary trade and commerce subsequent to acquisition thereof by the United States Government.

Id. The title listed the transferor of the vehicle as "U.S. Customs Service" in San Diego and the transferee as "Francisco J. Rivera Agredano." Id. The signer on behalf of the transferor was Guiseppe A. Vaccano, and plaintiff signed as the transferee. Id.

Having obtained possession of the Pathfinder, plaintiff "had to install the gas tank, which was right there in the vehicle itself." Tr. 59:3-4. To plaintiff's knowledge, after purchasing the Pathfinder, no one ever removed the rear seats, took out the paneling on the inside of the interior, or inspected the wheel walls above the tires. Id. at 59:14-25. Plaintiff and Gabriel Calderon drove the Pathfinder without any problems. Id. at 59:7-13.

Some four and one-half months later, on January 24, 2002, at about eleven o'clock at night, plaintiff drove with Alfonso Calderon in the Pathfinder from Enseneda to Tijuana. Id. at 60:21-61:9. They had traveled to Ensenada earlier that day to drop off ten thousand blank sheets of paper to be processed at printing facilities there. Id. at 60:7-12. For their trip home, they packed into the Pathfinder five thousand printed, cardboard-like posters for one of their clients, the supermarket chain Cali-Max. Id. at 61:3-6; 62:10-12.

In order to drive to Tijuana from Ensenada, plaintiff was required to stop at a mandatory checkpoint in the small town of Sauzal. Id. at 61:10-15. "[S]oldiers were inspecting all of the vehicles that came through there," and plaintiff and Alfonso Calderon "were asked where we were heading and what we were carrying." Id. at 62:8-10. Plaintiff was asked to pull to the side of the road, to get out of the Pathfinder, and to open the trunk. Id. at 62:20-24. The soldiers had a metal antenna "like [a] rod," id. at 63:14, "and they removed some coverings that the back upholstery has and they would stick in that metal antenna," id. at 63:9-11. Plaintiff saw the soldiers stick the metal antenna inside several places in the Pathfinder. Id. at 63:15-17. "When they were poking the side, the soldiers noticed that it would stop on something[,] and they started using force to knock off one of the coverings." Id. at 63:20-22. The soldiers found a package on the right side of the back part of upholstery. Id. at 63:23-64:5. They then asked Alfonso Calderon to get out of the Pathfinder, and "[t]hey started knocking down all of the - the signs, the cardboard signs, and they started breaking up all of the inside." Id. at 64:8-23. The soldiers found additional packages in the upholstery, in the doors, and in the sides of the vehicle. Id. at 64:24-65:3; see JX 12 (photographs from the evidence offering session) 12.

During the inspection at Sauzal, plaintiff and Alfonso Calderon were restrained by the soldiers, who pointed guns to their heads, touched them with the butt of the guns, and

handcuffed them. Tr. 65:23-66:8. Plaintiff injured his right arm "from the excessive movement upwards that they [the soldiers] made when they handcuffed me," and he was hit in the back a few times with the butt of a rifle. Id. at 67:20-68:10. Once the search was complete, plaintiff and Alfonso Calderon were held in a room and unable to make any telephone calls until six or seven o'clock in the morning. Id. at 66:11-19. The next morning, they were taken to an army barracks in Ensenada where "in a hidden manner a soldier let me [plaintiff] call Tijuana." Id. at 66:21-24. Plaintiff called his wife, Carmen. Id. at 66:25-67:1.

By nine o'clock on the morning of January 25, 2002, plaintiff was at the Office of the Federal Attorney General, where he was held in a cell separate from Alfonso Calderon. Id. at 68:17-24. He stayed in that cell for about twelve hours and then went to the court in Ensenada to give a statement. Id. at 69:1; 69:7-11. Plaintiff and Alfonso Calderon were then taken to the penitentiary at Ensenada at about ten or eleven o'clock at night. Id. at 69:8-9.

After arriving at the penitentiary, plaintiff was "totally, completely searched," and his wallet, belt, and shoelaces were taken. Id. at 70:2-4. The prison was constructed entirely of concrete and contained several areas with exposed sewage. Id. at 82:11; 83:19-21. Plaintiff was placed in a cell that contained approximately eleven other persons, id. at 70:9-10, and he remained there for twenty or thirty days, id. at 70:15. He testified that he did not fit in the cell and that he "was left to sit there at the door." Id. at 70:12-13. Because of the small size of the cell, plaintiff was unable to lie down to sleep. Id. at 70:20-23. The only bathroom facility available to plaintiff was a hole in the cell. Id. at 71:1-2. With regard to food and drink, plaintiff was given coffee and water three times a day and fed beans, rice, and soup. Id. at 71:15-24. Plaintiff's family would come and visit but it was difficult to do so "[b]ecause they had to be amongst the other inmates that were there. There [was]n't a special place where you can meet with them." Id. at 74:4-6. Eventually, plaintiff was transferred to another cell that contained forty-five or fifty persons. Id. at 72:17-19. He slept on the floor in that cell, id. at 75:9-11, and spent his days just sitting in the cell without an opportunity to exercise, id. at 74:18-75:14. He was provided with the same food and drink that he had received in the first cell. Id. at 81:19-23. There was only one toilet, which did not flush, located in the cell, and hot water was available for showering only at three or five o'clock in the morning. Id. at 83:1-15. Plaintiff remained in that cell for eleven months. Id. at 75:19-21.

B. Plaintiff's Criminal Proceedings in Mexico

Attorney Carlos Mejia-Lopez, a criminal attorney in Tijuana, Tr. 129:20-130:4, who is married to one of the sisters of plaintiff's wife, id. at140:11, represented plaintiff

throughout plaintiff's Mexican criminal proceedings, id. at 140:12-166:24. Mr. Mejia testified that, under Mexican criminal law, once someone is arrested, that person must appear before "the authorities that have jurisdiction over the person who's detained," id. at 131:18-19, within twenty-four hours and give a statement called "a ministerial statement," id. at 131:24-132:8. "It is at that time that the suspect is informed of the charges that he's being charged with." Id. at 132:2-3. "The Ministerial Government Office or District Attorney's Office then decides whether there are enough elements based on that statement . . . for that detainee to give a second statement before a judge." Id. at 132:11-15. The judge has forty-eight hours in which to accept the detainee's statement, which is known as "the pre-trial statement." Id. at 132:18-20. If the judge decides to pursue the charge, the defendant has three to six days to provide proof of his innocence. Id. at 133:2-22.

Following the search of the Pathfinder by Mexican authorities at Sauzal, plaintiff was charged with drug trafficking and possession of drugs. Id. at 141:10. The first judge was a judge based in Ensenada. Id. at 138:20-24. Mr. Mejia requested from that judge the extended time period within which to produce evidence, and he was granted the six-day period. Id. at 136:8-14. The protocol is that evidence is presented to the court in writing, id. at 133:23-24, and that "[o]ne has to present each means of proof or evidence one by one and has to disclose the purpose of each evidence," id. at 133:24-134:1. "Evidence can be testimony from witnesses, police inspections, expert evidence, documents, [and/or] interviews . . . ." Id. at 134:2-5. The evidence is then presented to a clerk. Id. at 134:22-135:1. "The judge almost never sees the defendant." Id. at 135:25.

Mr. Mejia testified that, following the initial presentation of evidence, if the defendant is indicted, the "instruction period," Tr. 136:22-25, begins, during which "the judge says you have an X amount of months for you to offer more evidence because this evidence is not sufficient," id. at 137:1-3. The evidence includes "statements, documents, eyewitness visits, confrontations, [and/or] reconstructing the scene of the events." Id. at 137:6-8. At the end of the instruction period, a hearing occurs at which the judge affords the attorney a final opportunity to make a record. Id. at 137:21-138:1. A few days after the hearing, the judge issues a decision. Id. at 138:1-2. If the judge finds the defendant guilty, the defendant may appeal the sentence before a "higher" judge. Id. at 138:11-15. Before the "higher" judge, "you present your written arguments and documents that you may have, but you are not allowed any more to offer any kind of statements or testimony or any visits where you personally go and inspect the scene." Id. at 138:15-19. If that second judge affirms the guilty verdict, the defendant may appeal once more before a panel of three "higher" judges. Id. at 139:10-12.

Plaintiff's initial line of defense was "to try to prove to the judge that they [plaintiff and Alfonso Calderon] were in Ensenada doing a printing job." Id. at 141:13-14. Plaintiff did not, when he was arrested, know how the marijuana came to be in the Pathfinder, id. at 141:22-142:1, and "[i]t wasn't until weeks later that we [plaintiff's defense attorneys] realized that the problem had been that that car had been previously detained with drugs in it." Id. at 142:1-3. On March 11, 2002, Mr. Mejia "had a visual inspection evidence offering session in Ensenada" where he "asked the judge to open those packages [the packages seized by the Mexican soldiers at the checkpoint]." Id. at 142:3-6. Mr. Mejia testified, "We opened some packages and the drugs had rotted. It was full of like fungi. It was rotten. It was no good." Id. at 142:6-8; see also JX 12 (photographs from the evidence offering session) 1-8. On that same date, plaintiff's wife presented Mr. Mejia with a document "that had the name Jose Jimenez-Coronel" and "explained there in English that the car had been seized at the San Ysidro Customs area on . . . January 25, 2001." Id. at 142:14-20; see JX 2 (Custody Receipt) 1. Mr. Mejia then contacted the U.S. Customs and Border Patrol in Otay Mesa for more information about the circumstances leading to the Customs sale of the Pathfinder at the auction, Tr. 143:7-10; 144:8-10, but the Customs officials "[spoke] harshly to me and they'd close the window," id. at 144:1-2. Mr. Mejia then hired a law firm in San Diego to help him obtain the information that he sought from Customs. Id. at 144:24-145:4.

With the help of the law firm in San Diego, which is the law firm to which plaintiff's counsel belongs, Mr. Mejia "obtained some important documents" from Customs. Tr. 145:7. Specifically, plaintiff's counsel sent a Freedom of Information Act (FOIA)/Privacy Act (PA) request to Customs, asking for "photographs of the Pathfinder and the marijuana found in the Pathfinder, and other photographs connected to this seizure file." JX 14 (Customs' response to plaintiff's counsel's FOIA request) 1. After receiving an incomplete response and sending a second FOIA request, see Part III.G.2, Mr. Mejia finally obtained the eight photographs that Customs had taken after having seized the Pathfinder, JX 15 (Customs' response to plaintiff's counsel's FOIA request) 1, 7-24. Mr. Mejia presented all eight photographs to the first judge before she submitted her ruling on the case. Tr. 148:2-5.

Mr. Mejia also offered evidence regarding the condition of the Pathfinder after the Mexican security forces discovered the marijuana. Id. at 150:12-154:11; JX 12 (photographs from the evidence offering session) 9-17. Mr. Mejia testified at trial that:

> [W]e went to do a car inspection because I wanted to see how it was that they had gotten the packages out of the car. Because the soldiers had said that the packages were hidden in the car, in the walls. And we went - when we went there to carry out this inspection, we realized that the soldiers had

> destroyed the whole interior of the car. They destroyed it all. They pulled off all of the upholstery. From the moment that they found the first package, they tore the car up inside entirely, took down all the walls. They didn't hesitate a bit. They found one [package] and they tore everything up, all of it totally. The car was destroyed.

Tr. 150:15-151:2; see JX 12 (photographs of the evidence offering session) 9-17. The posters that plaintiff and Alfonso Calderon had been transporting from California to Tijuana remained in the back of the car. Tr. 152:2-11; JX 12 (photographs from the evidence offering session) 21. Mr. Mejia took pictures of the posters and presented those pictures as additional evidence "because the judge did not believe that the posters had been in the car." Tr. 152:5-7; see JX 12 (photographs from the evidence offering session) 12-22.

Mr. Mejia presented additional photographs of the packages of marijuana. See JX 12 (photographs of the evidence offering session) 27-29. Mr. Mejia testified that the Mexican Federal Attorney General's Office "explained to me that some of the packages were wrapped in plastic - vacuum-packed so that the smell would not go through the packaging and that, because of this, most likely the packages could have been in the car for so long, about a year, and practically not have smelled." Tr. 159:22-160:2. One chemist had inspected the packages on the date that plaintiff and Alfonso Calderon were detained, and Mr. Mejia stated that:

> [H]e [the first chemist] testified before the judge because I asked that he be subpoenaed to give his statement. When I asked him certain things about the drugs, the characteristics of the drugs that he had checked on the date that my guys had been detained, he answered that the drugs that he had inspected in those packages was very dry, that it smelled badly, that it was drugs that had been stored for a long time and that it lacked texture and he was the chemist for the prosecution . . . , yet he was testifying as to things that he had noted the first day when he checked the drugs when they were arrested. . . .
>
> And then, afterwards, I asked for an expert opinion with two other chemists so that they could analyze each package one by one and that's how the three chemists finally arrived at the same conclusion, in that it was old drugs, that it was - they were - it was dry, that it lacked texture, and that it had spoiled

> and that these drugs had been in the car for at least a year. And the defendants had been arrested only about a month and a half.[4]

Id. at 160:20-161:19 (footnote added); see also JX 18 (summary of the first chemist's testimony) 1-2.

Mr. Mejia "offered 57 pieces of evidence, approximately." Tr. 162:24-25. The evidence included "visual inspections, expert chemists' testimony, many statements of witnesses, character witnesses to prove Mr. Rivera and Mr. Calderon's honorability, many reference letters, statements on the part of the soldiers, confrontations with the soldiers, and the soldiers themselves." Id. at 163:1-6. Mr. Mejia testifed that he asked the soldiers, "'When you asked the car to stop, what was the attitude on the part of these men, Rivera and Calderon?' They said that it was normal, that it didn't seem that they were worried or anything because they were convinced that what they were carrying in the car were posters, the posters that they had just printed up." Id. at 163:7-13.

Proceedings took place before the judge in Ensenada up until June 25, 2002. Id. at 138:23-24. On that date, the judge found plaintiff guilty and sentenced plaintiff to five years in jail. Id. at 139:23. The opinion delivered by the judge[5] found plaintiff's defense

---

[4]It appears that "a month and a half," Tr. 161:19, refers to the time elapsed between plaintiff's arrest and the chemist's examination of the drugs. The Pathfinder was seized on January 25, 2001, Compl. ¶ 9, and forfeited to defendant at some point between January 25, 2001 and September 5, 2001, id. at ¶¶ 9-13. Plaintiff purchased the Pathfinder on September 5, 2001. Tr. 50:7-10; 51:6-7. Plaintiff was arrested on January 24, 2002, id. at 60:21-66:13, approximately a year after the Pathfinder was seized.

[5]Plaintiff and defendant agreed to admit into evidence Interpreter Mayne's translation of certain sections of an opinion issued in Spanish by the Mexican criminal judge, Tr. 258:7-259:4, 514:3-13, at this juncture. Interpreter Mayne sight translated and read into the record portions of the opinion designated by plaintiff's attorney. Id. at 516:7-519:5. The court admitted the opinion into evidence under FRE 1005, Tr. 259:13-260:1, which states that "[t]he contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed . . . , may be proved by copy, certified as correct in accordance with [FRE] 902 or testified to be correct by a witness who has compared it with the original," FRE 1005. The opinion is self-authenticating under FRE 902(3), which provides that a foreign public document is self-authenticating and the court may treat it "as presumptively authentic without final certification or permit [it] to be evidenced by an attested summary with or without final certification." FRE 902(3). The opinion issued by the Mexican criminal court is a foreign public document; accordingly, no further proof of authenticity other than the document itself was required.

- that the United States had failed adequately to inspect the Pathfinder before selling it to plaintiff - incredible:

> Thus, what the Defense has stated, that precisely the authorities of the United States have not conducted an adequate inspection of the other compartments of the vehicle because the interior of the same was found intact is not credible. Said information, which was provided by the Customs Department, and which was offered as evidence in this criminal case, does not benefit them in any way since[,] independently of what the Defense states, that the U.S. authorities did not conduct an exhaustive inspection, it must be noted that they have adequate technology and don't have the need to destroy the vehicle. So, in regard to the documentary evidence presented or submitted, specifically the photographs showing the interior of the vehicle intact, that indicates that it did not have drugs in any other part of the vehicle and that they did not know of their existence.

Id. at 516:14-517:10. The judge opined that the United States officers would not have violated United States law by failing to inspect the Pathfinder:

> This Judge could not establish that an omission has been made on behalf of the Customs authorities in the United States in that they did not inspect adequately the other compartments of the vehicle since, as has been informed, such determination would constitute a violation of the laws of that country.

Id. at 517:13-20. The judge appears to assume that - based on photographic evidence - the proper inspections must have been made without destroying the interior. She further appears to assume that the "technology" available to the United States would have permitted a complete search without damaging the interior of the Pathfinder:

> In order to make a determination of something that is a matter for them to resolve, even though in the photographs it can be noted that the vehicles interior was intact and thus can be clearly seen, that the same at the moment it was seized by the Government of the United States did not have drugs in any other part and that, on the contrary, that the gasoline tank that had been removed had been the place where they had found drugs at the moment they seized - the United States authorities seized the vehicle and that the inspection was conducted according to their methods, procedures, and technology that they have, without having to destroy a vehicle in order to inspect it.

Id. at 517:20-518:11. The judge had previously refused to credit plaintiff's testimony that he had crossed the United States/Mexican border without incident:

> On the other hand, it is also incredible that the Defendant, Francisco Javier Rivera-Agredano, and witnesses Gabriel Calderon-Leon, as well as the minor, Paulina Lizeth Rivera-Calderon, what they stated, that during the Christmas season they crossed the vehicle in question into the United States in more than one occasion. Since that version is unbelievable since at that time of the year, the inspections are even more exhaustive. In addition, in December of 2001, they were particularly exhaustive since they were at a very recent time after the events of the terrorist attacks to the Twin Towers in New York. Being able to consider that if the drug that was seized had been found in the vehicle, it could have been easily detected.

Id. at 518:13-519:5.

From June 25, 2002 through September 17, 2002, plaintiff appealed before a magistrate judge in Tijuana. Id. at 138:25-139:5. Mr. Mejia "explained many of the arguments to the magistrate," id. At 164:14-15, who told Mr. Mejia that his "defense was very good," id. at 164:19, because he "offered many pieces of evidence," id. at 164:20-21. However, on September 17, 2002, the magistrate judge affirmed the first judge's sentence in a written ruling. Id. at 165:2-5. The judge ruled that the first judge "had been able to correctly evaluate the evidence, that the judge had done an excellent job." Id. at 165:10-12. From September 17, 2002 through January 10, 2003, Mr. Mejia worked on the final appeal for plaintiff, which was held before three judges in Mexicali. Id. at 139:10-17. On January 10, 2003, Mr. Mejia "received a call from Mexicali letting me know that they [plaintiff and Alfonso Calderon] would be released that day." Id. at 166:22-24.

### C. Procedural Background

On November 14, 2002, plaintiff and his brother-in-law, Alfonso Calderon Leon, jointly filed a claim in the United States District Court for the Southern District of California pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-80, alleging negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud or intentional misrepresentation, negligent misrepresentation, negligent and intentional infliction of emotional distress, and violation of California's Consumer Legal Remedies Act, § 1770(a)(14). Defendant's Motion to Dismiss Or, in the Alternative, for Summary Judgment (Def.'s Mot. or defendant's motion) App. 20-47. On June 29, 2004, the United States Supreme Court issued its decision in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), finding that a cause of action could not lie under the

Federal Tort Claims Act for "any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." Sosa v. Alvarez-Machain, 542 U.S. 692, 712 (2004). On or about November 3, 2004, Compl. ¶ 3, the United States District Court for the Southern District of California granted defendant's motion for summary judgment, finding that the action was barred under the Federal Tort Claims Act because plaintiffs' arrest occurred in Mexico, see Agredano v. United States, No. 02CV2243B, Docket Entry No. 71 (S.D. Cal. Nov. 3, 2004).

Thereafter, plaintiff, Alfonso Calderon, and defendant stipulated to the filing of an amended complaint and to the transfer of the action to this court. Compl. ¶ 3. On February 3, 2005, pursuant to the parties' stipulation, the United States Court for the Southern District of California dismissed plaintiff's and Calderon's claims without prejudice, granted the parties' motion to amend, and transferred the action to this court. Stipulation to Transfer and Dismiss Appeal, Agredano v. United States, No. 05-608, Docket Entry No. 1, Attach. 1 (Fed Cl. June 8, 2005).

On June 17, 2005, plaintiff and Alfonso Calderon filed their amended complaint in this court, alleging breach of warranty, breach of contract, and breach of the covenant of good faith and fair dealing. Compl. passim. On September 30, 2005, defendant filed defendant's motion, alleging that this court lacked jurisdiction because plaintiff's and Alfonso Calderon's claims sound in tort or, alternatively, that the material facts are not in dispute and that the facts as alleged entitle defendant to judgment as a matter of law. Def.'s Mot. 1-22. In support of its motion for summary judgment, defendant argued (1) that the "as is" clause in the terms of sale precludes the existence of an implied warranty, id. at 12-16; (2) that defendant did not breach the implied covenant of good faith and fair dealing because it did not "specific[ally] inten[d] to injure" plaintiffs or harbor "actual malice" toward them, id. at 16-18 (citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002), and Carolina Tobacco Co. v. Bureau of Customs & Border Prot., 402 F.3d 1345, 1350 (Fed. Cir. 2005)); (3) that the damages plaintiff and Alfonso Calderon alleged were unrecoverable because defendant's breach did not directly cause plaintiffs' harm, id. at 18-20; and (4) that Alfonso Calderon was not a third-party beneficiary of the contract of sale and therefore cannot recover under the contract, id. at 21. On November 14, 2005, plaintiff and Alfonso Calderon filed their Opposition to Defendant USA's Motion to Dismiss or, in the Alternative, for Summary Judgment, with Appendix (Pls.' Resp. or plaintiffs' response), arguing (1) that this court had jurisdiction because defendant's failure to search the vehicle constituted a breach of contract, Pls.' Resp. 15; (2) that the "as is" clause did not preclude the existence of a warranty because its scope was not broad enough to cover the defect plaintiffs allege, id. at 20; (3) that there was a triable issue of material fact as to whether defendant's alleged failure to search the vehicle prior to sale for the purpose of increasing the resale value of

the vehicle and defendant's concomitant failure to disclose its actions constitute a breach of the covenant of good faith and fair dealing, id. at 17, 19-21; (4) that the damages sustained were recoverable because they were foreseeable and in fact occurred, id. at 2, 17-18; and (5) that Alfonso Calderon was a third-party beneficiary and accordingly entitled to recover under the contract, id. at 17. Plaintiff and Calderon further moved the court for "leave to amend the[ir] complaint to allege additional facts to establish the causes of action set forth in the complaint," "if necessary." Id. at 1.

In its Opinion filed March 27, 2006, this court held: (1) that plaintiff and Alfonso Calderon sufficiently established that there were genuine issues of material fact as to whether the context of the sale and the policy to search seized vehicles prior to resale constituted an affirmative representation which would negate the disclaimer and create a warranty; (2) that plaintiff may pursue his allegation that defendant breached the covenant of good faith and fair dealing by proving either that the government failed to conduct an adequate search for the purpose of obtaining a higher resale value for the vehicle at auction or that plaintiffs could not have discovered the hidden contraband in the circumstances of the auction sale and that the government had a policy to search thoroughly any vehicle seized because it contained narcotics, but that the government acted in direct contravention of its stated policy; (3) that plaintiff established the existence of a genuine issue of material fact as to whether damages he sustained in Mexico are recoverable in contract against defendant; (4) that Alfonso Calderon was not a third-party beneficiary of the contract between Agredano, the buyer of the Pathfinder, and defendant, the seller of the Pathfinder; and (5) that plaintiff may not be given leave to amend his complaint. Agredano I, 70 Fed. Cl. at 573-580.

Following telephonic status conferences held with the parties on July 6, 2006 and July 10, 2006, the court assigned-in-part the case to alternative dispute resolution (ADR) proceedings and retained jurisdiction over discovery and other proceedings in the case. See Order of July 10, 2006. On September 1, 2006, the parties requested the ADR judge to suspend proceedings while the parties pursued formal discovery. Defendant's Status Report, Sept. 1, 2006, 1. The ADR judge granted the parties' request to suspend ADR proceedings, Order of Oct. 10, 2006, and this court issued a scheduling order for dispositive briefing, Order of Oct. 30, 2006. In the months that followed, the parties proceeded with the discovery process and again attempted to settle the dispute. See Order of Feb. 9, 2007; Order of Feb. 14, 2007; Order of June 1, 2007. Pursuant to the parties' request, the ADR judge terminated ADR proceedings on July 20, 2007. Order of July 20, 2007. On September 14, 2007, this court set out a pretrial scheduling order in preparation for trial. Order of Sept. 14, 2007. Pursuant to that pretrial scheduling order, the parties filed: Plaintiff Francisco Javier Rivera Agredano's Memorandum of Contentions of Fact and Law (Pl.'s Mem.); Defendant's Memorandum of Contentions of Fact and Law

(Def.'s Mem.); Defendant's Witness List (Def.'s Wit.); Defendant's Exhibit List (Def.'s Ex.); Plaintiff Francisco Javier Rivera Agredano's Response and Objections to Defendant's Memorandum of Contentions of Fact and Law; Witness and Exhibit List (Pl.'s Obj.); Plaintiff Francisco Javier Rivera Agredano's Witness List (Pl.'s Wit.); Plaintiff's Exhibit List (Pl.'s Ex.); and defendant's Motion for Leave to File Defendant's Objections to Plaintiff's Revised Witness and Exhibit Lists (Def.'s Obj.). Following a pretrial conference held on January 14, 2008, see Order of Jan. 10, 2008; Order of Jan. 15, 2008, the court held trial on January 28, 2008 through January 31, 2008 in the Federal Building at 880 Front Street, San Diego, California. See Tr. passim.

In its post-trial briefing, the government concedes that a contract existed between plaintiff and defendant when plaintiff purchased the Pathfinder. See Def.'s Br. 1-2, 5 (acknowledging that a contract existed between plaintiff and defendant). However, the government contends that the various contractual theories of breach posited by plaintiff do not apply. See Def.'s Br. passim; Def.'s Reply passim. Out of twenty-one witnesses in total, defendant presented only three witnesses on direct examination and three witnesses on rebuttal. Defendant did not address in its post-trial briefing plaintiff's damages presentation other than to argue generally that compensatory and emotional distress damages are not available at all to plaintiff. Def.'s Br. 22-29; Def.'s Reply 24-27. With several exceptions, the government has chosen to use the forum of a trial and post-trial briefing to present essentially legal arguments. The bulk of the testimony and evidence presented at trial, therefore, was presented by plaintiff in support of his case that a contract existed between plaintiff and defendant, that defendant breached that the terms of that contract when it sold the Pathfinder to plaintiff, and the nature and the amounts of the damages caused by that breach. See Tr. passim.

## III. Discussion

### A. Legal Standards

#### 1. Jurisdiction

The United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2006). The court does not have jurisdiction to render judgment upon actions sounding in tort. Id. When a defendant challenges this court's jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), the plaintiff bears the burden of proving that jurisdiction is proper. Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1383 (Fed. Cir.

2002); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Corrigan v. United States, 68 Fed. Cl. 589, 592 (2005).

The jurisdiction of this court is not limited by the tortious nature of a claim otherwise cognizable in it. See, e.g., Chain Belt Co. v. United States, 115 F. Supp. 701, 711-12 (Ct. Cl. 1953) ("While it is true that this court does not have jurisdiction over claims sounding primarily in tort, an action may be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract."). In particular, a claim for tortious breach of contract is not precluded merely because the claim, though rooted in contract, also sounds in tort. Id.; Pratt v. United States, 50 Fed. Cl. 469, 480 (2001) (stating that a claim for tortious breach of contract has been recognized "not [to be] a tort independent of the contract so as to preclude Tucker Act jurisdiction"). Nor does the fact that consequential damages are alleged make the claim a tort claim; rather, an allegation of "consequential damages" presumes that the plaintiffs are proceeding under a contract theory. See, e.g., Bohac v. Dep't of Agric., 239 F.3d 1334, 1339-40 (Fed. Cir. 2001) (recognizing "consequential damages" as a "contract law concept"). As long as the claim "specifically relate[s] to a contractual obligation," it will survive a motion to dismiss. Pratt, 50 Fed. Cl. at 480.

Despite defendant's assertion that the court did not have jurisdiction over this matter, see Def.'s Mot. 1-22 (alleging that this court lacks jurisdiction because plaintiffs' claims sound in tort or, alternatively, that the material facts are not in dispute and that the facts as alleged entitle defendant to judgment as a matter of law), the court ruled previously that the court does indeed have jurisdiction over the claims brought by plaintiff Agredano, Agredano I, 70 Fed. Cl. at 580, and the court is not persuaded by defendant's arguments to revisit its prior ruling.

2. Implied-in-Fact Warranty

The Court of Federal Claims has jurisdiction over implied-in-fact warranty contractual disputes only, not implied-in-law warranty contractual disputes. See Hercules Inc. v. United States (Hercules), 516 U.S. 417, 423 (1996). "The Tucker Act . . . does not confer jurisdiction of claims against the United States on contracts, implied at law, they must be implied at fact." Lopez v. A.C.&S., Inc. (Lopez), 858 F.2d 712, 714-15 (Fed. Cir. 1988). "Implied-in-fact contracts differ from contracts implied in law (quasi-contracts), where a duty is imposed by operation of law without regard to the intent of the parties." Russell Corp. v. United States, 537 F.2d 474, 482 (Ct. Cl. 1976). The Federal Circuit has held that implied-in-fact contracts are distinguished by "circumstances [that] strongly support[] a factual inference that a warranty was implied." Lopez, 858 F.2d at

715. "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Hercules, 516 U.S. at 424 (quoting Baltimore & Ohio R.R. v. United States (Baltimore & Ohio R.R.), 261 U.S. 592, 597 (1923)).

The alleged implied-in-fact warranty in this case is a warranty that the Pathfinder was free of all contraband when defendant sold the Pathfinder to plaintiff. See Pl.'s Br. 12-13. In order to determine whether such a warranty existed and, if it did, whether defendant violated that warranty, the court first will examine defendant's policies regarding searches and seizures of seized vehicles. The court then will examine defendant's and plaintiff's understandings, to be proven by plaintiff, reasonably inferable as facts from the parties' conduct in light of the surrounding circumstances, regarding whether the Pathfinder was free of all contraband. The "meeting of the minds" in this case, therefore, is a mutual, if tacit, understanding, between plaintiff and defendant that the Pathfinder was free of all contraband when defendant sold the Pathfinder to plaintiff.

3. Superior Knowledge

The superior knowledge doctrine provides that, where the government has vital information about the transaction or object of the transaction, knows that its contracting partner has no knowledge of and no reason to obtain such information, misleads its contracting partner as to that information, or fails to put its contracting partner on notice to inquire, and does not provide the relevant information, the government has breached the contract. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991). As this court ruled previously, "Where the government has a policy providing that it will search a vehicle prior to resale when there is probable cause to suspect that narcotics are hidden within the vehicle, . . . and where, as here, the vehicle was seized because of the presence of contraband, . . . the government may be found to have misled its contracting partner or, alternatively, failed to put its contracting partner on notice to inquire as to the presence of contraband in the vehicle." Agredano I, 70 Fed. Cl. at 575 (internal citations omitted).

The government has a duty to disclose "superior knowledge . . . which is unknown and reasonably is not available to the contractor." John Massman Contracting Co. v. United States (Massman), 23 Cl. Ct. 24, 32 (1991) (citing Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 52 (1985), aff'd, 790 F.2d 90 (Fed. Cir. 1986) (Table)). The government does not, however, have a duty to disclose information that is reasonably available, Massman, 23 Cl. Ct. at 32 (citing L.G. Everist, Inc. v. United States, 231 Ct. Cl. 1013, 1018 (1982)); see also Vann v. United States, 420 F.2d 968, 982 (Ct. Cl. 1970), or that the contractor has an opportunity to learn on its own, see Vann, 420 F.2d at 982

(stating that a contractor who knows or has the opportunity to learn the facts cannot show that it was misled by the contract).

Plaintiff alleges that defendant violated the doctrine of superior knowledge when it did not disclose to plaintiff the alleged existence of a rumored policy in Customs to minimize damage during searches of seized vehicles in order to preserve the resale value of the vehicles at auction. Pl.'s Br. 21. In order to determine whether such a policy existed and whether defendant violated the superior knowledge doctrine, the court will examine the relevant testimony provided by Customs employees at trial.

4. Implied Covenant of Good Faith and Fair Dealing

The covenant of good faith and fair dealing is implied in every contract. Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The covenant provides that no party may "act to destroy the reasonable expectations of its contracting partner regarding the fruits of the contract" and "applies to the government just as it does to private parties." Id.; see Chain Belt Co., 115 F. Supp. at 710-712 (holding that government could not act negligently when performing its obligations under a contract). A contracting party, including the government, may not "depriv[e] its contracting partner[] of a substantial measure of the fruits of the contract and appropriat[e] those fruits, pro tanto, to itself." Centex, 395 F.3d at 1305. Although the "implied covenant of good faith and fair dealing cannot be used to expand a party's contractual duties beyond those in its express contract," the object of the contract is presumed to be subject to the covenant of good faith and fair dealing and the exact prohibited conduct need not be expressed. Id. at 1306.

Plaintiff alleges that defendant violated the covenant of good faith and fair dealing because defendant failed to search the Pathfinder adequately in order to obtain a higher resale value at auction and because defendant acted in direct contravention of its stated policy to remove all contraband from the Pathfinder. Pl.'s Br. 26-27. In order to determine whether defendant curtailed its search of the Pathfinder in an effort to obtain a higher resale value and/or whether defendant acted in direct contravention of its own policy, the court will examine the testimony provided at trial by plaintiff, Alfonso Calderon, several Customs employees, and an employee with the United States Immigration and Customs Enforcement. The court will also consider the numerous directives presented to the court at trial as joint exhibits.

B. [*** Parts III.B.1-4 are redacted except for the last paragraph in Part III.B.4. See n.1. ***]

In the light of the foregoing framework of search procedures, the court now reviews the evidence concerning the search of the Pathfinder after its seizure by Customs.

C. Inspection and Seizure of the Pathfinder

On January 25, 2001, Customs stopped the Pathfinder at a border patrol facility near the United States border with Mexico. Id. at 401:17-20. One Jose Armando Jimenez Coronel (Mr. Jimenez) was driving the Pathfinder north from Mexico into the United States. Id.; JX 3 (Personal Property Inventory) 1. An initial canine search was conducted at the border patrol facility, and the search indicated the potential presence of illegal narcotics concealed in the vehicle. Tr. 411:9-17; JX 55 ([***]) 1. Customs moved the vehicle to a secondary searching area where Joseph Marilao, Senior Inspector, conducted a [***] and documented his findings. Tr. 401:17-20; 402:11-403:5; JX 1 (Vehicle Inventory) 1. The court heard the testimony of Mr. Marilao at trial.

Mr. Marilao documented his search of the Pathfinder on a form entitled, "[***]." JX 55 ([***]) 1; Tr. 409:15-25. In that form, Mr. Marilao noted that 27.05 kilograms of marijuana was found in the gas tank of the Pathfinder that was driven and owned by Mr. Jiminez. JX 55 ([***]) 1. In the "Narrative" section of the form, Mr. Marilao typed the following:

> ON 01252001 AT APPROXIMATELY 1530 HOURS I WAS INFORMED BY CI [Customs Inspector] WARREN JOHNSON OF A CANINE ALERT ON THE GAS TANK OF A 1987 NISSAN DRIVEN BY THE ABOVE SUBJECT. THE CONTRACT MECHANIC WAS DISPATCHED. THE GAS TANK WAS REMOVED BY THE CONTRACT MECHANIC. WHEN THE TANK SENSOR WAS REMOVED I OBSERVED PACKAGES WITH PACKING TAPE, CELLOPHANE, AND VACUUM SEALED INSIDE THE GAS TANK. I REMOVED ONE RANDOMLY SELECTED PACKAGE THAT TESTED POSITIVE FOR MARIJUANA. SECTOR WAS NOTIFIED AND SA [Special Agent] HALL RESPONDED. A TOTAL OF 40 PACKAGES THAT WEIGHED 27.05 KGS WERE REMOVED FROM THE GAS TANK. THE BULK, SAMPLES, VEHICLE, AND REGISTRATION WERE SEIZED ON CF6051'S 2001250490000401,2,3, AND 4 RESPECTIVELY [refers to chain of custody forms, Tr. 415:18-416:8]. TWO BARRELS CONTAINING THE BULK AND A BUCKET CONTAINING THE SAMPLES WERE TURNED OVER TO SCI [Senior Customs Inspector] VAN BROWN FOR LOCKUP IN THE VAULT.

JX 55 ([***]) 1. Mr. Marilao explained at trial that the contract mechanic referred to in the "Narrative" was "American Towing. Tr. 412:11-13. He stated: "Those are the mechanics that we have come down to the port of entry to help remove gas tanks and tires and any other parts that we cannot remove without the use of some sort of special knowledge or skill or tools." Id. at 412:13-17. Mr. Marilao further explained that, once one of the wrapped packages tested positive for marijuana, Agent Hall, an investigating agent for Customs, responded to conduct the investigation, that is, "to sit down and talk to the violators and anybody else that's in the vehicle." Id. at 414:1-14.

At trial, Mr. Marilao recalled removing the gas tank from the Pathfinder but not having caused any additional damage to the vehicle. Id. at 405:5-406:20. Per search protocol, Mr. Marilao completed a document entitled "[***]." Id. at 403:12-404:15; JX 1 ([***]) 1. Box 21 of the document states the following: "CONDITION OF CONVEYANCE (Note damage, dents, etc. any other defects at time of seizure - body, motor, tires, paint and interior. Give general description." JX 1 ([***]) 1. The only comment made by Mr. Marilao in Box 21 is "tank removed." Id. Mr. Marilao testified that the absence of any other comment probably means that no other damage was caused to the car. Tr. 406:14-407:3. He stated, "I just had the tank removed," id. at 406:18-19, and if he had "removed the seat, [he would have] most likely throw[n] it back in the vehicle," id. at 407:2-3.

Although Mr. Marilao did not note any physical changes to the Pathfinder other than removal of the gas tank, he admitted that damage is "normally" caused to a vehicle during a [***]. Id. at 426:18-21. After damaging a vehicle during a search, such as tearing out the seats or dismantling the side panels, he agreed with plaintiff's counsel that [***]. Id. at 426:23-25. Rather, he agreed that the damaged or removed items [***]. Id. at 426:24.

At some point during the seizure, Mr. Marilao took photographs of the Pathfinder, but he does not recall exactly when he took them. Id. at 416:24-417:12. The photographs were provided to plaintiff in response to his counsel's second FOIA request and were entered into evidence as JX 15 (Customs' response to plaintiff's counsel's FOIA request) 17-24. See supra Part II.B. [***] id. at 417:6-8. Mr. Marilao's testimony confirmed that the photographs contained in JX 15 (Customs' response to plaintiff's counsel's FOIA request) 17-24 appear to be pictures of the removed gas tank, the packages in the tank, and the exterior and interior of the Pathfinder. Id. at 417:25-418:25.

An additional form that Mr. Marilao filled out at the time of his inspection of the Pathfinder is contained in JX 56 ([***]) 1. Entitled "[***]," this form states that forty packages of marijuana, which were sealed in vacuum seal bags with duct tape, cellophane

wrap, and packing tape and weighed 27.05 kilograms, were found in the gas tank. JX 56 ([***]) 1; see also Tr. 419:13-25. The form contains a space entitled "Total time to remove contraband" in which Mr. Marilao wrote "15 minutes" by hand. JX 56 ([***]) 1. Mr. Marilao testified that the fifteen minutes refers to "the time it took me to take the packages out and to weigh them." Tr. 420:7-8.

At trial, plaintiff's counsel questioned Mr. Marilao about his search for narcotics in other areas of the Pathfinder. Id. at 421:15-423:16. Mr. Marilao acknowledged that he has "encountered situations where marijuana is found in more than one location of a vehicle." Id. at 421:16-18. He agreed with plaintiff's counsel's statement that [***]. Id. at 421:20-22.

It is unclear what happened immediately after Mr. Marilao's search of the Pathfinder. No documentary evidence was presented and no witnesses recalled whether the Pathfinder then underwent [***]. At some point after Mr. Marilao's search, however, the FP&F division of Customs oversaw the towing and subsequent storage of the Pathfinder. Id. at 452:25-453:9. Mr. Fanning, an FP&F Officer, id. at 448:6, testified that "EG&G was the national storage contractor," id. at 453:3-4, that Customs used at the time the Pathfinder was seized, and that American Towing was a subcontractor to EG&G, id. at 453:3-4. EG&G "contracted with American Towing to perform their towing services and their storage services." Id. at 453:8-9.

The involvement of FP&F in the forfeiture process began with receipt of Customs' "[***]," JX 54 ([***]) 1-14, which was written by Special Agent Hall after he received "all the facts concerning the seizure and the individual [Mr. Jimenez]," Tr. 455:5-6. Included in that report is a description of the seizure and information about Mr. Jimenez, JX 54 ([***]) 1-4, a "[***]," id. at 5; see also Tr. 455:21-25, a chain of custody form for the marijuana seized from the Pathfinder, JX 54 ([***]) 6; Tr. 456:2-4, and a seizure report, JX 54 ([***]) 7-14; Tr. 456:5-16.

EG&G prepared a series of documents regarding the Pathfinder when performing its towing and storing responsibilities for Customs. See JX 4 ([***]) passim. EG&G filled out a "[***]" form, JX 4 ([***]) 4, which Mr. Fanning testified is "used to document the condition and inventory of the vehicle," Tr. 463:21-22. Box 15D of that form asks for descriptions of "interior damage" to the upholstery, floor cover, head liner, and other areas of the vehicle. JX 4 ([***]) 4. A handwritten "ok" follows after each item on the lines provided for the descriptions. Id. Mr. Fanning testified that, according to EG&G, the interior of the car was "ok" at the time that EG&G took possession of it. Tr. 464:17-24. Mr. Fanning stated that sometimes EG&G would perform a "very basic maintenance plan," Tr. 471:25, and he testified that, per the "[***]" form included in JX

4 ([***]) 7, "it looks like the vehicle came in, they did some work to it, and they charged us for that," Tr. 472:13-14; see JX4 ([***]) 7. The work charged for on the form contained in JX4 ([***]) 7 included the following: "Check tire pressures and inflate to specifications;" "Remove trash and perishables from interior and storage compartments;" "Roll windows up;" and "Lock doors." JX4 ([***]) 7.

After the Pathfinder was put into storage, EG&G filled out its "[***]" form. Tr. 475:14-16; see JX4 ([***]) 12. Mr. Fanning testified that the Customs officer, at the seizure of the vehicle, "is required to provide an appraised value that the agency says it's worth X amount of dollars," Tr. 475:18-19, and that "that value is essentially a book value, . . . a Kelley Blue Book or an NADA book that says it's a certain type of car, certain year, certain amount of miles, and those are usually the factors involved," id. at 475:20-24. He further stated:

> Then the contractor is required to do what we call a fair market value and that's what they believe it's going to catch - it would fetch in the marketplace if they were to sell it. And so their number is typically different from ours. As you can see [referring to JX4 ([***]) 12], we appraised it at [$]5,000 in block number five, and then they - they looked at the car and applied their experience plus they looked at any damage, dents, dings, and all that sort of stuff, and then they come up with their value which looks to be - it looks to be that either the - [$]3,050 or the [$]3150.

Id. at 476:7-17. Box 22 of the form lists the "Initial FMV [Fair Market Value]" at $3,050, and Box 23 lists the "Adjusted FMV" at $3,150. JX4 ([***]) 12. Mr. Fanning testified that the initial FMV value represents the value assigned to the vehicle "shortly after they [EG&G] receive the vehicle," Tr. 476:24-25, and that the adjusted FMV represents the value of the vehicle "prior to sale," id. at 477:3. Mr. Fanning was unable to explain why the adjusted FMV was higher than the initial FMV for the Pathfinder. Id. at 478:9-17. Nevertheless, the actual price for which a vehicle sold is the important figure because EG&G then deducts the storage and maintenance costs from the auction proceeds. Id. at 484:4-9. Mr. Fanning testified:

> So, for example, if the car sold for a thousand dollars, then you have the sale of the vehicle minus . . . storage costs and all that other stuff. And then you do the math and then that's what the Government ends up with.

Id. When asked if the government receives less money from the sale of a vehicle when more services are performed on the vehicle by EG&G prior to sale, Mr. Fanning answered, "Absolutely." Id. at 484:15-18.

On September 6, 2001, American Towing, which is a subcontractor to EG&G, moved the Pathfinder to the auction lot, which was controlled by the McCormack Auction Company. JX 4 ([***]) 2. There was no witness testimony that the Pathfinder, once at the auction lot, was [***]. Mr. Fanning testified that it was his understanding that "[***]." Tr. 495:3-6. Additionally, based on testimony by Deputy Hood and Mr. Marilao, it appears to the court that defendant's policy in 2001 was [***]. See id. at 218:11-22; 425:8-426:9. Speaking from his experience as a Canine Officer, Mr. Marilao testified about [***]:

> Q: Okay. And the purpose of the [***] is to search for any drugs that might still be in the vehicles [***]?
> A: Yes.
> Q: And you personally have found additional drugs in some of the cars [***]; is that correct?
> A: Yes.
> Q: And you're aware of circumstances where other inspectors have found drugs [***] in the vehicles?
> A: Yes. Usually it's canine officers. I haven't had the experience with the inspectors going down to find other narcotics, but I have heard of that.
> Q: Okay. So normally [***]?
> A: Yes.
> Q: Okay. Was it your understanding that the [***] was to try to make sure that the vehicles did not contain drugs when a person thereafter bought them at the auction?
> A: Yes.

Id. at 425:11-426:9. Mr. Fanning underscored Mr. Marilao's testimony regarding the purpose of the [***]:

> Q: And is the purpose of that [***] to make sure that there were no more narcotics in the vehicles before it was sold?
> A: Yes.
> Q: If there are narcotics in the vehicle, then Customs won't sell them; right?
> A: At that time, correct.
> Q: Is there - is there a time when they will sell cars with narcotics?
> A: Well, they'll - I mean, if they - if they - the dog alerts on narcotics, then they'll search the vehicle and if they're satisfied that they've removed all of the narcotics, then we will sell the vehicle. Whether that occurs on the

same day, you know, prior to that sale and in time for that vehicle to go to sale or not depends on the situation.
Q: Because the United States doesn't want to sell vehicles that have narcotics in them?
A: That would be a - yes.

Id. at 495:7-25. Mr. Fanning further testified that another purpose of the [***], although not the primary purpose, is to protect the purchasing public. Id. at 496:1-497:20. He stated that "our purpose for searching vehicles is to ensure that we've interdicted and got all of the drugs out of the vehicle," id. at 496:4-7, and that "when we get to point of sale, obviously we want all of that removed out of the vehicle so that when we sell the vehicle, it doesn't have drugs in it," id. at 496:12-15 (emphasis added).

At the auction, the Pathfinder was sold to plaintiff for $2,600. Id. at 51:17-25; JX9 (Disposition Order) 1. EG&G documented the sales price in a form admitted to the court as JX9 (Disposition Order) 1. Tr. 488:9-490:4; see JX9 (Disposition Order) 1.

### D. Whether a Contract Arose Between Plaintiff and Defendant When Plaintiff Purchased the Pathfinder from Defendant

The court previously ruled that a contract did in fact arise between plaintiff and defendant when plaintiff purchased the pathfinder. Agredano I, 70 Fed. Cl. at 571-73. Specifically, the court defined the written portion of the contract as both the document that transferred title of the Pathfinder from defendant to plaintiff and the Bidder Registration Form to which plaintiff agreed by signing. Id. at 571-72. The Bidder Registration Form provided that the signer "'agree[s] to comply with the terms of sale contained in the sale catalog for this sale and all future sales I attend.'" Id. at 567. "The sale catalog state[d,] in pertinent part: 'WARRANTY/GUARANTEE: All merchandise is sold on an "AS IS, WHERE IS" basis, without warranty or guarantee as to condition, fitness to use, or merchantability stated, implied or otherwise. Please bid from your personal observations.'" Id. (discussing what is referred to as the "as is" clause).

The court also held in its Opinion of March 27, 2006 that "the plain meaning of the 'as is' clause limits its scope to the construction, maintenance, and mechanical operation of the vehicle and does not cover a situation in which 'the vehicle had been modified in a way that had no effect on its ability to function for transportation' by 'introduc[ing] an attribute not ordinarily associated with [the vehicle's ability to function for transportation].'" Id. at 70 Fed. Cl. at 572 (quoting Rodriguez v. United States, 69 Fed. Cl. 487, 498 (2006)). Accordingly, the law of the case is that the "as is" clause in the contract does not preclude the existence of a possible implied-in-fact warranty in this case because

the "as is" clause does not cover a situation in which defendant sells the Pathfinder with concealed contraband to plaintiff. See id. The law of the case was further supported by the testimony of Gabriel Calderon, who accompanied plaintiff to the auction lot when plaintiff purchased the Pathfinder, and testified that they were unable to inspect the interior of the car before purchasing it. Tr. 524:5-16. Gabriel Calderon stated that, prior to the auction, "the car was locked," id. at 524:7-8, and that he could only "[see] it [the interior of the Pathfinder] from the outside," id. at 524:8. He "saw that it looked fine, that nothing was broken like other cars," id. at 524:8-10, and that the only irregularity "was that the gasoline tank had been removed and it was in the back of the car, in the trunk," id. at 524:10-12. Other than the gas tank, the Pathfinder "looked in perfect condition." Id. at 524:16.

Plaintiff in fact did not understand the "as is" clause to cover the existence of concealed narcotics in the Pathfinder when he purchased the vehicle. See id. at 56:14-59:1. Indeed, plaintiff testified that he understood the "as is" clause to cover circumstances such as a faulty engine or transmission:

> Q: Were you aware that you were purchasing the vehicle "as is"?
> A: Yes.
> Q. And what did that - what did you understand "as is" to mean?
> A: Well, they on one occasion said that the vehicles were auctioned as they were, "as is." And they made reference to the fact that they didn't assume any responsibility if the engine was shot or the transmission didn't work.

Id. at 56:11-20.

Even if plaintiff and Gabriel Calderon had been able to inspect the interior of the car, the testimony at trial established that they, as lay people, would have been unlikely to discover the contraband themselves. Robert Bickers, a supervisor for Customs, id. at 261:13-18, trains new inspectors to conduct vehicle searches for Customs, id. at 262:23-24. Mr. Bickers testified that one would need training before discovering concealed contraband in a vehicle:

> Q: And does it take a certain amount of training to be able to detect hidden narcotics in the vehicles that were coming through the border?
> A: Initial training. Then experience is the best knowledge.
> Q: Is it something you expect a layperson to be able to do?
> A: After - after some training, yes.
> Q: But they would need some training?
> A: Yes.

Id. at 268:23-269:7. Joseph Marilao, the officer who conducted the secondary inspection of the Pathfinder, see JX 1 (Vehicle Inventory) 1, also testified that one would need to be trained to discover concealed narcotics in a vehicle:

> Q: And would you agree that thoroughly searching a vehicle for hidden compartments takes a level of specialized training and experience?
> A: Yes.
> Q: [I]t's not something you expect a layperson to be able to do?
> A: Yes. That's correct.
> Q: Some of the compartments are really sophisticated?
> A: They can be. Yes.
> Q: And you wouldn't expect a layperson to find something unless it was obvious[,] correct?
> A: Yes.

Tr. 423:4-16.

At trial, Mr. Ahern stated that the "as is" clause was not related to defendant's responsibility to conduct thorough searches of seized vehicles. He testified that the goal of the policy of Customs to search vehicles was to retrieve "all the narcotics:"

> Q: Did the fact that the vehicles were offered for sale as is, as a policy maker, in your mind did the fact that they're being sold as is relieve the United States of any of its responsibilities to conduct a thorough search of the vehicle before the sale?
> A: Again, I want to go back to the answer that I've given on what our reasons were for conducting the inspection. The goal, again, that I had set for the people that were within my area of responsibility was to make sure we retrieved all of the narcotics at every opportunity that we had, at the port of entry and certainly as we were out at the seized property locations. That was my goal. . . . [T]he goal that I had set for our officers [was] to make sure that all the narcotics were seized prior to the sale, I mean, it was to give every opportunity for us to retrieve all the narcotics. That is my goal. It was not necessarily to relieve the government, or this organization, or Customs at the time, of any liability. It was to make sure that, again, we seized all the narcotics that may have been present in those vehicles.
> Q: So your responsibility stayed the same whether the vehicle was sold as is or not, correct?
> A: My goals and the policy direction I set was to retrieve the narcotics.

> Q: Right. And the fact that the vehicle was sold as is didn't make a bit of difference to that particular goal?
> A: That would be correct.

Tr. 597:18-599:1. The evidence at trial is consistent with the court's earlier holding that the "as is" clause does not preclude the existence of an implied-in-fact warranty, Agredano I, 70 Fed. Cl. at 572, and demonstrates as well that, as a matter of fact, plaintiff could not reasonably have been expected to discover hidden narcotics in the Pathfinder.

E. Whether Defendant Violated an Implied-in-Fact Warranty When It Sold the Pathfinder to Plaintiff

Plaintiff argues that an implied-in-fact warranty existed within the contract that arose between plaintiff and defendant when plaintiff purchased the Pathfinder from defendant. Pl.'s Br. 10. Plaintiff asserts that the implied-in-fact warranty represented that the Pathfinder had been subject "to a reasonable search for contraband before it was sold to the public at the auction sale and that "reasonable efforts had been made to remove narcotics from the seized and forfeited vehicle before it was released for sale to [plaintiff]." Id. Defendant counters that plaintiff has not satisfied his burden in proving the existence of an implied-in-fact warranty. Def.'s Br. 13. Defendant argues that, in order to prove the existence of an implied-in-fact warranty, plaintiff "must prove 'facts that show or suggest in some manner an agreement between the parties, a meeting of the minds and a mutual consent to be bound.'" Id. at 14 (emphasis omitted) (quoting Shaw v. United States, 8 Cl. Ct. 796, 799 (1985)).

1. Whether Defendant Represented That the Pathfinder Was Free of All Contraband

Plaintiff argues that the context of the sale of the Pathfinder "created an affirmative representation that the [Pathfinder] had been subjected to a reasonable search for contraband." Pl.'s Br. 12. Specifically, plaintiff asserts that it was defendant's responsibility to remove all contraband from the vehicle and that plaintiff's belief that all contraband had been removed was a reasonable presumption because the auction was sponsored by Customs. Id. at 12-13. Defendant counters that plaintiff's "assumption that, because the United States was selling the vehicle, it must be free of all contraband . . . falls far short of establishing facts and circumstances that would evidence a mutual intent to agree to the asserted implied warranty." Def.'s Br. 16.

The officers and agents of Customs are tasked with the duty to identify and remove all contraband from vehicles that cross into the United States. As the court described in

Part III.B.2, see supra Part III.B.2, a series of directives tasked the officers and agents of Customs with exactly that duty. JX 39 (U.S. directives) 1-82. Additionally, the uncontroverted testimony of numerous Customs witnesses confirmed that Customs officers and agents were responsible for removing all contraband from vehicles seized at the border. For example, Deputy Hood confirmed that the policy at the San Ysidro port of entry was that the vehicles "were to be free of contraband, we were to remove all the contraband from the vehicle." Tr. 236:21-22. He also testified that getting "all of the drugs out of the vehicle" was "our job." Id. at 208:12-13. Mr. Murphy stated that "we would do our best to make sure that we had searched that vehicle systematically to remove whatever contraband was in the car." Id. at 318:5-7. He further stated that the "hope" was that the contraband would be removed "so it's not there when the vehicle is sold." Id. at 318:10-12. Other employees confirmed that Customs' "goal" was to remove all contraband from the vehicle. See id. at 272:4-13 (Bickers) (confirming that "our goal" was to sell conveyances that were free of all contraband); 378:16-19 (Nunez) (confirming that she understood that [***] were "to make sure there were no drugs in the vehicles before they were sold"); 383:3-6 (Nunez) (stating that "the point of [***] [was] [to make] sure that we didn't leave no drugs in the vehicle").

Mr. Marilao testified that his responsibility with regard to the Pathfinder was to remove the contraband. Id. at 401:17-402:3. As the "seizing inspector," he was "the one that's responsible for seizing the contraband out of the vehicle." Id. at 401:23-24. When asked what his responsibilities were in the position of seizing inspector, he responded, "To take the contraband out of the vehicle and turn it over to be stored." Id. at 402:2-3. Plaintiff's counsel then asked, "Are there any obligations for searching connected with the seizing inspector role?" Id. at 402:4-5. Mr. Marilao answered, "Yes. . . . They have to go ahead and do the inspection of the vehicle and take all the contraband out of the vehicle." Id. at 402:6-10 (emphasis added). Further, Mr. Marilao testified that the [***] were "to try to make sure that the vehicles did not contain drugs when a person thereafter bought them at the auction." Id. at 426:6-8. Mr. Fanning confirmed Mr. Marilao's understanding of the [***] by agreeing that "the purpose of that [***] [was] to make sure that there were no more narcotics in the vehicles before it was sold." Id. at 495:7-9.

Ms. Nunez, who also works as a Seizing Officer, id. at 369:7-370:22, confirmed Mr. Marilao's understanding of Customs' policy to remove all contraband from a seized and forfeited vehicle, id. at 394:13-16. She testified that the purpose of the policy of removing all contraband from a vehicle was to ensure that the vehicle was not sold with contraband. Id. at 394:5-9 (agreeing with the statement that "the purpose of [***] was to make sure that when they were sold, there was no packages left in them").

Mr. Root, a Canine Enforcement Supervisor, id. at 643:9-23, also testified that the purpose of [***] was to remove all of the contraband from the vehicles. Id. at 652:11-20. He stated that [***] "to make sure that we removed or got all the contraband out of the vehicles." Id. at 652:13-14. He agreed that another purpose of [***] was "to make sure you have all the narcotics or whatever the contraband may be out of the vehicle before it's sold." Id. at 652:18-20. Mr. Root expanded upon his testimony during cross-examination:

> Q: You testified earlier that you understood that the purpose of [***] was to make sure that the vehicles were free of contraband by the time they were sold or something to that effect. Is that right?
> A: That's right.
> Q: Why do you understand that to be the policy?
> A: Well, as an officer of the U.S. Customs Service[,] it was one thing we don't want to do is be selling vehicles with contraband still left in them. That would not look good for the Department. In a lot of cases there were thresholds on narcotic weights. I can't recall exactly how they were, but it might be if it's a first time smuggler and there might be a threshold saying that if it's less than 100 pounds of marijuana the federal government won't try the case, or they'll turn it over to the state, or something along those lines, or if it's a second time offense for this individual and then if it's 100 pounds or more then definitely he's going to do a lot more time in prison and so forth. So[,] if you've taken marijuana out of a vehicle, and have only gotten like 67 pounds, and you stop let's say at the gas tank and didn't search anything else, this particular smuggler goes to court and that's all he had was 67 pounds, that may have not hit the threshold to keep them in prison longer, if at all. So it's necessary to get everything out of these vehicles if possible because you don't know the consequences of what it could mean for the agent, and the Courts and so forth in the system. That and the fact that I would say it's embarrassing to the Customs Services to, you know, sell a vehicle that has narcotics already in it. I mean, we're supposed to be getting narcotics off the street and not giving it to the public.

Id. at 658:19-660:5 (emphasis added).

According to the documentary evidence before the court and the trial testimony of numerous Customs employees, it is clear to the court that a stated goal of Customs' procedures regarding seized vehicles is to remove all contraband from a vehicle prior to sale. That goal is the actual standard that defendant set for itself. Defendant is responsible for "getting narcotics off the street and not giving it to the public." Id. at 660:4-5. The government has that responsibility because only the government may possess illegal

narcotics. Private individuals are barred from possessing illegal narcotics. It is the responsibility of defendant to seize "all" illegal narcotics from vehicles forfeited by private individuals. Defendant's conduct of the sale, in particular, the fact that defendant provided no warning about the possible presence of narcotics in vehicles, demonstrates defendant's own belief that it had successfully carried out its policy of removing all narcotics.

2. Whether Plaintiff Reasonably Assumed That the Pathfinder Was Free of All Contraband

The court now turns to the other contracting party in the transaction that led to Customs' transferring ownership of the Pathfinder to plaintiff: the plaintiff buyer. Plaintiff argues that he held a subjective belief, "consistent with that of a reasonably prudent person . . . [,] that since the vehicles were being sold by the [United States], they had been searched and did not contain large quantities of narcotics." Pl.'s Br. 12. Indeed, plaintiff testified that, when he purchased the Pathfinder at the auction, he was not concerned that it may contain contraband:

> Q: When you decided to purchase the Pathfinder, did you have a concern that it might still have drugs in it left by the previous owner?
> A: No.
> Q: Why not?
> A: Because I was buying it from a country that has - that I supposed had high technology, the latest technology, and that it was impossible for it to have any problem.
> Q: What type of technology are you referring to?
> A: Well, the same - you know, when I cross into the United States, there is a great deal of inspection, there are dogs, and then there is a Secondary Inspection. And I imagine that, there, they had equipment to check it.
> Q: When you bought the Pathfinder, were you under the impression that it had been checked for contraband or drugs?
> A: I felt 100 percent sure, safe.
> Q: Why?
> A: Because what I just said, that I was buying it from the [U.S.] Government itself.

Tr. 58:4-59:1. Plaintiff also testified that no announcements or warnings regarding the vehicles' seizure histories or potential to contain contraband were made prior to the auction. Id. at 52:19-21.

Gabriel Calderon, who was with plaintiff when he bought the Pathfinder, testified that he had a similar understanding to that of plaintiff:

> Q: When you were at the auction, did you have an understanding of where the vehicles had come from?
> A: It was my understanding that the cars had been confiscated or seized by the Government of the United States.
> Q: Did you know anything about the history of the Pathfinder?
> A: No, never.
> Q: Were you worried that it might have drugs in it?
> A: No.
> Q: And why not?
> A: Well, because if the Government of the United States was selling it, it was logical that it had been thoroughly inspected.

Id. at 525:21-526:10.

The materials distributed to potential buyers at the auction identified the auction as a Customs-sponsored event. Customs itself advertised the auction as a Customs-affiliated event. See JX 5 (auction flyer) 1. The flyer used to announce the auction was entitled "U.S. Customs & Combined Agency Public Vehicle Auction." Id. Further, the bidder registration form, which was provided to potential and actual purchasers, was entitled "EG&G Technical Services Inc., U.S. Customs Service Support, Bidder Registration Form." JX 6 (Bidder Registration Form) 1. The document that transferred title from Customs to the purchaser, the "Certificate to Obtain Title to a Vehicle," JX 7 (Certificate to Obtain Title to a Vehicle) 1, identified defendant as the owner of the vehicle until transfer of title is complete:

> The undersigned Department or Agency of the United States Government certifies that the vehicle described herein, the property of the United States Government, has been transferred this 5th day of September 2001, to the Transferee designated herein; and that this is the first transfer of such vehicle in ordinary trade and commerce subsequent to acquisition thereof by the United States Government.

Id. (emphasis added). The back of that same document reiterates that the vehicle is government property prior to transfer to the purchaser: "This certificate constitutes an official transfer of the vehicle described hereon, and formally evidences its release from the custody of the United States Government to the designated transferee." Id. at 2 (emphasis added).

Plaintiff demonstrated at trial that he believed that the Pathfinder was in fact free of contraband when he bought it, Tr. 58:4-59:1, and Gabriel Calderon confirmed that belief, id. at 525:21-526:10. The court determines that plaintiff's belief was reasonable. By selling the Pathfinder, which then belonged to the United States government, see JX 7 (Certificate to Obtain Title to a Vehicle) 1-2, at an auction sponsored by the United States government, JX 5 (auction flyer) 1, defendant represented to potential buyers that the Pathfinder did not contain any contraband. Because defendant works to remove illegal narcotics from the hands and property of private individuals and because only defendant may possess illegal narcotics, it was reasonable for plaintiff to assume as a fact that defendant would not sell a vehicle containing illegal narcotics to a private individual.

An implied-in-fact warranty is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Baltimore & Ohio R.R., 261 U.S. at 597. In Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp. (Ryan), 350 U.S. 124 (1956), the United States Supreme Court held that an implied-in-fact warranty existed when the petitioner stevedoring contractor agreed to perform all of the respondent shipowner's stevedoring operations without signing a formal stevedoring contract or an express indemnity agreement. Ryan, 350 U.S. at 126, 1. When one of the shipowner's longshoreman severely injured his leg - while unloading cargo that the stevedoring contractor had loaded onto the ship - and subsequently sued the shipowner, the shipowner filed suit against the stevedoring contractor for indemnification. Id. at 126-28. The Supreme Court held that the parties' "uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded . . . necessarily includes [the stevedoring contractor's] obligation not only to stow the [cargo], but to stow [it] properly and safely." Id. at 133 (emphasis added). The Court further stated:

> Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract.

Id. (emphasis added).

When plaintiff purchased the Pathfinder from defendant, both parties had the same expectation: that the Pathfinder was free of all contraband. That mutual and common expectation is the "meeting of minds" within this contract. Much like the parties in Ryan, who expected the stevedoring contractor not only to load the shipowner's ship but to load

it "properly and safely," Ryan, 350 U.S. at 133, the parties in this case expected to transfer ownership of the Pathfinder free of any contraband. Defendant's conduct that showed its "tacit understanding" of this warranty was repeatedly demonstrated by defendant's written policies, by the testimony provided by defendant's agents, and by the fact that the circumstances of the sale suggested absolutely no uncertainty on the part of the government that the Pathfinder was free of contraband. That documentary and testimonial evidence proved that the "purpose" of defendant's search procedures was to remove all contraband from seized and forfeited vehicles prior to sale. Selling a vehicle that contains illegal narcotics to a private individual after having seized the vehicle and having been in possession of the illegal narcotics contradicts defendant's stated goal of removing "all" contraband. The conduct of the sale - with no warning to the public or opportunity for the public to inspect the vehicles - makes clear that defendant assumed as a fact that the vehicles it sold were free of narcotics. Defendant has a duty to "[get] narcotics off the street and [not to give] it to the public." Tr. 660:4-5. Plaintiff was reasonable in assuming, as a fact, that the Pathfinder did not contain any contraband because, as a private individual, it is illegal for him to possess contraband. Defendant did not meet its own standard of clearing "all" contraband from the Pathfinder before selling the Pathfinder to plaintiff. Defendant violated the implied-in-fact warranty, evidenced by the circumstances of the sale, that the Pathfinder was free of contraband when it sold the Pathfinder with seventeen kilograms of marijuana to plaintiff.

### F. Whether Defendant Violated the Doctrine of Superior Knowledge and Breached Its Contract with Plaintiff

Plaintiff argues that defendant violated the doctrine of superior knowledge when it did not disclose to plaintiff that a "policy/rumor/suggestion to 'minimize damage' during searches to preserve 'resale value' (which increased the risk that 'large loads' of drugs remained in the vehicles at the time of sale)" allegedly existed. Pl.'s Br. 21. Plaintiff asserts that, had the government disclosed this information to plaintiff, "the value of the conveyance would have been decreased but [plaintiff] would have been aware of the risk and taken proper steps to protect himself if he decided to proceed with the sale." Id. Defendant counters that the doctrine of superior knowledge is inapplicable to this case: it claims that plaintiff has not proven the government's withholding of a fact because plaintiff failed to prove that a policy to curtail searches in fact existed. Def.'s Reply 9. Defendant further argues that the doctrine is strictly limited to the disclosure of facts that affect performance costs and that "the only cost component of the contract [in this case] is the price of the property purchased." Id.

Plaintiff presents the testimony of Mr. Marilao, the seizing officer who searched the Pathfinder, as evidence that defendant had a policy to minimize damage during its vehicle

searches in order to obtain a high resale value of those vehicles at auction. During direct examination by plaintiff's counsel, Mr. Marilao stated that there was a policy at the San Ysidro point of entry to minimize damage to seized vehicles for purposes of reselling the vehicles at the auctions. Tr. 427:23-429:9. He agreed with plaintiff's counsel that his supervisors had instructed him and other seizing officers "to minimize the damage for a vehicle for resale purposes." Id. at 428:21-22; see also id. at 429:22. He also agreed with plaintiff's counsel's statement that "the inspectors were told that they - that when they inspect the vehicles, not to cause extensive damage because the vehicles were going to go into auction." Id. at 429:1-4. Mr. Marilao admitted that "because this [minimizing damage] would make the car worth more at auction, sometimes [he] would do [his] best to minimize the damage during a search." Id. at 429:6-8. During cross-examination, Mr. Marilao reiterated that the policy was a "policy to minimize damages for purposes of resale," not "a policy simply to minimize damage." Id. at 431:11-13. However, he then appeared to contradict his earlier statements, testifying that the officers' attempts to minimize damage to the vehicles was "[n]ot necessarily," id. at 431:17, always for the purposes of resale. He further stated that he did not "curtail [his] own searches pursuant to this policy to a degree where [he was] skipping things that [he] would normally do," id. at 432:17-19, and that, if he had to cut up a seat in order to search for contraband, he would do so, id. at 432:21-23.

As discussed in Part III.A.3, the superior knowledge doctrine provides that, where the government has vital information about the transaction or object of the transaction, knows that its contracting partner has no knowledge of and no reason to obtain such information, misleads its contracting partner as to that information, or fails to put its contracting partner on notice to inquire, and does not provide the relevant information, the government has breached the contract. GAF Corp., 932 F.2d at 949.

However, not all information that could be or is withheld by a party would implicate the superior knowledge doctrine. In Hercules, the Federal Circuit noted that the doctrine concerns only "the withholding of superior knowledge that makes it more difficult to perform under the terms of the contract at issue." Hercules, 24 F.3d at 197 (emphasis added). Hercules involved plaintiff chemical companies seeking indemnification for a settlement suit into which they had entered with veterans allegedly injured by the use of Agent Orange during the Vietnam War. Id. at 191-93. Because the government had knowledge of the health risks associated with chemicals contained in Agent Orange, the plaintiffs argued, the government should indemnify the plaintiffs for the costs and attorneys fees of litigating the veterans' suit. Id. at 193-94. The Federal Circuit ruled against the Hercules plaintiffs because it found that "nothing the government did or failed to do had any impact upon [plaintiffs'] production of Agent Orange." Id. at 197.

In Helene Curtis Industries, Inc. v. United States (Helene Curtis), 312 F.2d 774 (Ct. Cl. 1963), the Court of Claims, the predecessor to this court, held that the defendant United States Army, did violate the doctrine of superior knowledge when it withheld specialized knowledge of the manufacturing method necessary to produce chlormelamine, a disinfectant chlorine powder, and about the product itself. Helene Curtis, 312 F.2d at 777-78. The defendant had solicited a bid for chlormelamine to be used as a disinfectant for army gear in the Korean War, id. at 775-76, without providing certain information about the product and the methods used to manufacture it, id. at 778. The plaintiff, who had submitted the lowest bid based upon a belief that chlormelamine could be made simply by mixing various ingredients, was awarded the contract and incurred $90,000 more in costs because it discovered that grinding was necessary to make the product meet defendant's solubility specifications. Id. at 776. The Court of Claims ruled in favor of the plaintiff and held that the government failed to disclose its knowledge of the difficulties in producing chlormelamine and that it had even implied that grinding would not be necessary. Id. at 778.

Similarly, in Hardeman-Monier-Hutcherson v. United States (Hardeman), 458 F.2d 1364 (Ct. Cl. 1972), the Claims Court held that defendant, the United States Navy, violated the doctrine of superior knowledge when it awarded a contract to the plaintiff contractor that included construction of a pier at a site marred by "unpleasantly rough sea[s]." Hardeman, 458 F.2d at 1365, 1372. When the plaintiff had submitted its bid to defendant, the plaintiff had requested copies of the defendant's reports that divulged the statistics for the tidal streams and winds of the proposed pier's location. Id. at 1367. The defendant denied the plaintiff's request, id., and "[t]he invitation for bids contained no affirmative representation as to the winds, tide, currents or sea condition other than the statement that there were occasional cyclones," id. at 1369. Because the plaintiff did not have time within the bidding period to perform an adequate investigation of the proposed pier site, the plaintiff underestimated the amount of time it would take to complete performance of the contract. Id. at 1367-68. The Court of Claims found that the defendant had a duty to disclose its superior knowledge regarding the conditions at the proposed pier site, and it held that the defendant's failure to disclose that knowledge constituted a breach of contract. Id. at 1372.

It is not clear, however, that the superior knowledge doctrine addresses information of the type alleged by plaintiff to exist in this case. The knowledge that the defendants withheld in Helene Curtis and Hardeman involved specialized, scientific information that was determined and documented by the government. See Helene Curtis, 312 F.2d at 777-78; Hardeman, 458 F.2d at 1365-66.

Even if the superior knowledge doctrine were applicable to the information allegedly withheld in this case, plaintiff was unable to produce any evidence demonstrating that the rumored policy to minimize searches for the sake of resale values was an official policy of Customs or even that the rumor was widespread within Customs. On the contrary, several Customs agents testified that no such policy existed. Chief Jose Perez, a Supervisor within Customs, Tr. 725:17, stated at trial that he never heard an instruction at San Ysidero to curtail searches in order to increase the resale prices of vehicles, that he never heard a rumor to that effect, and that he never instructed anyone to curtail their searches for that reason, id. at 728:21-729:10. He further specified that, as Supervisor to Mr. Marilao, he never "instructed Joseph Marilao to curtail his searches so that the resale prices at auction would be higher." Id. at 729:11-14. He went on to say:

> [Customs] would never say well, we're concerned about the resale value of a seized vehicle so don't search it, or don't do this, or don't do that. Our job is to get all the drugs out of a vehicle by whatever means possible. . . . The goal is to get all the drugs out of a vehicle. I could say that I don't think too many Customs Officers . . . would care at all what the resale value of a vehicle would or would not be.

Id. at 729:19-730:24. Deputy Hood also testified that he has never heard of defendant's "engag[ing] in a practice of curtailing its searches of seized vehicles in order to increase the resale prices of those vehicles when they were sold at public auction," id. at 243:23-244:1, that he had never been instructed to curtail searches for that reason, id. at 244:4-8, and that he himself had never curtailed the searches of vehicles for any reason, id. at 244:9-16. Additionally, Mr. Bickers denied ever hearing the rumor, id. at 282:3, and Mr. Root stated that he "never" heard that rumor, id. at 663:19. Mr. Root further testified that "[m]oney [the resale price] was never an issue," id. at 664:4-5, and that he does not care for what price a vehicle sells because his "job is to make sure that the narcotics everywhere in that vehicle wherever it's found is removed before it's sold at auction," id. at 664:18-21.

Even if the superior knowledge doctrine were applicable, plaintiff did not prove facts sufficient to support a claim that defendant violated the doctrine of superior knowledge. Because plaintiff failed to prove that defendant had a policy to "'minimize damage' during searches to preserve 'resale value,'" Pl.'s Br. 21, much less withheld knowledge of such policy, the court finds that the doctrine of superior knowledge is inapplicable to this case.

G. Whether Defendant Violated the Implied Covenant of Good Faith and Fair Dealing When It Sold the Pathfinder to Plaintiff

In Agredano I, when defendant moved for summary judgment as to plaintiff's claim that defendant violated the implied covenant of good faith and fair dealing, the court ruled:

> The court declines to grant defendant's motion for summary judgment as to its claim that defendant did not breach the covenant of good faith and fair dealing. It may be that plaintiffs can prove that the government failed to conduct an adequate search for the purpose of obtaining a higher resale value for the vehicle at auction. This could be a case of the government's appropriating profits to itself at the expense of its contracting partner in direct contravention of the covenant of good faith and fair dealing. See Centex, 395 F.3d at 1305.
>
> Or, if plaintiffs prove that they could not have discovered the hidden contraband in the circumstances of the auction sale, and that the government had a policy to search thoroughly any vehicles seized because they contained narcotics, but that the government acted in direct contravention of its stated policy, plaintiffs may be able to show that the government had a duty to notify plaintiffs of the government's failure to search the vehicle thoroughly or a responsibility to put plaintiffs on notice that it would be their responsibility to inspect the vehicle for contraband and to allow them the opportunity to conduct a meaningful inspection.

Agredano I, 70 Fed. Cl. at 574.

1. Whether Defendant Had a Policy to Curtail Searches of Vehicles In Order to Obtain a Higher Resale Value

Plaintiff argues that defendant violated the covenant of good faith and fair dealing because defendant "failed to conduct an adequate search of the Pathfinder . . . [f]or the purpose of obtaining a higher resale value for the vehicle at auction." Pl.'s Br. 26 (emphasis omitted). However, as discussed in connection with plaintiff's claim under the superior knowledge doctrine in Part III.F above, plaintiff failed to prove the existence of a policy of minimizing damage to obtain a higher resale value or that such a motive affected the search of the Pathfinder. See supra Part III.F. The court notes that several Customs agents, including Customs inspectors and directors, testified that, had the Pathfinder undergone a thorough, [***], the marijuana left in the Pathfinder would have been discovered. See Tr. 276:20-24 (Bickers) ("Q: And if there were 35 pounds of marijuana on the interior of the car, do you - would you expect that it should be found during that process? A: Thirty-five pounds of marijuana should be found during that process. Yes."); id. at 333:22-334:1 (Murphy) ("Q: How about 35 pounds of marijuana; would you

expect that a thorough inspection of the interior to detect that? A: I would hope that if you followed all the procedures, that you would find that amount. Yes."); id. at 379:15-22 (Nunez) ("Q: Would you expect that if all of the searches were done in the way you were trained on the Pathfinder in this case, that - and if the Pathfinder had 37 pounds of marijuana in it at the time of the search, that it would be found by the inspectors if they had done all the searches the way they were supposed to be done? A: Correct."); id. at 237:25-238:7 (Hood) ("Q: If a [***] is conducted thoroughly, would you expect that they would find an amount of marijuana that was, say, 35 pounds? . . . . [A:] I would expect that I would find it. I don't know about other officers. I would expect I would. I can only speak for myself."); id. at 605:22-606:2 (Ahern) ("Q: What if the marijuana was in the door, and the wheel wells and under the seat? Would those be areas you would expect them to find if they were conducting a thorough and adequate [***]? A: I would think so, yes.").

The court does not know how Customs missed the contraband in the Pathfinder that resulted in plaintiff's arrest, incarceration, and injuries. However, the court cannot conclude, based on the preponderance of the credible evidence, that the reason for the failure was the government's intent to obtain a higher resale value for the Pathfinder. The preponderance of the evidence presented at trial simply does not support the allegation. See supra Part III.F. Thus, the court cannot find a violation of the covenant of good faith and fear dealing based on the allegation that the government failed to conduct an adequate search for the purpose of obtaining a higher resale value.

2. Whether Defendant Acted in Direct Contravention of Its Stated Policy

The court now turns to plaintiff's alternative theory that defendant may have violated the implied covenant of good faith and fair dealing if plaintiff proves: 1) that he could not have discovered the hidden contraband himself; 2) that the government had a policy to search thoroughly any vehicles seized because they contained narcotics; and 3) that the government acted in direct contravention of its stated policy. With regard to the first element, it is clear to the court that it was impossible for plaintiff to discover the contraband himself prior to his purchase of the Pathfinder. See supra Part III.D. When plaintiff first saw the Pathfinder on the auction lot, and before he decided to bid on it, the Pathfinder was locked and plaintiff was unable to open the doors. Tr. 53:14-16. The first time plaintiff was able to get inside of the Pathfinder was "[a] day after it was bought." Id. at 55:12. Gabriel Calderon, who accompanied plaintiff to the auction, confirmed plaintiff's testimony that it was impossible to inspect the interior of the car. Id. at 524:5-527:11. He stated that "the car was locked," id. at 524:7-8, when he and plaintiff viewed it before bidding at the auction. He further stated that he was not able to open the doors to

the Pathfinder and to get inside of it until the day after plaintiff purchased it. Id. at 526:21-23.

Furthermore, even if plaintiff had been able to inspect the interior of the Pathfinder prior to bidding on it at the auction, it is highly unlikely that, as a layperson with no training in searching for contraband in seized vehicles, plaintiff could have discovered the narcotics himself. See supra Part III.D. Several Customs agents testified that no layperson could discover hidden contraband within a vehicle. Mr. Bickers agreed that training and experience were required in order "to detect hidden narcotics in the vehicles that were coming through the border," Tr. 268:24-25, and that a layperson would only be able to detect hidden narcotics in a vehicle "after some training," Tr. 269:5. Mr. Marilao confirmed Mr. Bickers' testimony by agreeing "that thoroughly searching a vehicle for hidden compartments takes a level of specialized training and experience," id. at 423:4-6, which is something that one cannot "expect a layperson to be able to do," id. at 423:8-9. Accordingly, the court finds that the first element of its inquiry, that plaintiff could not have discovered the contraband on his own, is satisfied.

With regard to the second element of the court's inquiry, "that the government had a policy to search thoroughly any vehicles seized because they contained narcotics," Agredano I, 70 Fed. Cl. at 574, the court has already determined that defendant certainly had such a policy, see supra Part III.B. Thus, the court now turns to the third and final inquiry: whether the government acted in direct contravention of its stated policy.

The Federal Circuit held in Centex that the government breached a contract with corporate plaintiffs when Congress enacted certain tax legislation. Centex, 395 F.3d at 1314. The case arose out of the savings and loans crisis in which "[t]he government sought to mitigate the effects of the crisis in the industry by inducing healthy financial institutions to take over troubled [savings and loan associations] in order to avert their collapse." Id. at 1287. The plaintiffs had entered into one such takeover arrangement that provided that the government would provide tax benefits to the plaintiffs in consideration of their bailing out troubled associations. Id. at 1287-88. Soon thereafter, Congress enacted new tax legislation that "had the effect of disallowing such institutions from claiming deductions for the built-in losses on assets covered by the . . . assistance agreements." Id. at 1289. The Federal Circuit affirmed the ruling by the Court of Federal Claims, holding that "an implied promise of good faith and fair dealing . . . was breached when Congress passed the targeted legislation that effectively appropriated to the government a substantial portion of the benefits that the plaintiffs reasonably expected from the operation of the Agreement." Id. at 1314.

Plaintiff sets forth two allegations in support of his claim that defendant acted in direct contravention of its stated policy. Pl.'s Br. 26-27. First, plaintiff points to the alleged rumor that seizing officers were directed to minimize damage during searches of seized vehicles in order to retain the resale value of the vehicles. Id. at 26. Second, plaintiff claims that the difficulties he and his attorneys faced when requesting the photographs taken by Customs after the Pathfinder had been seized demonstrate that "the government, knowingly and without reasonable justification, withheld relevant information from its contracting partner ([plaintiff])." Id. at 27.

The court has already examined plaintiff's claim regarding the alleged rumor and determined that the documentary evidence presented at trial and the testimony provided by numerous witnesses do not support plaintiff's claims. See supra Part III.F. Unlike the circumstances in Centex, in which the defendant performed an action, enacting new tax legislation, that directly contravened what it had promised to the Centex plaintiffs, see Centex, 395 F.3d at 1314, the allegation of an unsubstantiated rumor does not rise to the level of direct contravention. The court therefore concludes that the possible existence of an alleged rumor to minimize damage to vehicles during searches is not an action taken by defendant that directly contravenes defendant's stated policy to search all vehicles thoroughly.

With regard to plaintiff's allegation that defendant withheld evidence from plaintiff by not initially submitting to plaintiff all of the photographs of the Pathfinder taken by Customs, the court understands how plaintiff's suspicions could have arisen. When plaintiff's criminal attorney in Mexico was unable to retrieve photographs of the Pathfinder from the government, he enlisted the assistance of plaintiff's counsel in the United States. Tr. 144:24-145:4; see JX 60 (Mr. Mejia's FOIA request) 1-10. On April 5, 2002, plaintiff's counsel sent a letter to the Office of the Special Agent in Charge, c/o Freedom of Information Act/Privacy Act. JX 59 (plaintiff's counsel's FOIA request) 1-4. The letter requested "any and all photographs taken in connection with the seizure of a 1987 Nissan Pathfinder . . . from Jose Jimenez Coronel in January of 2001 as further described in the Custody Receipt for Retained or Seized Property attached hereto." Id. at 1. On April 8, 2002, Customs responded to plaintiff's counsel with a letter that included the following paragraph:

> There exists eight (8) pictures in our file. Pursuant to the above referenced telephone conversation, please be advised that six (6) enclosed pictures are provided in response to your request. One (1) picture is non-responsive, and one (1) picture is being withheld pursuant to 5 U.S.C. [§] 552(b)(7)(c).

JX 14 (Response to plaintiff's counsel's FOIA request) 1. Juliet Calip, a paralegal specialist for the United States Immigration and Customs Enforcement (ICE), testified that she had prepared that response to plaintiff's counsel's initial FOIA request. Tr. 682:17-23. She explained that 5 U.S.C. § 552(b)(7)(c) concerns "invasion of privacy," id. at 684:8-10, and that she withheld one of the photographs, which depicted an interior view of the Pathfinder from the passenger's side, for the reason that "a person's face" was in it, id. at 690:24-25; see JX 15 (Response to Mr. Mejia's FOIA request) 20 (showing the redacted version of the photograph with the person's face blacked out). She stated that she found the other photograph, which depicted an entirely interior view of the back seat of the Pathfinder, see JX 15 (Response to Mr. Mejia's FOIA request) 24, non-responsive to plaintiff's counsel's request because "[t]here were no pictures of any drugs in that picture, and it was asking about pictures of drugs in a wheel well and in the car, and that exact picture had pictures of items that were not drugs, and they were inside a car, so it was determined as non[-]responsive," Tr. 684:14-19.

The court does not understand why the photograph of the back seat of the Pathfinder was deemed non-responsive to plaintiff's counsel's FOIA request. The letter sent by plaintiff's counsel requested the following:

> Without waiving any rights to seek additional documentation in the future, this is to request a copy of any photographs of the Pathfinder, the marijuana found in the Pathfinder, or any other photographs from the above referenced seizure file.

JX 59 (plaintiff's counsel's FOIA request) 1 (emphasis added). The court understands that sentence to request clearly three types of photographs: 1) any photographs of the Pathfinder; 2) any photographs of the marijuana found in the Pathfinder; and 3) any other photographs contained in the seizure file maintained by Customs. Ms. Calip testified that eight photographs were contained in the seizure file, Tr. 704:16-18, yet she only sent six photographs to plaintiff's counsel, JX 14 (Response to plaintiff's counsel's FOIA request) 4-9.

Ms. Calip did not send the two additional photographs, which depicted the interior of the Pathfinder, to plaintiff's counsel until a local news anchorwoman made a similar FOIA request. Tr. 690:15-691:14; 697:8-11; see JX 15 (Response to Mr. Mejia's FOIA request) 1-24.[6]

---

[6]Ms. Calip testified that, after the news anchorwoman filed a Freedom of Information Act (FOIA) request for the photographs of the Pathfinder taken by Customs, she was instructed by

(continued...)

Although plaintiff's difficulty in obtaining the photographs and Ms. Calip's non-responsive testimony raise concerns about defendant's responsiveness to plaintiff's FOIA requests, plaintiff has not demonstrated any connection between ICE and Customs in this matter. Plaintiff presented no evidence demonstrating that ICE and Customs had worked together in order to prevent plaintiff from receiving photographs of the interior of the Pathfinder. Nor did plaintiff's evidence prove that defendant intended to act in direct contravention of its stated policy to remove all contraband from the Pathfinder. The court finds that defendant did not violate the implied covenant of good faith and fair dealing when it sold the Pathfinder to plaintiff.

## IV. Damages

"A cause of action for damages arises upon the breach of a contract." 17A Am. Jur. 2d Contracts § 707 (2008). As Professor Corbin has stated:

> One who commits a breach of contract must make compensation to the injured party. In determining the amount of this compensation as the "damages" to be awarded, the aim in view is to put the injured party in as good a position as that party would have been in if performance had been rendered as promised.

11-55 Corbin on Contracts § 55.3 (rev. ed. 2008). Putting "the injured party in as good a position as that party would have been in if performance had been rendered as promised" is the general principal underlying expectation damages. See id. Section 347 of the Restatement (Second) of Contracts provides the general rule of expectation damages:

> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by
>
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

[6](...continued)
Customs' "headquarters and legal counsel," Tr. 690:22-23, to send a redacted version of the photograph that contained an agent's face, id. at 690:23-691:4. She was then instructed to send the redacted photograph to Mr. Mejia. Id. at 691:5-7. In her response to Mr. Mejia's request, Ms. Calip also included the picture of the interior of the Pathfinder, which she had not included in her response to plaintiff's counsel's request. Compare JX 15 (Response to Mr. Mejia's FOIA request) 17-24 with JX 14 (Response to plaintiff's counsel's FOIA request) 4-9.

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

Restatement (Second) of Contracts § 347 (1981).[7] The Federal Circuit has confirmed the purpose of expectation damages: "[e]xpectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position he would have been had the contract been performed." S. Cal. Fed. Sav. & Loan Assoc. v. United States (S. Cal Fed.), 422 F.3d 1319, 1334 (Fed. Cir. 2005) (citing Bluebonnet Sav. Bank, F.S.B. v. United States (Bluebonnet), 266 F.3d 1348, 1355 (Fed. Cir. 2001)). The Federal Circuit has further held that a three-prong inquiry underlies the awarding of expectation damages:

> Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.

---

[7]In addition to the Restatement (Second) of Contracts (1981), the Federal Circuit sometimes looks to the Uniform Commercial Code (U.C.C.), which governs contracts for sales of goods, see U.C.C. § 2-102 (2004), as a point of reference in adjudicating contract disputes, see, e.g., Metro. Area Transit, Inc. v. Nicholson, 463 F.3d 1256, 1260 (Fed. Cir. 2006); Cruz-Martinez v. Dep't of Homeland Sec., 410 F.3d 1366, 1371 (Fed. Cir. 2005); Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1328 (Fed. Cir. 2003). However, the Federal Circuit has observed that "Congress has not applied the Uniform Commercial Code to federal contracts." GAF Corp. v. United States, 932 F.2d 947, 951 (Fed. Cir. 1991). The contract at issue in GAF Corp., however, was not one in which the United States sold goods to a private buyer. See id. at 948. The court is not aware of any case in which the Federal Circuit has ruled on the applicability of the U.C.C. to sales of goods by the government to a private buyer, but the United States Supreme Court has held that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579 (1934). If the U.C.C. were to apply to the sales of goods by the government to a private buyer, the U.C.C. would provide additional authority under which the court may award damages to plaintiff. See U.C.C. §§ 2-711, 2-715. According to the U.C.C., if a seller fails to perform a contractual obligation, see U.C.C. § 2-711(1), the buyer may "recover damages for breach with regard to accepted goods," id. § 2-711(2)(f), and may also "recover damages in any manner that is reasonable under the circumstances," id. § 2-711(2)(j). Further, the buyer is entitled to recover for "injury to person or property proximately resulting from any breach of warranty" in the form of consequential damages. Id. § 2-715(2)(b). Given the uncertainty as to the applicability of the U.C.C. to this case, the court conducts its damages analysis under the guidelines provided by the Restatement (Second) of Contracts as interpreted and applied by the Federal Circuit.

Bluebonnet, 266 F.3d at 1355 (citing Restatement (Second) of Contracts §§ 347, 351-52 (1981)).

With regard to foreseeability, the Federal Circuit looks to the Restatement (Second) of Contracts for guidance. See Bluebonnet, 266 F.3d at 1355; Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001). Section 351 of the Restatement concerns "Unforeseeability and Related Limitations on Damages:"

> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
>
> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>
> (a) in the ordinary course of events, or
>
> (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.
>
> . . . .

Restatement (Second) of Contracts § 351. The losses suffered by plaintiff were foreseeable to defendant because those losses "follow[] from the breach in the ordinary course of events." See id. Defendant breached its contract with plaintiff when it sold to plaintiff the Pathfinder containing seventeen kilograms of marijuana. See supra Part III.E. It was foreseeable to defendant that, by selling a vehicle containing contraband, the buyer of that vehicle would be at risk for arrest and imprisonment. Only defendant may legally possess contraband, a fact that is evidenced by defendant's policies to retrieve all contraband from seized vehicles. See id. Although the particular circumstances of this case may be unique, it is within the "ordinary course of events" that a vehicle containing contraband would be seized by law enforcement officials and that the owner of the vehicle would be arrested, convicted, and imprisoned. That is exactly what happened to plaintiff, supra Part II.A, and the court determines that the events were foreseeable to defendant at the time defendant sold the Pathfinder to plaintiff. Included in the foregoing are the damages that could reasonably be expected to be incurred in connection with imprisonment: legal fees, additional expenses of family members directly related to plaintiff's imprisonment, plaintiff's lost income, and the costs of the medical treatment for plaintiff's injuries and illnesses caused by the imprisonment.

The second prong in the inquiry regarding expectation damages concerns causation. In order to determine the causal relationship between a breach of contract and a party's losses, the Federal Circuit has set forth two standards: the "substantial factor" theory and the "but for" theory. Citizens Fed. Bank v. United States (Citizens), 474 F.3d 1314, 1318 (Fed. Cir. 2007). The "substantial factor" theory of causation provides that a plaintiff may recover damages where a defendant's breach of a contract "was a substantial factor in causing the damages." Id. The "but for" theory of causation provides that "a 'plaintiff can only recover those items of damage which are the proximate result of the acts of the [g]overnment.'" Id. (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). Ultimately, it is within the discretion of the trial court to determine which standard to apply: "the selection of the appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." Id.

The court finds that a causal relationship exists between defendant's breach of contract and plaintiff's losses under either the "substantial factor" or "but for" theories of causation. Each and every item of monetary damages that plaintiff seeks to recover, described in detail below, stems directly from defendant's breach of the contract with plaintiff. Plaintiff's physical and mental health problems, financial woes, and the costs incurred by his family are all direct and foreseeable results of defendant's breach. Defendant breached its contract with plaintiff when it sold the Pathfinder to plaintiff with seventeen kilograms of marijuana contained inside of it. See supra Part III.E. Because of defendant's breach, plaintiff was arrested, charged with possession of illegal narcotics, found guilty, and imprisoned for one year. See supra Part II.A. The health and financial problems that plaintiff has dealt with during his imprisonment and since his release are directly related to defendant's breach. Defendant is therefore responsible for the consequences of plaintiff's imprisonment. Under the "substantial factor" test, defendant's breach was not only a substantial factor - but also the critical factor - in causing the damages: had defendant not sold the Pathfinder with contraband to plaintiff, plaintiff would not have been arrested and imprisoned. Similarly, under the "but for" test, "but for" defendant's breach, plaintiff would not have been arrested and imprisoned. In either case, had plaintiff not been arrested, he would not face the health and financial problems that he has encountered and will continue to encounter. Thus, the court finds that defendant's breach of contract was both a "substantial factor in causing [plaintiff's] damages," see Citizens, 474 F.3d at 1318, and that plaintiff's damages "are the proximate result of the acts of the [g]overnment," see id.

With regard to the third and final prong, whether the damages are proved with reasonable certainty, the court notes that the parties have stipulated to the monetary amounts for damages regarding plaintiff's health and financial losses. See Stipulations of Fact (Stip.) 6-7. Based on the stipulations, together with extensive testimony, including

testimony by both percipient witnesses and qualified experts, see Tr. 754:17-822:14, detailed below, the court concludes that the damages sought by plaintiff are fair and reasonable. The court finds that plaintiff is entitled to expectation damages because of defendant's breach of contract.

A. Plaintiff's Health

In the parties' Stipulations of Fact, the parties stipulate that "plaintiff's total medical expenses are $10,000" and that "plaintiff's total psychiatric expenses are $12,500." Stip. 6. Defendant states, with respect to each amount, that it "neither concedes that this amount is recoverable as damages in this case, nor stipulates that this category of alleged damages was foreseeable." Id. Because the court has determined that plaintiff's medical costs were foreseeable consequences of defendant's breach and are recoverable by plaintiff, see Part IV, the court accepts the monetary amounts set forth by the parties for the medical costs already incurred by plaintiff. However, because plaintiff requests additional damages to cover the costs of his future medical and psychiatric treatments, Pl.'s Br. 39-40, the court now turns to testimony provided by plaintiff's doctors at trial.

Prior to his imprisonment, plaintiff did not suffer any of the health problems that he developed in prison and continues to suffer to the present day. See Tr. 768:16-769:1 ("The change was evident in [plaintiff]. The change was evident. The change between before he was in prison and after he was in prison, so the fact that he was in prison modified his factors, his life."); id. at 816:18-22 (testimony of Dr. Miguel Lizarraga that plaintiff's imprisonment "triggered the illnesses that he has currently and the ones that were formed"). About six or seven months after entering prison, plaintiff was visited by his doctors, id. at 79:5-9, and three of those doctors presented testimony at trial.

Dr. Jesus Manuel Cesea Caro, a medical doctor, visited plaintiff in prison on July 29, 2002. Id. at 757:12-16; JX 33 (Dr. Cesea's medical report) 3. Dr. Cesea found plaintiff to be "very nervous, depressed, obe[se]." Tr. 757:19; JX 33 (Dr. Cesea's medical report) 1. He concluded that plaintiff was nervous because of his "[i]nsomnia and crying crises." Tr. 759:9; JX 33 (Dr. Cesea's medical report) 1. Dr. Cesea also noted that plaintiff "was suffering from diarrhea, headache, problems on his skin[,] and difficulty of not being able to keep [up his] personal hygiene." Tr. 761:10-12; JX 33 (Dr. Cesea's medical report) 2-6. Dr. Cesea testified that the lack of personal hygiene probably led to plaintiff's skin ailments, including itching and fungi, Tr. 761:15-16, and to increased cavities in his teeth, id. at 762:8-14. Dr. Cesea diagnosed plaintiff as obese, and, due to plaintiff's added weight and inability to exercise, plaintiff also suffered from articular pain in his knees, id. at 762:18-763:3, from becoming out of breath after a small amount of exercise, id. at 763:19-23, and from "insufficiency of veins," id. at 766:7-8. The prognosis

that Dr. Cesea provided at the time was that plaintiff was at risk "to suffer a cardiac problem and emotional disorders." Id. at 767:17-18; JX 33 (Dr. Cesea's medical report) 2. Since plaintiff's release from prison, Dr. Cesea has seen plaintiff several times. Tr. 767:25-768:7. He currently treats plaintiff for diabetes, a condition that Dr. Cesea stated was caused by plaintiff's weight gain in prison. Id. at 769:6-15.

Dr. Hector Santillana, a psychiatrist, examined plaintiff in prison in August 2002. Id. at 772:20-21; 778:7-9. Dr. Santillana conducted the psychiatric exam both by conducting a direct psychiatric exam and by questioning plaintiff. Id. at 779:1-2. The exam gauges the patient's "[p]resentation, demeanor, body appearance, conscious state, adaptability, memory, reasoning, orientation, productivity, and consciousness of mental illness." Id. at 779:1-7. Dr. Santillana testified that, when he examined plaintiff, he found plaintiff to be unkempt in appearance and to have a depressed demeanor, which was evidenced by plaintiff's "crying easily, tiredness, [and] lack of interest [in life]." Id. at 780:4-6; 780:7-10; 780:22. Dr. Santillana diagnosed plaintiff with major depression, which is the highest grade of depression. Id. at 785:23-786:2; JX 30 (Dr. Santillana's psychiatric report) 10. More specifically, Dr. Santillana determined that plaintiff's depression was reactive and recurrent. Tr. 785:24; JX 30 (Dr. Santillana's psychiatric report) 10. "Reactive" means that an external cause prompted the depression, Tr. 786:4-8, and "recurrent" indicates that the depression can come and go in cycles, id. at 786:20-787:5. Dr. Santillana testified that the external cause to plaintiff's depression was "[h]is mistreatment and his confinement," Tr. 786:11; JX 30 (Dr. Santillana's psychiatric report) 8-9, something the doctor classified as "[a] serious external cause," Tr. 789:11. Dr. Santillana also diagnosed plaintiff as being claustrophobic, the "fear [of] being locked up or enclosed," id. at 786:15-16, which the doctor determined "[b]cause of [plaintiff's] anguish and desperation," id. at 786:19. Plaintiff exhibited physical characteristics that Dr. Santillana understood to be indicative of psychiatric conditions. Id. at 788:3-4 (stating that "[a] doctor used to say that when the hurt is not released in tears, it makes other organs cry."). Dr. Santillana found that plaintiff did not have a regular pulse, had chest pains and variation in his blood pressure, was obese, and suffered from a fungus infection. Id. at 788:7-19. In terms of plaintiff's functioning ability, Dr. Santillana graded plaintiff a score of forty on a 100-point scale promulgated by the American Society of Psychiatry. Id. at 789:18-790:14; JX 30 (Dr. Santillana's psychiatric report) 10. If someone is rated at 100 percent, that person is "totally well . . . with no psychiatric issues." Tr. 790:17-18. Dr. Santillana also noted that plaintiff harbored "[f]rank [s]uicide [i]deas," JX 30 (Dr. Santillana's psychiatric report) 10, because plaintiff preferred "to die [rather] than [be] in prison," Tr. 791:18-19.

With regard to treatment options for plaintiff's psychiatric condition, Dr. Santillana testified that plaintiff should be hospitalized for approximately two weeks. Id. at 792:19-

24. Dr. Santillana stated that the cost of hospitalization in Tijuana, Mexico is between $4,000 to $5,000 per week. Id. at 793:3-9. After a period of hospitalization, plaintiff would then require out-patient therapy for five years or more, for which Dr. Santillana estimated costs to be between $5,000 to $10,000 per year. Id. at 793:10-15.

Dr. Miguel Lizarraga is a medical doctor, id. at 798:1, with a speciality in treating obesity, id. at 799:4-8. Dr. Lizarraga examined plaintiff in prison in August of 2002. Id. at 801:18-23. Dr. Lizarraga conducted a clinical examination, which included recording plaintiff's heredity information and health history, physically examining plaintiff, and making a diagnosis. Id. at 802:3-11. Plaintiff reported to Dr. Lizarraga that, since entering prison, he suffered from nasal bleeding, headaches, cough, thoracic pain, chest pain, fever, nasal congestion, earache, eye pain, and throat pain. Id. at 803:9-11; JX 31 (Dr. Lizarraga's medical report) 1. Plaintiff also reported suffering from insomnia, shortness of breath, weight gain, pain in his teeth, feeling a burning sensation while urinating, numbness in his legs and hands, inflammation of his legs and ankles, pain in his shoulders, arms, and knees, diarrhea, abdominal pain, and depression. Tr. 803:19-807:18; JX 31 (Dr. Lizarraga's medical report) 1-2. Dr. Lizarraga diagnosed plaintiff as suffering from an emotional disorder, Tr. 810:2-3; JX 31 (Dr. Lizarraga's medical report) 4-5, "morbid obesity with a severe risk of cardiovascular illness," Tr. 810:5-6; JX 31 (Dr. Lizarraga's medical report) 4, dermatitis, JX 31 (Dr. Lizarraga's medical report) 4, conjunctivitis, JX 31 (Dr. Lizarraga's medical report) 4, hypertension, Tr. 812:9-14, and gastroenteritis, JX 31(Dr. Lizarraga's medical report) 4, which is an infection associated with diarrhea, nausea, and vomiting, id. at 811:21-24. Dr. Lizarraga concluded that plaintiff's health problems stemmed from his "being charged with and consequently becoming a victim of an injustice," that is, that plaintiff's imprisonment caused plaintiff's health disorders. Id. at 814:17-815:2; JX 31 (Dr. Lizarraga's medical report) 5-6.

Dr. Lizarraga testified that the treatment that plaintiff requires, "a treatment with a group of medical scientists specialized in multi-disciplinary [treatment]" can cost over $100,000 in the United States. Tr. 817:4-7. He stated that similar treatment, which includes "endocrinologists, . . . [a] rheumatologist, cardiologist, and nutritionist," id. at 817:11-5, would cost about twenty percent less in Mexico, id. at 821:22-23, which would be $80,000.

Based on the parties' stipulations and the testimony provided at trial, the court awards to plaintiff the following medical expenses incurred and to be incurred: $10,000 for plaintiff's medical bills to date; $80,000 for plaintiff's future medical treatments;

$12,500 for plaintiff's psychiatric bills to date; and $46,500 for plaintiff's future psychiatric treatment.[8]

B. Plaintiff's Finances

Plaintiff seeks to recover the fair market value of the Pathfinder, the attorneys fees he incurred to obtain his freedom in Mexico, and the income he lost during the year of his imprisonment. Pl.'s Reply 18-19. The parties stipulated that the fair market value of the Pathfinder is $2,600, that plaintiff's criminal attorneys fees are $350,000, and that plaintiff's lost income is $48,000. Stip. 6. After each stipulation, defendant states that it "neither concedes that this amount is recoverable as damages in this case, nor stipulates that this category of alleged damages was foreseeable." Id. Because the court has determined that the value of the Pathfinder, criminal attorneys fees, and lost income were foreseeable consequences of defendant's breach and are recoverable by plaintiff, see Part IV, the court accepts the monetary amounts to which the parties have stipulated. Thus, the court awards the following to plaintiff: $2,600 for the value of the Pathfinder; $350,000 for the criminal attorneys fees incurred by plaintiff; and $48,000 for the income lost by plaintiff during his imprisonment.

C. Costs and Expenses Incurred by Plaintiff's Family

Plaintiff seeks to recover "[t]he costs and expenses incurred by his family members to bring him supplies while he was imprisoned." Pl.'s Br. 39; Pl.'s Reply 18. The parties stipulated that "[e]xpenses in the amount of $1,254.00 were incurred when . . . plaintiff's wife traveled to see . . . plaintiff while he was incarcerated." Stip. 6. Defendant states that it "neither concedes that this amount is recoverable as damages in this case, nor stipulates that this category of alleged damages was foreseeable." Id. Because the court determined that the costs incurred by plaintiff's family were foreseeable consequences of defendant's breach and are recoverable by plaintiff, see Part IV, the court awards $1,254 for costs and expenses incurred by plaintiff's family.

D. Emotional Distress

---

[8]Dr. Santillana testified that plaintiff's psychiatric treatment should entail two weeks of hospitalization and five years or more of ambulatory care. Tr. 792:1-24. He stated that hospitalization costs between $4,000 and $5,000 per week, and that ambulatory care costs between $5,000 to $10,000 per year. Id. at 792:19-793:15. The court arrives at $46,500 as a final sum by taking the median amount for each treatment - $4,500 per week for hospitalization and $7,500 per year for ambulatory care - and multiplying those figures by the time advised by Dr. Santillana for each treatment - two weeks and five years, respectively. The total is $46,500.

Plaintiff states in briefing that he is entitled to recover "emotional distress damages in an amount which the Court deems reasonable compensation for the arrest and imprisonment of [plaintiff] for a period of 351 days." Pl.'s Reply 19. Plaintiff argues that his emotional distress includes, but is not limited to, "suicidal thoughts . . . [,] serious and life[-]threatening physical injuries and diseases . . . [,] anguish, loss of liberty, stress, embarrassment, humiliation, loss of reputation, fear, anxiety, depression, sorrow, pain, discomfort, uncontrolled crying and emotional breakdowns post[-]traumatic stress disorder, and other related emotional injuries, phobias, and disabilities . . . ." Id. at 19-20. However, the court does not believe it is in a position to determine from scratch, as it were, a "reasonable compensation" for "emotional distress" as requested by plaintiff. The court is awarding plaintiff damages intended to address, as supported by testimony and the parties' stipulations, the costs of remedying the physical, psychiatric, and financial injuries plaintiff suffered as a proximate result of defendant's breach. The court does not find that an additional award has been supported by plaintiff.

## V. Conclusion

For the foregoing reasons, the court determines that defendant breached its contract with plaintiff when defendant sold plaintiff the Pathfinder with seventeen kilograms of marijuana hidden inside. Defendant is directed to pay to plaintiff $10,000 for the medical bills plaintiff incurred from the injuries and illnesses resulting from his imprisonment; $80,000 for the medical expenses it is reasonably foreseeable that plaintiff will incur in the future as a result of the injuries and illnesses he suffered resulting his imprisonment; $12,500 for the psychiatric bills plaintiff has incurred as a result of the psychiatric ailments that his imprisonment caused; and $46,500 for psychiatric expenses it is reasonably foreseeable that plaintiff will incur as a result of his imprisonment; $2,600 for the fair market value of the Pathfinder; $350,000 for attorneys fees incurred by plaintiff during his criminal proceedings in Mexico; $48,000 for the income plaintiff lost during his imprisonment; and $1,254 for the costs and expenses incurred by plaintiff's family in bringing supplies to plaintiff while he was imprisoned. The Clerk of the Court is directed to ENTER JUDGMENT for plaintiff in the amount of $550,854.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge